Dennis F. Dunne (*pro hac vice* pending)
Risa M. Rosenberg (*pro hac vice* pending)
**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219
ddunne@milbank.com
rrosenberg@milbank.com

Andrew M. Leblanc (*pro hac vice* pending)
**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586
aleblanc@milbank.com

Louis R. Strubeck, Jr.
State Bar No. (19425600)
William R. Greendyke
State Bar No. (08390450)
**FULBRIGHT & JAWORSKI L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200
lstrubeck@fulbright.com
wgreendyke@fulbright.com

ATTORNEYS FOR ALLEGED DEBTORS

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § § § | **Involuntary Chapter 11** |
| VITRO ASSET CORP. | § | Case No. 10-47470-rfn-11 |
| VITRO CHEMICALS, FIBERS & MINING, LLC | § | Case No. 10-47472-dml-11 |
| VITRO AMERICA, LLC | § | Case No. 10-47473-dml-11 |
| TROPER SERVICES, INC. | § | Case No. 10-47474-rfn-11 |
| SUPER SKY PRODUCTS, INC. | § | Case No. 10-47475-dml-11 |
| SUPER SKY INTERNATIONAL, INC. | § | Case No. 10-47476-rfn-11 |
| VVP HOLDINGS, LLC | § | Case No. 10-47477-dml-11 |
| AMSILCO HOLDINGS, INC | § | Case No. 10-47478-rfn-11 |
| B.B.O. HOLDINGS, INC. | § | Case No. 10-47479-dml-11 |
| BINSWANGER GLASS COMPANY | § | Case No. 10-47480-rfn-11 |
| CRISA CORPORATION | § | Case No. 10-47481-rfn-11 |
| VVP FINANCE CORPORATION | § | Case No. 10-47482-dml-11 |
| VVP AUTO GLASS, INC. | § | Case No. 10-47483-dml-11 |
| V-MX HOLDINGS, LLC | § | Case No. 10-47484-rfn-11 |
| VITRO PACKAGING, LLC | § | Case No. 10-47485-rfn-11 |
| **Alleged Debtors.** | § § | **Joint Administration Requested** |

**OBJECTION OF ALLEGED DEBTORS TO EMERGENCY MOTION OF DISSIDENT
MINORITY NOTEHOLDERS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C.
§§ 105(a) AND 303(f) RESTRAINING ALLEGED DEBTORS' USE OF PROPERTY**

TO THE HONORABLE RUSSELL F. NELMS,
UNITED STATES BANKRUPTCY JUDGE:

Vitro Asset Corp. (f/k/a American Asset Holdings Corp.), Vitro Chemicals, Fibers & Mining, LLC, Vitro America, LLC, Troper Services, Inc., Super Sky Products, Inc., Super Sky International, Inc. VVP Holdings, LLC, Amsilco Holdings, Inc, B.B.O. Holdings, Inc., Binswanger Glass Company (f/k/a Troper Inc.), Crisa Corporation, VVP Finance Corporation, VVP Auto Glass, Inc., V-MX Holdings, LLC (f/k/a Crisa Holdings Corp.), and Vitro Packaging, LLC (collectively, the "Alleged Debtors"), wholly-owned indirect subsidiaries of Vitro, S.A.B. de C.V. ("Vitro SAB"), solely in their capacity as alleged debtors in the above-captioned involuntary chapter 11 cases, by and through the special appearance of their attorneys, hereby submit this objection (the "Objection") to the emergency motion (the "Motion" or "Mot.") of petitioners Knightland Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund L.P., and Lord Abbett Bond-Debenture Fund, Inc. (collectively, the "Dissident Minority Noteholders") seeking entry of an order, pursuant to sections 105(a) and 303(f) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), restraining the Alleged Debtors' use of property, and in support thereof respectfully state as follows:

## PRELIMINARY STATEMENT

The Dissident Minority Noteholders -- who in the aggregate hold approximately $75 million, *or a mere six percent*, of Vitro SAB's $1.2 billion of outstanding unsecured senior notes[1] -- have unjustifiably imposed on this Court by hauling the Alleged Debtors into court on shortened notice to address, on an emergency basis, their supposed concern with the leakage of

---
[1] To the extent the Dissenting Minority Noteholders purport to act for a larger group of noteholders, they have not made the disclosures required by Rule 2019 of the Federal Rules of Bankruptcy Procedure (as

the Alleged Debtors' asset value outside the United States. *The simple fact is there is no emergency that requires action by this Court.* The Motion fails to identify any transfers or actions that pose an imminent threat to the Alleged Debtors or their creditors, and is completely devoid of any rational explanation demonstrating -- and legal authority supporting -- why the requested "emergency" measures are either necessary or appropriate.

In fact, the Motion appears to be little more than a thinly-veiled attempt by a group of disgruntled minority creditors to use the involuntary chapter 11 process to interrupt the valid and consensual restructuring under **Mexican law** of a **Mexican company** that is not before this Court. After two years in financial limbo following the global recession of 2008, Vitro SAB, a multi-billion dollar **Mexican corporation** and the indirect parent of each Alleged Debtor, has developed a consensual plan to restructure more than $1.5 billion of its indebtedness (the "*Concurso* Plan") through a tender offer, exchange offer and consent solicitation (collectively with the tender offer, the "Exchange Offer and Consent Solicitation") followed by a prepackaged *concurso mercantil* proceeding in **Mexico**. The tail would truly be wagging the dog if the Dissident Minority Noteholders are permitted to impede the consensual restructuring of billions of dollars of Vitro SAB's indebtedness in the name of preventing a transaction by the Alleged Debtors that would not occur for months and not until it has been reviewed by, at least, the **Mexican court** in approving the *Concurso* Plan. Moreover, such a result is completely at odds with principles of international comity and the well-established public policy of favoring out-of-court restructurings.

Were the Court to grant the relief sought by the Motion, it would only condone the Dissident Minority Noteholders' abuse of the bankruptcy process and permit them to exercise

---

amended, the "Bankruptcy Rules") and, therefore, are not properly before this Court.

undue influence and gain leverage in the current restructuring process. Indeed, the only logical reason that the Dissident Minority Noteholders have commenced involuntary cases against the Alleged Debtors and filed the Motion is because they believe that Vitro SAB's proposed restructuring will ultimately be supported by a majority of its creditors and be consummated under Mexican law. To the extent that the Dissident Minority Noteholders dislike Vitro SAB's proposed restructuring, they can exercise their bargained-for rights and express their displeasure through their votes, but they must not be allowed to attack Vitro SAB's restructuring through an abuse of the bankruptcy process in the United States.

Furthermore, taking the Motion at face value and ignoring its purpose as a pretext for larger disruption, the broad relief requested therein is unsupported and unsupportable. Pursuant to section 303(f) of the Bankruptcy Code, the Dissident Minority Noteholders ask that the Court require the Alleged Debtors to obtain prior approval before (i) engaging in ***any*** action that would materially affect their capital structure, including the participation in any out-of-court restructuring, or (ii) transferring ***any*** assets currently located in the United States to a location outside the United States. Apart from conjecture, however, the Motion fails to identify any actual transfer or action by the Alleged Debtors that poses any threat to the Dissident Minority Noteholders, let alone an ***imminent*** threat. In fact, upon closer examination, the Dissident Minority Noteholders attempt to justify their Motion by pointing to certain actions required of the Alleged Debtors under Vitro SAB's *Concurso* Plan actually backfires. Specifically, as explained clearly in the Solicitation Statement (as defined below and which the Dissident Minority Noteholders attached to their Motion), the Alleged Debtors are not being solicited at all, and the proposed issuance of new guarantees by the Alleged Debtors under the *Concurso* Plan will not take place for ***several months*** at the earliest, and then only ***after*** the *Concurso* Plan

3

has been voted on and accepted by creditors in accordance with *Ley de Concursos Mercantiles* and then approved the Mexican court.

Likewise, the Dissident Minority Noteholders have failed to demonstrate any risk of loss from extraterritorial transfers of assets by the Alleged Debtors, let alone a sufficient risk to justify the significant burden that their relief would place on the Alleged Debtors. While the requested relief might have little effect on a typical domestic entity, the Alleged Debtors are subsidiaries of an international enterprise based in Mexico and, as such, regularly engage in various intercompany transfers with Vitro SAB and its Mexican and other non-U.S. subsidiaries in the ordinary course of business and on ordinary business terms. In fact, certain of the Alleged Debtors' very business purpose is to distribute and sell products in the United States on behalf of their Mexican affiliates, which necessarily involves the transfer of products into and cash proceeds out of the country. Others act as sales representatives or purchasing agents for affiliates in Mexico, providing goods or services and receiving payment in return. Thus, the relief requested in the Motion would significantly impair the ordinary course, day-to-day operations of the Alleged Debtors. The Dissident Minority Noteholders have made no showing that transfers between the Alleged Debtors and their foreign affiliates will divest the Alleged Debtors of assets to the detriment of their creditors. To the contrary, the relief requested by the Motion would actually harm all creditors of both Vitro SAB and the Alleged Debtors by placing a stranglehold on the companies' ability to continue operations and carry out the consensual restructuring of their debt under Mexican law. To avoid this anomalous result, the Motion must be denied.

**BACKGROUND**[2]

**A.     Alleged Debtors' Business**

1.      The Alleged Debtors are subsidiaries of Vitro SAB, a corporation organized under the laws of Mexico, which is the ultimate parent holding company for an international enterprise of wholly-owned direct and indirect subsidiaries (together with Vitro SAB, "Vitro"). Vitro is the largest manufacturer of glass containers and flat glass in Mexico. Sol. Stmt. at 22. It has manufacturing facilities in 11 countries and distribution centers throughout the Americas and Europe, and it exports its products to more than 50 countries worldwide. As of December 31, 2009, Vitro employed 16,807 personnel, approximately 81% of whom were located in Mexico. See Sol. Stmt. at 138.

2.      Vitro's operations are organized into two business units: (1) the Glass Containers business unit and (2) the Flat Glass business unit, representing approximately 52% and 48%, respectively, of Vitro's consolidated net sales in 2009. Sol. Stmt. at 22. Alleged Debtors Vitro Packaging, LLC, Vitro Chemicals, Fibers & Mining, LLC, V-MX Holdings, LLC, Amsilco Holdings, Inc. and B.B.O. Holdings, Inc. are members of Vitro's Glass Containers Business, while Alleged Debtors Crisa Corporation, VVP Holdings, LLC, VVP Auto Glass, Inc., Vitro America, LLC, VVP Finance Corporation, Super Sky International, Inc., Super Sky Products, Inc., Binswanger Glass Company, and Troper Services, Inc. are members of Vitro's Flat Glass business unit. Among other things, Alleged Debtors fabricate and distribute flat glass for automotive and architectural applications, design, fabricate and install skylights for commercial

---

[2]     Except as otherwise noted, the facts and circumstances set forth in the background section of this Objection are set forth more fully in the Solicitation Statement dated November 1, 2010 that Vitro SAB distributed to its security holders in connection with the launch of its Exchange Offer and Consent Solicitation (attached hereto as Exhibit A, as supplemented, the "Solicitation Statement" or "Sol. Stmt.").

5

buildings and private residences, and provide services to Mexican affiliates in connection with the distribution of glass containers, glass for automotive applications, and chemicals in the U.S.

**B.     Vitro's Indebtedness**

3.     As of September 30, 2010, Vitro's consolidated outstanding third-party indebtedness was approximately $1.962 billion,[3] including approximately $1.216 billion in outstanding principal under certain unsecured senior notes issued by Vitro SAB in 2003 and 2007 (collectively, the "Notes"),[4] which are guaranteed on an unsecured basis by the Alleged Debtors. Approximately $1.5 billion of this indebtedness is being restructured under the *Concurso* Plan (the "Restructured Debt"), including the obligations under the Notes.

**C.     Events Precipitating Vitro's Restructuring**

4.     The global financial crisis and severe economic recession beginning in the second half of 2008 affected each of Vitro's major markets, Mexico, the United States and Spain, and significantly affected its Glass Container and Flat Glass businesses. See Sol. Stmt. at 24. The sharp decline in demand for new cars and trucks in the automobile industry and for new homes and buildings in the construction industry, as well as reduced beer bottle demand from Vitro's main client for glass containers, resulted in a 36.8% decline in Vitro's consolidated operating income for 2008 compared to 2007, and a further 22.3% decline in Vitro's operating income for 2009 compared to 2008. In a similar trend, net income decreased from Ps. 131 million in 2007

---

[3]     The information in this subsection is set forth on page 8 of the Solicitation Statement Supplement dated November 12, 2010 which Vitro SAB distributed to its security holders in connection with its Exchange Offer and Consent Solicitation (attached hereto as Exhibit B, the "Solicitation Statement Supplement" or "Sol. Stmt. Supp.").

[4]     On February 1, 2007, Vitro SAB issued $300 million principal amount of 8.625% Senior Notes due 2012 (the "2012 Notes") and $700 million principal amount of 9.125% Senior Notes due 2017 (the "2017 Notes"). As of September 30, 2010, the full original principal amount remained outstanding on the 2012 Notes and 2017 Notes. On October 22, 2003, Vitro SAB issued $225 million aggregate principal amount of 11.75% Senior Notes due 2013 (the "2013 Notes"). Part of the 2013 Notes were prepaid on June 25,

to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009. Eventhough the economy has shown moderate signs of recovery in 2010, some of Vitro's markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. For the nine-month period ended September 30, 2010, Vitro's consolidated net sales decreased 4.8% compared to the same period ended September 30, 2009. Sol. Stmt. Supp. at 18.

5. Additional financial pressure was placed on Vitro's overall operations by high volatility in interest rates, a significant drop in the price of natural gas and a sharp decrease in the value of the Mexican peso compared to the U.S. dollar,[5] which adversely affected Vitro's hedging positions, forcing Vitro to unwind the majority of its open positions in the fourth quarter of 2008. The unwinding of these hedging positions not only led to substantial claims (which resulted in litigation, since settled), but also triggered cross-default provisions in the majority of Vitro's other debt instruments, including the indentures governing the Notes. Faced with this crisis, in February 2009 Vitro announced its intention to restructure the outstanding Notes and the other Restructured Debt. See Sol. Stmt. at 26.

**D. Negotiation of Consensual Restructuring Plan And Commencement Of Exchange Offer And Consent Solicitation**

6. Since February 2009, Vitro SAB has engaged in substantive, good faith restructuring negotiations with various parties, including the self-described *ad hoc* committee of holders of the Notes (the "Steering Committee"). Unfortunately, the negotiations with the

---

        2008, and, as of September 30, 2010, the aggregate principal amount that remained outstanding on the 2013 Notes was $216 million. See Sol. Stmt. Supp. at 8.

[5]     Specifically, between July 2008 and December 2008, natural gas prices plummeted more than 50%, and the Mexican peso registered a 30% devaluation against the dollar, reversing the appreciation trend experienced in the first seven months of the year and making it substantially more expensive for Vitro to service its U.S. dollar-denominated debt. See Sol. Stmt. at 25.

7

Steering Committee did not result in an agreement. Instead, in January of 2010, the Steering Committee sent notices of acceleration in respect of the 2012 Notes and 2017 Notes, and in April 2010 notice was sent accelerating the 2013 Notes. See Sol. Stmt. at 28. Notwithstanding these actions, Vitro SAB continued to negotiate with the Steering Committee in the hope of reaching a consensual resolution. In addition, in April 2010, Vitro SAB and certain of its Mexican subsidiaries were found liable by the Supreme Court of New York in lawsuits brought by certain financial institutions in connection with the unwinding of Vitro's hedging obligations. See Sol. Stmt. at 26. These developments and the continued recalcitrance of the Steering Committee, among other things, led Vitro SAB to explore alternative means to implement a restructuring, including a possible voluntary in-court restructuring in its home country of Mexico.

7. As a result of negotiations and discussions with various parties over the last few months, Vitro SAB formulated a new restructuring proposal -- the *Concurso* Plan -- for an in-court restructuring of Vitro SAB's indebtedness to be effectuated through the Exchange Offer and Consent Solicitation and a *concurso mercantil* proceeding (the "*Concurso* Proceeding") under *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act"). Under the *Concurso* Plan, at the conclusion of the *Concurso* Proceeding all of Vitro's Restructured Debt will be exchanged for consideration which will include new unsecured notes issued by Vitro SAB and guaranteed by sixty-six of its subsidiaries (including each of the Alleged Debtors),[6] as well as cash and other new debt. The *Concurso* Plan further provides for the cancelation of all obligations under the Restructured Debt, including all subsidiary guarantees with respect to the Notes.

---

[6] See Sol. Stmt. at 218-19 (definition of "Guarantor").

8. On November 1, 2010, Vitro SAB launched the Exchange Offer and Consent Solicitation for the Notes, together with other measures to obtain the consent of holders of Restructured Debt to its proposed *Concurso* Plan. In connection therewith, Vitro SAB announced its belief that holders of Restructured Debt would recover 68% to 75% of the face value of their debt, and that the *Concurso* Plan has the requisite support among its creditor body to accomplish its proposed restructuring through a prearranged *Concurso* Proceeding. See November 1, 2010 Release ("Vitro Announces Offers for its Outstanding Senior Notes") (attached hereto as Exhibit C) and Sol. Stmt. at 10. The Steering Committee announced their opposition to this proposal even before the Solicitation Statement was filed. In fact, *six days prior* to the launch, the Steering Committee issued a press release denouncing the yet-to-be-publicly-disclosed terms of the proposal as providing an "unacceptably poor economic outcome" for holders of Notes. See October 26, 2010 Release ("Ad Hoc Committee of Noteholders Reject Vitro's Initial Consent Solicitation") (attached hereto as Exhibit D).

### E. Dissident Minority Noteholders' Filing Of Involuntary Chapter 11 Petitions Against Alleged Debtors

9. On November 17, 2010 (the "Involuntary Petition Date") -- less than two weeks before Vitro SAB was scheduled to conclude its Exchange Offer and Consent Solicitation and commence a *Concurso* Proceeding and ancillary chapter 15 proceeding in the United States, and more than three weeks after publicly denouncing Vitro SAB's proposal as unacceptable -- the Dissident Minority Noteholders filed with this Court involuntary chapter 11 petitions against the Alleged Debtors. Well after the close of business on the following day, the Dissident Minority Noteholders filed the Motion and scheduled a hearing thereon three business days later.

## OBJECTION

10. The Motion is a wolf in sheep's clothing. On the surface, the Dissident Minority Noteholders paint their requested relief as a "comfort" order to preserve the status quo and their interests in the Alleged Debtors. Properly considered, however, the Motion is nothing more than a thinly-veiled attempt to impede, to the greatest extent possible, Vitro SAB's restructuring process in Mexico. To this end, the Dissident Minority Noteholders inflate their own economic exposure, play victim to the laws of the jurisdiction of the foreign debtor in which they chose to invest, manufacture emergency circumstances which they patently contradict in their own Motion, and bend the provisions of the Bankruptcy Code applicable to the involuntary "gap" period beyond their breaking point. For these and for the reasons set forth more fully below, the Alleged Debtors respectfully request that the Motion be denied in its entirety.

## I. Relief Not Authorized Under Bankruptcy Code Or Warranted Under Circumstances

### (a) *Relief Under § 303(f) Is Not Appropriate Under These Circumstances*

11. In the Motion, the Dissident Minority Noteholders request a drastic form of relief under Bankruptcy Code section 303(f) without providing any support for why such relief would be appropriate or providing any authority for such relief. As its very language makes clear, section 303(f) is intended to protect debtors wrongly thrust into bankruptcy court by their creditors, not to aid creditors in strong-arming debtors into one-sided arrangements: "[T]he debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced." 11 U.S.C. § 303. The section contains an exception that permits a court to "order otherwise," but legislative history makes clear that this exception is only intended to be invoked in rare circumstances where a real threat to estate assets exists. "[Section 303(f)] is both a clarification and a change from existing law. It permits the debtor to continue to operate any business of the debtor and to dispose of property as if the case had not

been commenced." See H.R. Rep. No. 95-595, at 288 (1977). Disregarding conjecture by the Dissident Minority Noteholders, the Motion simply does not establish that any of these circumstances exist, let alone provide a plausible basis for this Court to justify invoking section 303(f) to depart from the strong Legislative intent that debtors not be subjected during the involuntary "gap" period to Bankruptcy Code restrictions on asset transfers until an order for relief has been entered.

12. Case law confirms that the gap period is intended to be a restriction-free period for an involuntary debtor, free from the restrictions of a full blown chapter 11 case, with as little disturbance in the debtor's business as possible. See, e.g., In re Wynn, 889 F.2d 644, 645 (5th Cir. 1989) (stating that the continuation of the involuntary gap period "inures to the benefit of the debtor [who is] free to continue to operate his business and to acquire and dispose of assets during the interim period"); Consolidated Partners Inv. Co. v. Lake, 152 B.R. 485, 490 (Bankr. N.D. Ohio 1993) ("The rationale for allowing the debtor to operate during the involuntary gap period is that prior to the entry of an order for relief, the subject of an involuntary petition should not be adversely affected by the case"). See also 3 COLLIER ON BANKRUPTCY § 303.22 (16th Ed. 2009) ("Section 303(f) was designed to make sure that the involuntary filing does not affect the debtor or its business."). Creditors are even required to put up with a certain amount of risk that involuntary debtors will diminish their asset pool, although the Alleged Debtors have no such intentions in the instant case. In re Wynn, 889 F.2d at 645 (In an extended gap period, "the creditors risk the continued diminution and dispersal of the remaining assets.").

13. Because involuntary debtors enjoy relatively unfettered operations during the gap period, Congress set up alternative sections of the Bankruptcy Code to provide protection for creditors during this time. In re Brooklyn Overall Co., Inc., 57 B.R. 999, 1002 (Bankr. E.D.N.Y.

1986) (holding that a reading of sections 303(f) and 549(b) together "elicits the intention of Congress to temper the 'gap' period debtor's right to transfer property of the estate for no value or less than its value equivalent.") (citing H.R. No. 95-595, 95th Cong., 1st Sess. 375 (1977); S.R. No. 95-989, 95th Cong. 2d Sess. 90 (1978)). The Dissident Minority Noteholders provide no explanation as to why these alternative protections are insufficient in this case. Accordingly, with the protections that Congress explicitly provided to protect the Dissident Minority Noteholders intact and given that the Alleged Debtors have no plans to undertake any transactions that would harm them, the Dissident Minority Noteholders have no basis whatsoever to believe that they require the additional protections of section 363 of the Bankruptcy Code, nor have they cited any. On this basis alone, the Motion should be denied.

### (b) *Requested Relief May Cripple Alleged Debtors' Businesses*

14. The Motion requests that the Alleged Debtors be prohibited from "extraterritorially transferring, selling, distributing, acquiring, trading, exchanging or otherwise disposing of any of the respective assets or property currently located within the territorial jurisdiction of the United States." Proposed Order at 2 (attached to Motion as Exhibit 1). Several of the Alleged Debtors are distributors who do nothing more than sell in the U.S. glass products produced in Mexico, which necessarily involves paying Mexican companies for the products they sell to U.S. customers. Others are service providers who provide services to affiliates in exchange for payment while still others rely on Mexican affiliates for critical supplies. To prevent the Alleged Debtors from extraterritorially transferring property would be to prevent many of them from doing any business at all and would materially impair all of the operating companies. No Mexican company, whether an affiliate or not, would forward products to one of these U.S. distributors or operating companies knowing that it could never receive payment in return. While the Proposed Order would allow for the Alleged Debtors to make such

transactions after obtaining this Court's approval pursuant to section 363 of the Bankruptcy Code, it would be neither feasible nor possible for either the Alleged Debtors or this Court to conduct a hearing every time a payment needed to be made. Given the nature of the businesses involved, the requested relief would be a death knell for the Alleged Debtors.

15. Furthermore, the Alleged Debtors do not regularly transfer money or other assets to their Mexican parent companies on a regular basis without receiving consideration in return. In fact, historically the reverse has happened -- the Mexican affiliates often forward funds to the Alleged Debtors as payment for services and, from time to time, as intercompany loans. But even these transfers would be prohibited by the requested relief as an acquisition of assets or property that materially alters the Alleged Debtors' current assets and liabilities. It is a mystery why the Dissident Minority Noteholders would want to do such damage to the Alleged Debtors' businesses in this manner since they would be harming themselves as creditors of those entities. Regardless, the requested relief should not be granted.

## II. Dissident Minority Noteholders Do Not Merit Requested Relief

### (a) *Dissident Minority Noteholders Represent Small Fraction of Outstanding Notes*

16. The Dissident Minority Noteholders hold a very small minority of the Notes -- just $75 million out of an outstanding principal amount of over $1.2 billion, or approximately 6% of the total. Mot. ¶ 8. Yet they are attempting to subvert the entire restructuring process for Vitro SAB, defy the will of the board of directors and extract leverage (and presumably value) to which they are not legally entitled. ***Six percent is not a significant minority***, let along a proxy for the majority, and they should not be permitted to use the Bankruptcy Code and this Court to disrupt the Exchange Offer and Consent Solicitation or hinder the business operations of the Alleged Debtors solely to advance their own agenda.

17. The Dissident Minority Noteholders are eager to note that they are part of the Steering Committee, which they allege holds or controls $600 million in principal amount of the Notes. Mot. ¶ 8. However, if the Dissident Minority Noteholders are actually acting on behalf of a larger group of creditors, they are required by Bankruptcy Rule 2019 to file a statement disclosing the identity and holdings of those creditors. See In re Blackwell, 263 B.R. 505, 508 (W.D. Tex. 2000) (stating rule 2019 disclosure requirements and citing and analogizing to Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981)); In re Craft, 321 B.R. 189, 191-92 (Bankr. N.D. Tex. 2005) (stating rule). The Dissident Minority Noteholders are either a very small group of minority stakeholders whose desires should not be permitted to invoke a U.S. bankruptcy process designed to facilitate majority-rule restructurings, or they are not properly before the Court at all and their Motion should be dismissed entirely for failure to comply with applicable Bankruptcy Rules.

### (b) *Motion Fabricates "Emergency" as Pretext for Attack on Restructuring Process*

18. In an apparent attempt to generate more attention for their attack than it deserves given the paltry size of their claims, the Dissident Minority Noteholders have characterized their Motion as an "emergency" and scheduled a hearing on three business days' notice immediately prior to the Thanksgiving holiday. Any such "emergency" is entirely imagined.

19. As the Dissident Minority Noteholders are aware, the Alleged Debtors are neither being solicited nor soliciting others to participate in Vitro SAB's pending Exchange Offer and Consent Solicitation. The Dissident Minority Noteholders intentionally muddle this important point by stating "*Vitro [SAB]* is plainly seeking to obtain consent to restructure the [Alleged] Debtors obligations." Mot. ¶ 29 (emphasis added). While it is true that the Alleged Debtors' obligations will eventually be restructured when the Notes are cancelled and replaced with the

14

Restructuring Consideration, and while it is also true that the consents that Vitro SAB is currently seeking are one step in the process that will lead to this restructuring, it is also true that the replacement of the Notes and the attendant alteration of the Alleged Debtors' obligations will not happen until months from now, in a later stage of the *Concurso* Proceeding. The appearance of this restructuring on the horizon does not constitute an "emergency."

20. The very language the Dissident Minority Noteholders quote from the *Concurso* Plan makes the ample timing of the contemplated restructuring process clear: "Vitro shall be obligated to make and cause all of the Guarantors [the Alleged Debtors, among others] to agree to the terms of this [*Concurso* Plan], ***once approved by the Judge*** . . . ." Mot. ¶ 29 (quoting *Concurso* Plan at A-16, Annex A to Sol. Stmt. Supp.) (emphasis added). As provided in the Solicitation Statement and as the Dissident Minority Noteholders well know, the *Concurso* Proceeding is likely to last a minimum of several months before the *Concurso* Plan can be approved by the judge presiding over such proceeding. See, e.g., Sol. Stmt. at 74 ("The *Concurso* Plan constitutes a restructuring agreement to be filed with a petition for a *concurso* proceeding governed by the Mexican Bankruptcy Law, to be approved within the Work-out Stage of such proceeding and affecting all creditors recognized therein. ***The Work-out Stage shall not last more than one calendar year*** following the last publication of the *Concurso* ruling in the *Diario Oficial de la Federacion*, Mexico's Daily Official Gazette of the Federal Government.") (emphasis added). Accordingly, the Alleged Debtors will not be required take any action relating to voting their intercompany claims or incurring guarantee liability until some time in 2011, several months from now. Thus, even if the Court determines that some action is required, it is not required on an emergency basis.

21.     Furthermore, the Exchange Offer and Consent Solicitation contemplates Vitro SAB's commencing an ancillary chapter 15 proceeding in the U.S. to run concurrently with the *Concurso* Proceeding. Not only is there plenty of time before anything will happen to the Alleged Debtors' guarantee of the Notes, but creditors in the United States will also be provided with the opportunity to voice any legitimate objections they might have with Vitro SAB's restructuring during the chapter 15 proceeding. The notion that the start of the Exchange Offer and Consent Solicitation somehow constitutes an "emergency" requiring immediate attention from a bankruptcy court in the United States is obvious hyperbole and should be disregarded.

### III.     Dissident Minority Noteholders Should Not Be Permitted To Interfere With Vitro SAB's Consensual Restructuring in Mexico

22.     The Proposed Order would also prohibit the Alleged Debtors from participating in a capital restructuring (i.e., the *Concurso* Plan) without first obtaining permission from this Court. In their Motion, the Dissident Minority Noteholders complain about Vitro SAB's incorporating into its *Concurso* Plan aspects of the Mexican Business Reorganization Act that conflict with the Bankruptcy Code. Mot. ¶ 30 ("The Debtors should also be prohibited from utilizing intercompany claims to manufacture support for the Solicitation and restructuring of the Debtors' debt in the *Concurso*."). This Court should not permit the Dissident Minority Noteholders to play the victim in this manner. Vitro SAB is a Mexican company, located in Mexico and subject to the laws of Mexico. Those laws may differ in some respects from those of the United States of America, but they are entitled to be respected under principles of comity. See, e.g., In re Petition of Garcia Avila, 296 B.R. 95, 108 -109 (Bankr. S.D.N.Y. 2003) (holding Mexican bankruptcy proceedings "easily" satisfied concerns underlying requirements of comity under former section 304(c) of Bankruptcy Code because Mexican Business Reorganization Act, among other things, expressly provides that foreign creditors shall have the same rights as

16

Mexican creditors concerning the commencement of or participation in a *concurso* proceeding and "permits all creditors, including American creditors, the opportunity to file claims, litigate disputes before the Mexican court, and appeal adverse determinations") (citations omitted). When they purchased the Notes, the Dissident Minority Noteholders knew they were purchasing debt of a corporation subject to the laws of a foreign jurisdiction that could seek to avail itself of the insolvency and reorganization laws of its home country. See Canada Southern Ry. v. Gebhard, 109 U.S. 527, 537 (1883) ("Every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes."); Int'l Trans., Ltd. v. Embotelladora Agral Regiomontana, SA de CV, 347 F.3d 589, 594 (5th Cir. 2003) ("Businesses . . . that voluntarily deal with foreign entities impliedly subject themselves to the laws of the foreign government under which the corporation is organized which may affect the powers and obligations of that corporation").

23.      Finally, the Dissident Minority Noteholders have also not provided any justification for abandoning the consensual restructuring process that is already under way in favor of a contested bankruptcy. Bankruptcy law and public policy generally favor out-of-court restructurings. In direct contravention of this policy, the Dissident Minority Noteholders are attempting to use the involuntary scheme in the Bankruptcy Code to inject this Court into what otherwise appears to be the last stage of a two-year out-of-court restructuring. By doing so, the Dissident Minority Noteholders are imposing on the parties -- and this Court -- the very expense, uncertainty and inconvenience on which the policy favoring consensual and out-of-court restructurings is founded. See In re Excelsior Henderson Motorcycle Mfg. Co., 273 B.R. 920, 924 (Bankr. S.D. Fl. 2002) (finding that the enforcement of a stipulation freely entered into by

the debtor "furthers the public policy in favor of encouraging out of court restructuring and settlements"); In re Cheeks, 167 B.R. 817, 819 (Bankr. D.S.C. 1994) (court should "further the public policy in favor of encouraging out-of-court restructurings and settlements. Bankruptcy courts may be an appropriate forum for resolving many of society's problems, but some disputes are best decided through other means.").

24. Finally, the Alleged Debtors expressly are not waiving their rights to contest the involuntary petitions on any grounds whatsoever, and hereby reserve all such rights, objections and defenses.

[Remainder of page intentionally left blank.]

**WHEREFORE** the Alleged Debtors respectfully request that the Court (i) deny the relief requested in the Motion in its entirety and (ii) grant such other and further relief as it deems just and proper.

Dated: New York, New York
November 22, 2010

**FULBRIGHT & JAWORSKI L.L.P.**

*/s/William R. Greendyke*
Louis R. Strubeck, Jr.
State Bar No. (19425600)
William R. Greendyke
State Bar No. (08390450)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200

-and-

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
Dennis F. Dunne (*pro hac vice* pending)
Risa M. Rosenberg (*pro hac vice* pending)
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Andrew M. Leblanc (*pro hac vice* pending)
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (212) 835-7500
Facsimile: (212) 263-7586

*Attorneys for Alleged Debtors*