| | |
|---|---|
| Louis R. Strubeck, Jr., Esq., State Bar No. 19425600 William R. Greendyke, Esq. State Bar No. 08390450 FULBRIGHT & JAWORSKI L.L.P. 2200 Ross Avenue, Suite 2800 Dallas, Texas 75201 Telephone: 214-855-8000 Telecopy: 214-855-8200 *Counsel for the Alleged Debtors* | Robert W. Jones, Esq. State Bar No. 10951200 Brent R. McIlwain, Esq. State Bar No. 24013140 PATTON BOGGS LLP 2000 McKinney Avenue, Suite 1700 Dallas, Texas 75201 Telephone: 214-758-1500 Telecopy: 214-758-1550 *Counsel for Bank of America, N.A., and Banc of America Leasing & Capital, LLC* C. Edward Dobbs, Esq. (pending admission *pro hac vice*) Joshua J. Lewis, Esq. (pending admission *pro hac vice*) PARKER, HUDSON, RAINER & DOBBS LLP 1500 Marquis Two Tower 285 Peachtree Center Avenue, N.E. Atlanta, Georgia 30303 Telephone: 404-523-5300 Telecopy: 404-522-8409 *Counsel for Bank of America, N.A., and Banc of America Leasing & Capital, LLC* |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Involuntary Chapter 11** |
| | § | |
| VITRO ASSET CORP. | § | **Case No. 10-47470-rfn-11** |
| VITRO CHEMICALS, FIBERS & MINING, LLC | § | **Case No. 10-47472-dml-11** |
| VITRO AMERICA, LLC | § | **Case No. 10-47473-dml-11** |
| TROPER SERVICES, INC. | § | **Case No. 10-47474-rfn-11** |
| SUPER SKY PRODUCTS, INC. | § | **Case No. 10-47475-dml-11** |
| SUPER SKY INTERNATIONAL, INC. | § | **Case No. 10-47476-rfn-11** |
| VVP HOLDINGS, LLC | § | **Case No. 10-47477-dml-11** |
| AMSILCO HOLDINGS, INC | § | **Case No. 10-47478-rfn-11** |
| B.B.O. HOLDINGS, INC. | § | **Case No. 10-47479-dml-11** |
| BINSWANGER GLASS COMPANY | § | **Case No. 10-47480-rfn-11** |
| CRISA CORPORATION | § | **Case No. 10-47481-rfn-11** |
| VVP FINANCE CORPORATION | § | **Case No. 10-47482-dml-11** |
| VVP AUTO GLASS, INC. | § | **Case No. 10-47483-dml-11** |
| V-MX HOLDINGS, LLC | § | **Case No. 10-47484-rfn-11** |
| VITRO PACKAGING, LLC | § | **Case No. 10-47485-rfn-11** |
| | § | |
| **Alleged Debtors.** | § | **Joint Administration Requested** |

**JOINT EMERGENCY MOTION OF CERTAIN ALLEGED DEBTORS, BANK OF AMERICA, N.A. AND BANC OF AMERICA LEASING & CAPITAL, LLC FOR INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 303, 361, 363, 364 AND 552, (I) AUTHORIZING ALLEGED DEBTORS (A) TO CONTINUE TO OBTAIN SECURED FINANCING, (B) TO CONTINUE TO UTILIZE EXISTING CASH MANAGEMENT SYSTEM AND (C) TO USE CASH COLLATERAL, (II) APPROVING POST-PETITION FINANCING, (III) GRANTING ADEQUATE PROTECTION AND (IV) SCHEDULING INTERIM AND FINAL HEARINGS**

Vitro America, LLC, a Delaware limited liability company ("*Vitro America*"), and VVP Finance Corporation, a Delaware corporation ("*Finance*," and together with Vitro America, the "*Borrowers*"), and VVP Holdings, LLC, a Delaware limited liability company ("*Holdings*"), VVP Auto Glass, Inc., a Delaware corporation ("*Auto Glass*"), Super Sky International, Inc., a Delaware corporation ("*International*") and Super Sky Products, Inc., a Wisconsin corporation ("*Products*," and collectively with Holdings, Auto Glass and International, the "*Guarantors*"), each an alleged debtor (collectively, the "*Alleged Debtors*") in the above-captioned involuntary Chapter 11 cases in respect of the Alleged Debtors and certain of their affiliates, Bank of America, N.A., a national banking association (the "*Lender*") and Banc of America Leasing & Capital, LLC ("*BALC*") hereby move for entry of an interim order, substantially in the form annexed as Exhibit A hereto (the "*Interim Order*"), and a final order (the "*Final Order*" and, together with the Interim Order, the "*Orders*"), pursuant to Sections 105, 303(f), 361, 363, 364 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), (I) authorizing the Alleged Debtors (A) to continue to obtain secured financing, (B) to continue to utilize their existing Cash Management System (as defined below) and (C) to use Cash Collateral (as defined below), (II) approving post-petition financing, (III) granting adequate protection to the Lender, on its behalf and on the behalf of BALC, and (IV) scheduling interim and final hearings (the "*Final Hearing*") with respect to the relief requested herein (the "*Motion*").

## Background

### A.      Introduction

1.      On November 17, 2010 (the "*Involuntary Petition Date*"), Knighthead Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund, LP, and Lord Abbett Bond-Debenture Fund, Inc., as alleged creditors (collectively, the "*Petitioners*"), filed involuntary petitions for the entry of orders for relief with respect to the Alleged Debtors under Chapter 11 of the Bankruptcy Code (the "*Involuntary Petitions*").

2.      On November 18, 2010, the Court entered its *Standing Scheduling Order Regarding Involuntary Cases* [Docket No. 3], setting a conference on December 20, 2010 regarding the possible entry of orders for relief.  No response has been filed by, or is yet due from, any Alleged Debtor to any Involuntary Petitions.

3.      As authorized by Section 303(f) of the Bankruptcy Code, the Alleged Debtors continue to operate their businesses and use, acquire or dispose of property as if an involuntary case had not been commenced against them.  No trustee or examiner has been requested or appointed in any of the Alleged Debtors' involuntary Chapter 11 cases.

### B.      Overview of the Alleged Debtors' Corporate Structure and Business

4.      The Alleged Debtors' primary business is the manufacture and distribution of glass products across the automotive, home construction and commercial construction industries.

5.      The Alleged Debtors are wholly-owned indirect subsidiaries of Vitro, S.A.B. de C.V. ("*Vitro, S.A.B.*" and collectively with its direct and indirect subsidiaries, "*Vitro*"), a corporation organized under the laws of the United Mexican States, which maintains its principal place of business in Monterrey, Mexico.  Vitro is one of the largest glass manufacturers in the world.  Three of Vitro's operating subsidiaries, Vitro America, Products and Auto Glass, are Alleged Debtors in these involuntary Chapter 11 cases.

6.      Vitro America is a full-line glass distributor in the United States, and is a leading fabricator, distributor and installer of glass in the construction and automotive replacement markets.  As of April 30, 2010, Vitro America employed approximately 1,651 individuals.

7.      Vitro America's wholly-owned indirect subsidiary, Products, designs, fabricates and installs skylight systems for commercial buildings and private residences.  Incorporated in 1959 and located in Mequon, Wisconsin, Products is registered to do business in all 50 U.S. states and in the District of Columbia.  As of April 30, 2010, Products employed approximately 68 individuals.

8.      Auto Glass is a sister corporation to Vitro America.  As of April 30, 2010, Auto Glass employed approximately 30 individuals, including 15 temporary laborers.

C.      **The Alleged Debtors' Debt Structure**

9.      The Borrowers are party to that certain Loan and Security Agreement, dated as of June 27, 2003 (hereinafter, together with all amendments thereto and modifications thereof, the "*Loan Agreement*"), pursuant to which the Lender provided the Borrowers with, among other things, $35 million in aggregate principal amount of revolving commitments (the "*Loan Facility*"), including letters of credit, with a sublimit for letters of credit of $18 million.  The financing provided by the Lender to the Borrowers is of a type known as "asset-based lending," meaning that the availability of loans and other extensions of credit to the Borrowers under a revolving credit facility is conditioned upon the aggregate amount of all such loans and other extensions of credit not exceeding a "Borrowing Base" (calculated as a percentage of eligible accounts, eligible inventory and eligible real estate of the Borrowers on any date, less reserves). In connection with the Loan Facility, the Guarantors executed, in the Lender's favor, certain Continuing Guaranty Agreements (the "*Guaranty Agreements*").

10.     As of the Involuntary Petition Date, there was outstanding under the Loan Facility, loans in the approximate principal amount of $8,610,575, reimbursement obligations for any draws made upon letters of credit issued by the Lender for the account of the Borrowers, in the aggregate face amount of approximately $14,180,000, and corporate credit card debt of approximately $501,000 (collectively, with all other obligations of any Alleged Debtors to the Lender, including all indebtedness associated with the Cash Management System and all interest, fees, legal expenses and other amounts heretofore or hereafter accruing on any of the foregoing or at any time chargeable to any of the Alleged Debtors in connection therewith, being referred to as the "*Pre-Petition Debt*").

11.     As security for the payment of all Pre-Petition Debt and certain equipment lease indebtedness owed on the Involuntary Petition Date to BALC in the approximate principal amount of $3,602,000 (together with all other liabilities of any Alleged Debtor under any such equipment lease, the "*BALC Lease Obligations*"), each Alleged Debtor other than Products granted to the Lender, for itself and for the benefit of BALC, pursuant to the Loan Agreement, the Guaranty Agreements and all mortgages and related security documents (collectively, the "*Loan Documents*"), security interests in and liens upon (a) all or substantially all of such Alleged Debtor's personal property, including, without limitation, all accounts, inventory, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment, money, securities, deposit accounts, and books and records, and (b) certain real property and improvements thereto located in Los Angeles County, California, Denver County, Colorado, Grenada County, Mississippi, Guilford County, North Carolina, Oklahoma County, Oklahoma, Tulsa County, Oklahoma, Dallas County, Texas, Harris County, Texas, and Henrico County, Virginia (all such real and personal property, as the same existed on

the Involuntary Petition Date, together with all cash and non-cash proceeds thereof, the "*Pre-Petition Collateral*").

12.     The Alleged Debtors maintain all or substantially all of their banking relationships with the Lender, including lockbox and depository accounts.  As part of the Cash Management System, obligors on accounts receivables of the Alleged Debtors are directed to remit payment with respect to such accounts to a collection account at the Lender or lockbox over which the Lender exercises dominion and control, and after the Lender's receipt thereof, all such collections are applied to the Pre-Petition Debt in accordance with the Loan Documents. Some or all of the Alleged Debtors have the use of corporate credit cards issued by Lender.

**D.     The Alleged Debtors' Immediate Need for Liquidity**

13.     The filing of the Involuntary Petitions has created an onslaught of adverse publicity with respect to the Alleged Debtors and their businesses.  While the Alleged Debtors are attempting to maintain normal trade terms at this time, the adverse publicity could result in the Alleged Debtors' primary vendors seeking a reduction of normal trade terms, which, if acceded to, will result in unsustainable pressure on the Alleged Debtors' liquidity.  Moreover, the Alleged Debtors are facing a payroll deadline of November 24, 2010, which they cannot meet due to (a) the Lender's refusal to extend further credit under the Loan Facility (as defined below) without the protections requested herein and (b) the Affiliate Lender's (as defined below) refusal to provide further funding without the protections requested herein.  Thus, the Alleged Debtors have an immediate need to access the Loan Facility and the Affiliate Loan Facility (as defined below), and to use Pre-Petition Collateral (as defined below), including Cash Collateral, to, among other things, permit the orderly operation of their businesses by securing goods on normal trade terms and paying employees and preserve their businesses' going concern value. The Alleged Debtors believe that such financing and use of Cash Collateral will enable them to

maintain their profitability, normalize and/or maintain their vendor relationships, meet their

payroll obligations and otherwise avoid immediate and irreparable harm to the Alleged Debtors

pending the Final Hearing.

## **Jurisdiction and Venue**

14.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the

relief requested herein are Sections 105, 303(f), 361, 363, 364 and 552 of the Bankruptcy Code.

## **Relief Requested**

15.     By this Motion, the Alleged Debtors, the Lender and BALC seek entry of the

Interim and Final Orders, inter alia:

(a)     under Bankruptcy Code Section 364(d), authorizing the Borrowers to
obtain loans and other extensions of credit from the Lender under the Loan Agreement,[1] and
authorizing the Lender to honor such requests for loans and other extensions of credit in
accordance with the terms of the Loan Agreement and with all of the benefits, privileges and
security set forth in the Loan Documents, including the ongoing effectiveness of the Pre-Petition
Liens with respect to all Pre-Petition Collateral and attachment to all other like items of property
created, acquired or arising after the Involuntary Petition Date (all such after-acquired property
being referred to as "*Post-Petition Collateral*");

(b)     under Bankruptcy Code Section 364(d), authorizing the Alleged Debtors
to obtain secured post-petition financing on a junior priority lien basis (the "*Affiliate Loan
Facility*") during the Gap Period (as defined below) pursuant to the terms and conditions of that
certain Subordinated Post-Petition Loan and Security Agreement, dated as of November [__],
2010 (as amended, supplemented, restated or otherwise modified from time to time, the "*Affiliate
Loan Agreement*"), between the Borrowers, the Guarantors and one of the Alleged Debtors' non-
Alleged Debtor affiliates, as the lender (the "*Affiliate Lender*"), substantially in the form of
Exhibit B annexed hereto;

(c)     authorizing the Alleged Debtors to execute and deliver the Affiliate Loan
Agreement and other related loan documents (collectively with the Affiliate Loan Agreement,
the "*Affiliate Loan Documents*") among the Borrowers, the Guarantors and the Affiliate Lender,

---

[1] The Alleged Debtors and the Lender are still engaged in discussions to determine whether the extension of loans
and other extensions of credit by the Lender under the Loan Agreement during the Gap Period will be committed
extensions of loans or in the Lender's discretion.

and to perform such other acts as may be necessary or desirable in connection with the Affiliate Loan Agreement;

(d)     granting to the Affiliate Lender automatically perfected security interests in and liens on all of the Collateral (as defined below), including, without limitation, all property constituting Cash Collateral, which liens shall be junior to the Pre-Petition Liens (as defined below) in all respects, to secure the advances, if any, made during the Gap Period under the Affiliate Loan Agreement;

(e)     authorizing (i) the Alleged Debtors to continue utilizing, and the Lender to continue making available to the Alleged Debtors, the bank accounts services, lockboxes, corporate credit cards, treasury management services and other aspects of the cash management system established at the Lender (collectively, the "*Cash Management System*"), including, without limitation, (y) making deposits to, and causing transfers to be made from, the bank accounts maintained by the Alleged Debtors at the Lender, including ACH transfers and wire transfers initiated by an Alleged Debtor from any such bank account and (z) continuing to use all bank accounts and lockboxes at the Lender and all corporate credit cards issued by the Lender, and (ii) the Alleged Debtors to incur and repay indebtedness to the Lender in connection therewith;

(f)     authorizing the Lender to continue making the Cash Management System available to the Alleged Debtors subject to all of the terms and conditions in the pre-petition agreements between one or more of the Alleged Debtors and the Lender and with the ongoing benefit of all collateral security therefor;

(g)     under Bankruptcy Code Sections 361, 363(c)(2) and 363(e) authorizing the use of Cash Collateral under the Loan Agreement in the operation of the businesses of the Alleged Debtors, including, without limitation, making payments to BALC in respect of the BALC Lease Obligations accruing during the Gap Period, during the period from the Involuntary Petition Date to the earlier to occur of (i) entry of orders for relief in these involuntary Chapter 11 cases or (ii) dismissal of the Involuntary Petitions (the "*Gap Period*"), authorizing the Lender to turn over to any or all of the Alleged Debtors all such Cash Collateral received by the Lender during the Gap Period and providing adequate protection to the Lender, for its benefit and the benefit of BALC, for any diminution in value of its interest in the Pre-Petition Collateral as a condition to the Alleged Debtors' use of property subject to such pre-petition security interests and liens;

(h)     pursuant to Bankruptcy Rule 4001, scheduling a preliminary hearing on this Motion and authorizing the Alleged Debtors, from entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained the Loan Agreement and to utilize Cash Collateral on the terms set forth in the Interim Order; and

(i)     pursuant to Bankruptcy Rule 4001, scheduling a Final Hearing on this Motion and establishing notice procedures in respect of the Final Hearing by this Court to consider entry of the Final Order authorizing the Alleged Debtors to continue to obtain credit under the terms contained the Loan Agreement and to utilize Cash Collateral.

**Basis for Relief**

16.     The Alleged Debtors, the Lender and BALC request entry of the Interim Order

pursuant to Sections 105, 303(f), 361, 363, 364 and 552 of the Bankruptcy Code.  Section 303(f)

of the Bankruptcy Code permits the Alleged Debtors to continue to use, acquire or dispose of

their respective properties during the Gap Period as if the Involuntary Petitions had not been

filed.  Section 303(f) provides:

> Notwithstanding section 363 of this title, except to the extent that the court orders
> otherwise, and until an order for relief in the case, any business of the debtor may
> continue to operate, and the debtor may continue to use, acquire, or dispose of
> property as if an involuntary case concerning the debtor had not been
> commenced.

11 U.S.C. § 303(f); see also In re QDN, LLC, 363 Fed. Appx. 873, 878 (3d Cir. 2010) ("Unless

and until an order for relief is granted, an involuntary filing has no effect on the affairs of the

debtor.").

17.     The Alleged Debtors' need to use Cash Collateral on an interim basis and to

obtain credit on an interim basis pursuant to the Loan Agreement is immediate and critical in

order to enable the Alleged Debtors to finance their operations, maintain business relationships

with their vendors, suppliers and customers and to pay their employees.  The Alleged Debtors

believe that, in the immediate future, their operations can be sustained by the use of cash

proceeds from the sale, collection or other disposition of their existing and future assets,

including the Pre-Petition Collateral (such proceeds being referred to as the "*Cash Collateral*"),

and without the necessity of obtaining additional extensions of credit from the Lender under the

Loan Agreement.  Because the Borrowers are uncertain about the effect that the filing of the

Involuntary Petitions will have on their cash flow and operations and forecast that they may need

access to Cash Collateral prior to the disposition of the Involuntary Petitions, loans and other

extensions of credit from the Lender under the Loan Agreement will be necessary to prevent

immediate and irreparable harm to the Alleged Debtors, their creditors and equity holders, especially as the Alleged Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the Loan Facility and authorized use of Cash Collateral.

18.     Moreover, even with the use of Cash Collateral and the extension of credit on an interim basis pursuant to the Loan Agreement, the Alleged Debtors anticipate that they may nonetheless need additional funding (the "*Affiliate Funding*") from the Affiliate Lender during the Gap Period. Indeed, the Alleged Debtors are concerned that the damage to their businesses from the adverse publicity surrounding the filing of the Involuntary Petitions, including the possible reduction of normal credit terms by vendors, will increase the need for funding to make up operational shortfalls and certain capital expenditures as well as to pay down debt. The Affiliate Lender has represented that it is unwilling to extend the Affiliate Funding during the Gap Period on an unsecured basis. The Alleged Debtors have been unable to obtain financing from sources other than the Affiliate Lender on terms more favorable than the Affiliate Loan Facility. In fact, the Alleged Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Given the irreparable harm that would result if the Affiliate Funding were not provided to the Alleged Debtors, the Alleged Debtors have agreed to grant the Affiliate Lender security interests in and liens upon the Collateral (excluding any equipment lease by any Alleged Debtor from BALC), in exchange for the extension of credit in the aggregate outstanding principal amount of $3 million at any one time outstanding under the Affiliate Loan Facility during the Gap Period. The Lender, on its behalf and the behalf of BALC, represents that it consents to this secured financing arrangement on the terms and conditions set forth in the Affiliate Loan Agreement and in the Interim Order, subject to the requirement that the Lender, BALC and the Affiliate Lender execute a

subordination agreement (the "*Subordination Agreement*") in form and substance satisfactory to the Lender, BALC and the Affiliate Lender providing that the Affiliate Liens (as defined in the Interim Order) shall be junior to the Pre-Petition Liens in all respects and the Affiliate Obligations (as defined in the Interim Order) shall be subordinated to the indefeasible payment in full of the Pre-Petition Debt and the Gap Credit Extensions (as defined below).

19.     The Lender and BALC are also willing to consent to the Alleged Debtors' use of the Pre-Petition Collateral, including Cash Collateral, and the ongoing use of the Cash Management System, and the Lender is willing to provide supplemental financing in accordance with the terms of the Loan Agreement, subject to the following protections (as more specifically set forth in the Interim Order):

(a)     the Lender shall have no responsibility for any Alleged Debtor's use of any Cash Collateral or any Gap Credit Extensions;

(b)     the Alleged Debtors' use of Cash Collateral and the Lender's extensions of credit shall be predicated upon, without limitation, the aggregate amount of all Pre-Petition Debt, as well as any additional extensions of credit after the Involuntary Petition Date, not exceeding, in aggregate, the Borrowing Base under (and as defined in) the Loan Agreement;

(c)     continued use of the Cash Management System shall be predicated upon the Lender receiving assurances that the Lender is authorized to continue to implement and administer in the Cash Management System in accordance with all relevant pre-petition agreements between any Alleged Debtor and the Lender;

(d)     the Lender shall be granted adequate protection against any diminution in the value of the Lender's interest in the Pre-Petition Collateral (including Cash Collateral) resulting from the Alleged Debtors' use, sale, consumption or other disposition of any part of the Pre-Petition Collateral consisting of inventory (whether raw materials, work in process or finished goods);

(e)     the Pre-Petition Liens shall continue in effect from and after the Involuntary Petition Date, irrespective of the provisions of Section 552 of the Bankruptcy Code that would otherwise apply, and such Pre-Petition Liens shall continue with respect to all of the Pre-Petition Collateral and, to the extent of any such diminution in value, shall attach to all Post-Petition Collateral (such Post-Petition Collateral, with all Pre-Petition Collateral being jointly referred to as the "*Collateral*");

(f)     for purposes of determining the use, sale or other disposition of inventory, it will be presumed that inventory in existence on the Involuntary Petition Date was the first

inventory to be used, sold or otherwise disposed of and that any inventory acquired after the Involuntary Petition Date was not used, sold or otherwise disposed of until after the disposition of all inventory in existence on the Involuntary Petition Date;

(g)     Any extensions of credit from the Lender during the Gap Period (including all interest, fees and other charges in connection therewith, the "*Gap Credit Extensions*") shall constitute Obligations under (and as defined in) the Loan Agreement and shall be deemed to be secured by the Pre-Petition Liens, which shall attach to all of the Collateral irrespective of anything to the contrary contained in Section 552 of the Bankruptcy Code;

(h)     The Pre-Petition Liens with respect to all of the Collateral to the extent securing the Gap Credit Extensions shall be deemed valid, perfected and unavoidable under Section 549 of the Bankruptcy Code or otherwise;

(i)     Any payments made by any of the Alleged Debtors with respect to any of the Obligations incurred under (and as defined in) the Loan Agreement shall be deemed to have been applied first to the payment in full of the Gap Credit Extensions and any interest, fees, and other charges incurred in connection therewith; and

(j)     In no event shall any payment with respect to any of the Gap Credit Extensions be recoverable under Section 549(b) of the Bankruptcy Code, inasmuch as all such payments shall be deemed to be for value received within the meaning of Section 549(b) of the Bankruptcy Code.

20.     The extension of credit pursuant to the terms of the Loan Agreement and the use of Cash Collateral subject to the aforementioned protections and assurances were negotiated in good faith and at arm's length among the Alleged Debtors, the Lender and BALC. Similarly, entry into the Affiliate Loan Agreement was negotiated in good faith and at arm's length among the Alleged Debtors and the Affiliate Lender. The Alleged Debtors, the Lender and BALC respectfully submit that the relief requested herein is not prejudicial to any party in interest in that it will only be effective through the Gap Period, and does not seek a determination by the Court of (a) the amount, validity or enforceability of any of the Pre-Petition Debt, (b) the validity, extent, perfection or priority of any of the Pre-Petition Liens with respect to the Pre-Petition Debt, or (c) the validity or enforceability of any of the Loan Documents.

21.     Moreover, the grant of the foregoing protections and assurances is consistent with the statutory predicates cited herein and is designed to foster and facilitate a cooperative and

seamless relationship between the Alleged Debtors, their primary secured creditors and the Affiliate Lender. In the absence of the grant of adequate protection in favor of the Lender and BALC, the Lender and BALC will be harmed by the Alleged Debtors' continued use of the Pre-Petition Collateral due to the erosion in value of such collateral and the effect of Section 552 of the Bankruptcy Code, which restricts the Pre-Petition Liens from attaching to the Alleged Debtors' property acquired after the Involuntary Petition Date. Furthermore, in the absence of the Affiliate Loan Facility, the Alleged Debtors may be forced to cease operations altogether. Thus, the Alleged Debtors, the Affiliate Lender, the Lender and BALC request entry of the Interim Order granting the relief requested herein.

### Notice

22.      The Alleged Debtors certify that notice of this Motion will be given by them to: (i) the Office of the United States Trustee for the Northern District of Texas, (ii) counsel to the Affiliate Lender and (iii) counsel to the Petitioners (collectively, the "*Initial Notice Parties*"). The Alleged Debtors, the Lender and BALC submit that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

23.      The Alleged Debtors, the Lender and BALC further respectfully request that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to the Initial Notice Parties and any party that has filed prior to such date a request for notices with this Court. The Alleged Debtors, the Lender and BALC request that the Court consider such notice of the Final Hearing.

24.      No previous request for the relief sought herein has been made to this Court or any other court.

## Summary of Relief Requested

WHEREFORE, the Alleged Debtors, the Lender and BALC respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as this Court may deem just and proper.

Dated: November 22, 2010

Respectfully submitted,

/s/*Louis R. Strubeck*_____
Louis R. Strubeck, Jr. (SBT 19425600)
William R. Greendyke (SBT 08390450
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:    214-855-8000
Telecopy:     214-855-8200

*Counsel for the Alleged Debtors*

and

Robert W. Jones, Esq.
Brent R. McIlwain, Esq.
PATTON BOGGS, LLP
2000 McKinney Ave., Suite 1700
Dallas, Texas  75201
(214) 758-1500 (Phone)
(214) 758-1550 (Facsimile)

*Counsel for Bank of America, N.A., and*
*Banc of America Leasing & Capital, LLC*

and

C. Edward Dobbs, Esq.
Joshua J. Lewis, Esq.
PARKER, HUDSON, RAINER & DOBBS LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303
Telephone No.:  (404) 523-5300
Facsimile:  (404) 522-8409

*Counsel for Bank of America, N.A., and*
*Banc of America Leasing & Capital, LLC*