

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed December 03, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | **Involuntary Chapter 11** |
| | § | |
| VITRO ASSET CORP., *et al.* | § | Case No. 10-47470-rfn-11 |
| | § | |
| **Alleged Debtors.** | § | **Jointly Administered** |
| | § | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 303, 361, 363 AND 364 (I) AUTHORIZING CERTAIN FACILITY OBLIGORS (A) TO CONTINUE TO OBTAIN SECURED FINANCING, (B) TO CONTINUE TO UTILIZE THEIR EXISTING CASH MANAGEMENT SYSTEM AND (C) TO USE CASH COLLATERAL, (II) APPROVING POST-PETITION FINANCING, (III) GRANTING ADEQUATE PROTECTION AND (IV) SCHEDULING A FINAL HEARING**

This matter came on for hearing on November 23, 2010 (the "*Interim Hearing*") on the Joint Emergency Motion (the "*Motion*") of Vitro America, LLC, a Delaware limited liability company ("*Vitro America*"), and VVP Finance Corporation, a Delaware corporation ("*Finance*," and together with Vitro America, the "*Borrowers*"), and VVP Holdings, LLC, a Delaware limited liability company ("*Holdings*"), VVP Auto Glass, Inc., a Delaware corporation ("*Auto Glass*"), Super Sky International, Inc., a Delaware corporation ("*International*") and Super Sky Products, Inc., a Wisconsin corporation ("*Products*," and collectively with Holdings, Auto Glass

and International, the "*Guarantors*"), each an alleged debtor (collectively, the "*Facility Obligors*")[1] in the above-captioned involuntary Chapter 11 cases, Bank of America, N.A., a national banking association (the "*Lender*"), and Banc of America Leasing & Capital, LLC ("*BALC*") pursuant to Sections 105, 303(f), 361, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), seeking entry of an interim order (the "*Interim Order*"):

(i)   authorizing the Borrowers to continue to request and receive loans and other extensions of credit from the Lender pursuant to the terms of the Loan Agreement (as defined below) and the securing and repayment thereof;

(ii) under Bankruptcy Code Section 364(d), authorizing the Facility Obligors to obtain secured post-petition financing on a junior priority lien basis (the "*Affiliate Loan Facility*") during the Gap Period (as defined below) pursuant to the terms and conditions of a certain Subordinated Post-Petition Loan and Security Agreement (as amended, supplemented, restated or otherwise modified from time to time, the "*Affiliate Loan Agreement*"), to be entered into among the Borrowers, the Guarantors and Vitro, S.A.B. de C.V. ("*Vitro*" or the "*Affiliate Lender*");

(iii) authorizing the Facility Obligors to execute and deliver the Affiliate Loan Agreement and other related loan documents (collectively with the Affiliate Loan Agreement, the "*Affiliate Loan Documents*") among the Borrowers, the Guarantors and the Affiliate Lender, and to

---

[1] The Facility Obligors, together with Vitro Asset Corp., Vitro Chemicals, Fibers & Mining, LLC, Troper Services, Inc., Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Company, Crisa Corporation, V-MX Holdings, LLC and Vitro Packaging, LLC, comprise the alleged debtors (collectively, the "*Alleged Debtors*") in the above-captioned involuntary Chapter 11 cases.

perform such other acts as may be necessary or desirable in connection with the Affiliate Loan Agreement;

(iv) granting to the Affiliate Lender automatically perfected security interests in and liens on all of the Collateral (as defined below), including, without limitation, all property constituting Cash Collateral (as defined below), which liens would be junior in all respects to the Pre-Petition Liens (as defined below) to secure the advances, if any, made during the Gap Period under the Affiliate Loan Agreement;

(v) authorizing the Facility Obligors to continue utilizing, and the Lender to continue making available to the Facility Obligors, the bank account services, lockboxes, corporate credit cards, treasury management services and other aspects of the cash management system established at the Lender (the "*Cash Management System*"), subject to all of the terms and conditions in the pre-petition agreements between one or more of the Facility Obligors and the Lender relating to such Cash Management System and with the ongoing benefit of all collateral security therefor;

(vi) authorizing the use of Cash Collateral and providing adequate protection to the Lender for any diminution in value of its interests (held for itself and BALC) in the Pre-Petition Collateral (as defined below) as a condition to the Facility Obligors' use of such property, which is subject to the Pre-Petition Liens held by Lender; and

(vii) scheduling a final hearing (the "*Final Hearing*") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the stipulation of counsel submitted at the Interim Hearing and the certification of counsel for the Facility Obligors that the Motion has been served by them on the U.S. Trustee (as defined below) and counsel of record for the

Petitioners (as defined below); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d) and 9014; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections to the relief requested in the Motion having been resolved by the Court; and it appearing to the Court that granting the relief requested is necessary to avoid immediate and irreparable harm to the Facility Obligors, is otherwise fair and reasonable and in the best interests of the Facility Obligors, their creditors and equity holders, and is essential for the continued operation of the Facility Obligors' businesses; and adequate protection being provided on account of the interests of holders of liens on the property of the Facility Obligors on which liens are to be granted;

Based upon the record established at the Interim Hearing by the Facility Obligors, the Lender and BALC and as further clarified by the Court on the record of the hearing held on December 1, 2010, and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT[2] AND CONCLUSIONS OF LAW:

A. <u>Involuntary Petition Date</u>. On November 17, 2010 (the "*Involuntary Petition Date*"), Knighthead Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund, LP, and Lord Abbett Bond-Debenture Fund, Inc., as alleged creditors (collectively, the "*Petitioners*"), filed involuntary petitions for the entry of orders for relief with respect to the Alleged Debtors under Chapter 11 of the Bankruptcy Code (the

---

[2] These findings of fact are solely for purposes of granting the relief requested in the Motion and are based on statements made therein and the testimony at the Interim Hearing; but none of these findings shall be binding upon any party in interest other than the Facility Obligors.

"*Involuntary Petitions*"). No response has been filed by, or is yet due from, any Alleged Debtor to any Involuntary Petitions.

B. <u>Preliminary Conference</u>. On November 18, 2010, the Court entered its *Standing Scheduling Order Regarding Involuntary Cases* [Docket No. 3], setting a conference on December 20, 2010 regarding the possible entry of orders for relief.

C. <u>Conduct and Nature of Business</u>. The Facility Obligors manufacture, fabricate and distribute glass products across the automotive, home construction and commercial construction industries. As authorized by Section 303(f) of the Bankruptcy Code, the Facility Obligors continue to operate their businesses and use, acquire or dispose of property as if an involuntary case had not been commenced against them.

D. <u>Pre-Petition Debt</u>. The Borrowers are party to that certain Loan and Security Agreement, dated as of June 27, 2003 (hereinafter, together with all amendments thereto and modifications thereof, the "*Loan Agreement*"), pursuant to which the Lender provided the Borrowers with, among other things, a $35 million secured revolving credit facility (the "*Loan Facility*"), including letters of credit, with a sublimit for letters of credit of $18 million. In connection therewith, the Guarantors executed, in the Lender's favor, certain Continuing Guaranty Agreements (the "*Guaranty Agreements*") by which they guaranteed payment and performance of all Obligations under (and as defined in) the Loan Agreement. As of the Involuntary Petition Date, there was outstanding under the Loan Facility, (1) loans in the approximate principal amount of $8,610,575, (2) reimbursement obligations for any draws made upon letters of credit issued by the Lender for the account of the Borrowers, in the aggregate face amount of approximately $14,180,000 and (3) corporate credit card debt of approximately $501,000 (collectively, with all other obligations of any Facility Obligor to the Lender, including

all indebtedness associated with the Cash Management System and all interest, fees, legal expenses and other amounts heretofore or hereafter accruing on any of the foregoing or at any time chargeable to any of the Facility Obligors in connection therewith, referred to as the "*Pre-Petition Debt*").

      E.    <u>Pre-Petition Liens</u>. As security for the payment of all Pre-Petition Debt and certain equipment lease indebtedness owed to BALC in the approximate principal amount on the Involuntary Petition Date of $3,602,000 (together with all other liabilities of any Facility Obligor under any such equipment lease, the "*BALC Leasing Obligations*"), each Facility Obligor other than Products granted to the Lender, for itself and for the benefit of BALC, pursuant to the Loan Agreement, the Guaranty Agreements, and various mortgages and related security documents (collectively, the "*Loan Documents*"), security interests in and liens upon (the "*Pre-Petition Liens*") (1) all or substantially all of such Facility Obligor's personal property, including, without limitation, all accounts, inventory, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment, money, securities, deposit accounts, and books and records, and (2) certain real property and improvements thereto located in Los Angeles County, California, Denver County, Colorado, Grenada County, Mississippi, Guilford County, North Carolina, Oklahoma County, Oklahoma, Tulsa County, Oklahoma, Dallas County, Texas, Harris County, Texas, and Henrico County, Virginia (all such real and personal property, as the same existed on the Involuntary Petition Date, together with all cash and non-cash proceeds thereof, the "*Pre-Petition Collateral*").

      F.    <u>Cash Management System</u>. The Facility Obligors maintain all or substantially all of their banking relationships with the Lender, including lockbox and depository accounts. As part of the Cash Management System, obligors on accounts receivables of the Facility Obligors

are directed to remit payment with respect to such accounts to a collection account at the Lender or a lockbox over which the Lender exercises dominion and control, and after the Lender's receipt thereof, all such collections are applied to the Pre-Petition Debt in accordance with the Loan Documents. Some or all of the Facility Obligors have the use of corporate credit cards issued by Lender. The Lender asserts that its willingness to continue to maintain the foregoing components of the Cash Management System for the Facility Obligors is predicated upon the Lender receiving assurances, in accordance with later provisions of this Interim Order, that the Lender is authorized to continue to implement and administer the Cash Management System during the Gap Period (as defined below) in accordance with all relevant pre-petition agreements between the Facility Obligors and Lender and with the ongoing benefit of all collateral security therefor.

G.     <u>Affiliate Loan Facility</u>.  The Affiliate Lender has represented that it is willing to extend credit to the Facility Obligors to make up operational shortfalls and certain capital expenditures as well as to pay down debt (the "*Affiliate Funding*").  It is uncertain whether the Affiliate Lender is willing to extend the Affiliate Funding to the Facility Obligors during the Gap Period on an unsecured basis.  At this time, however, the record is insufficient to determine that (1) the Facility Obligors are unable to obtain financing from sources other than the Affiliate Lender on terms more favorable than the Affiliate Loan Facility, and (2) the Facility Obligors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense.  At this time, it is also not clear if the Facility Obligors will need the funding provided under the Affiliate Loan Facility prior to the Final Hearing, but the Facility Obligors are concerned that the damage to their business from the adverse publicity surrounding the filing of the Involuntary Petitions, including the possible reduction of normal credit terms by

vendors, increase the likelihood of the need for such funding.  Accordingly, the Facility Obligors seek authorization to enter into the Affiliate Loan Agreement with the Affiliate Lender during the Gap Period on an unsecured basis.  The Lender, on its behalf and the behalf of BALC, represents that it consents to the Affiliate Funding on the terms and conditions set forth in the Affiliate Loan Agreement and in this Interim Order.  The Facility Obligors reserve all of their rights to request additional interim hearings to renew their request that the Affiliate Lender be granted post-petition security interests in and liens upon the Collateral in connection with the Affiliate Funding.  If the Affiliate Lender is granted post-petition security interests in and liens upon any of the Collateral in connection with the Affiliate Funding, the Lender, the Affiliate Lender and the Facility Obligors agree that they will first execute a lien subordination agreement, in form and substance satisfactory to the Lender, the Affiliate Lender and the Facility Obligors, pursuant to which the Affiliate Lender will subordinate the priority of such post-petition security interests and liens in its favor to the Pre-Petition Liens and all other liens and security interests granted to the Lender pursuant to this Interim Order or any subsequent order of the Court.  At the Final Hearing, the Alleged Debtors will seek final approval of the financing under the Affiliate Loan Facility pursuant to a proposed final order (the "*Final Order*"), which shall be in form and substance acceptable to the Lender and the Affiliate Lender.

H.    <u>Cash Collateral/Financing</u>.  The Facility Obligors intend to continue to operate their businesses in the ordinary course pursuant to Section 303(f) of the Bankruptcy Code and, in connection therewith, to use, sell and otherwise dispose of their respective properties, including property constituting Pre-Petition Collateral.  The Facility Obligors believe that, in the immediate future, their operations can be sustained by the use of cash proceeds from the sale, collection or other disposition of their existing and future assets, including the Pre-Petition

Collateral (all such proceeds being referred to as the "*Cash Collateral*"), and without the necessity of obtaining additional extensions of credit from the Lender under the Loan Agreement. The Borrowers are uncertain, however, about the effect that the filing of the Involuntary Petitions will have on their cash flow and operations, and forecast that they may need access to funds in excess of Cash Collateral prior to the Final Hearing. Thus, to prevent immediate and irreparable harm to the Facility Obligors, their creditors and equity holders, the Borrowers seek authorization to continue obtaining loans and other extensions of credit from the Lender under the Loan Agreement, and for the Lender to be authorized to honor such requests for loans and other extensions of credit in accordance with the terms of the Loan Agreement and with all of the rights, benefits, privileges and security set forth in the Loan Documents, including the ongoing effectiveness of the Pre-Petition Liens with respect to all Pre-Petition Collateral and attachment to all other like items of property created, acquired or arising after the Involuntary Petition Date (all such after-acquired property being referred to as "*Post-Petition Collateral*" and, together with the Pre-Petition Collateral, the "*Collateral*"). The Lender and BALC represent that they are willing to consent to the Facility Obligors' use of the Pre-Petition Collateral, including the Cash Collateral, and the Lender represents that it is willing to continue to provide financing, on the terms and subject to the conditions of this Interim Order, including the provision of adequate protection to the Lender as hereinafter set forth. At the Final Hearing, the Alleged Debtors will seek final approval of the ongoing financing and use of Cash Collateral arrangements pursuant to the Final Order.

      I.      <u>Need for Use of Cash Collateral/Financing</u>. The Facility Obligors' need to (1) use Cash Collateral on an interim basis and to obtain ongoing credit on an interim basis pursuant to the Loan Agreement and (2) obtain credit on an interim basis pursuant to the Affiliate

Loan Agreement is immediate and critical in order to enable the Facility Obligors to continue operations. The ability of the Facility Obligors to finance their operations, maintain business relationships with their vendors, suppliers and customers and to pay their employees requires the availability of working capital from the Loan Facility and Affiliate Loan Facility and the use of Cash Collateral, the absence of which will immediately and irreparably harm the Facility Obligors, their creditors and equity holders. The Facility Obligors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the Loan Facility, the Affiliate Funding and authorized use of Cash Collateral.

    J. <u>Adequate Protection</u>. The Lender is entitled to receive adequate protection as more fully set forth in paragraph 5 of this Interim Order, pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, for any diminution in value of its interests (held for itself and BALC) in the Pre-Petition Collateral resulting from the Facility Obligors' use of Cash Collateral or their use, sale, consumption or other disposition of any part of the Pre-Petition Collateral consisting of inventory (whether raw materials, work in process or finished goods) or BALC leased equipment.

    K. <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>. The Lender and BALC have indicated a willingness to consent to the use of Cash Collateral, and the Lender has indicated a willingness to extend credit under the Loan Agreement, subject to (i) the terms of this Interim Order and the Final Order (if acceptable, in form and substance, to the Lender) and (ii) entry of findings by this Court that such use of Cash Collateral and such extensions of credit are essential to the Facility Obligors, that the Lender is extending credit to the Facility Obligors pursuant to the terms of the Loan Agreement in good faith, and that the

Lender's protections granted pursuant to this Interim Order will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order. The use of Cash Collateral and extension of credit under the Loan Agreement and this Interim Order were negotiated in good faith and at arm's length among the Facility Obligors, the Lender and BALC. Use of Cash Collateral and credit to be extended under the Loan Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and the Lender and BALC are therefore entitled to the protections and benefits of Section 364(e) of the Bankruptcy Code and this Interim Order.

L. <u>Notice</u>. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided, and certified to, by the Facility Obligors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the office of the United States Trustee (the "*U.S. Trustee*"), (ii) counsel to the Affiliate Lender and (iii) counsel for the Petitioners. The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

M. <u>Relation Back to Oral Ruling</u>. The Court on November 24, 2010, announced on the record that the Motion was granted, with certain modifications thereto relating to the unsecured nature of the proposed Affiliate Funding and as further clarified by the Court on the record of the hearing held on December 1, 2010. Accordingly, this Interim Order will be effective as of November 24, 2010, but the adequate protection afforded herein will be effective as of the Involuntary Petition Date.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.  <u>Granting of Motion</u>.  The Motion is hereby granted as and to the extent hereinafter set forth.

2.  <u>Authorization of the Affiliate Loan Facility</u>.  Entry into the Affiliate Loan Facility and the Affiliate Funding thereunder during the Gap Period are hereby approved, <u>provided</u> that, unless and until otherwise authorized by the Court, all Affiliate Funding shall be on an unsecured basis, subject to the provisions of paragraph 9(c) of this Interim Order.  The Facility Obligors are expressly and immediately authorized, empowered and directed to execute and deliver the Affiliate Loan Documents, to incur and perform the obligations thereunder in accordance with, and subject to the terms of, this Interim Order and the Affiliate Loan Documents and to deliver all instruments and documents which may be required or necessary for the performance by the Facility Obligors under the Affiliate Loan Facility.  Upon execution and delivery, the Affiliate Loan Documents shall represent valid and binding obligations of the Facility Obligors, enforceable against each of the Facility Obligors in accordance with their terms.  Until the termination of the Gap Period, and subject to the terms and conditions set forth in the Affiliate Loan Documents and this Interim Order, and in order to prevent immediate and irreparable harm to the Facility Obligors, the Facility Obligors are hereby authorized to request Affiliate Funding on an unsecured basis up to an aggregate outstanding principal amount of $3 million at any one time outstanding from the Affiliate Lender.  Copies of any executed Affiliate Loan Documents shall be provided to counsel to the Lender and the Petitioners.

3.     Affiliate Obligations.  Subject to the provisions of paragraph 9(c) of this Interim Order, the Affiliate Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Affiliate Funding and all of the Facility Obligors' other obligations under the Affiliate Loan Facility (collectively, the "*Affiliate Obligations*"), which Affiliate Obligations shall be enforceable against the Facility Obligors.  Upon entry of this Interim Order, the Affiliate Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Facility Obligors to the Affiliate Lender under the Affiliate Loan Documents or this Interim Order, including, without limitation, all principal, interest, accrued interest, costs, fees, expenses and other amounts under the Affiliate Loan Documents.  Subject to the provisions of paragraph 9(c) of this Interim Order, the Affiliate Obligations shall be due and payable, without notice or demand, upon the expiration of the Gap Period, provided that no repayment of the Affiliate Obligations shall be permitted to be made by any Facility Obligor unless at the time of such repayment the conditions under the Loan Agreement (as in effect on the date hereof) for the repayment of Vitro-Holdings Intercompany Debt (as defined in the Loan Agreement) are satisfied (regardless of whether any Affiliate Obligations constitute Vitro-Holdings Intercompany Debt).

4.     Turnover of and Authorization to Use Cash Collateral.  Subject to the provisions of paragraph 5 of this Interim Order regarding adequate protection for any diminution in value of the Lender's interests (held for itself and BALC) in the Pre-Petition Collateral and subject to the ongoing satisfaction of the Basic Funding Conditions (as defined below), the Facility Obligors are authorized, during the period (the "*Gap Period*") from the Involuntary Petition Date to the earliest to occur of (a) entry of orders for relief with respect to any Facility Obligor that is a

Borrower or (b) dismissal of the Involuntary Petitions, to use Cash Collateral in the operation of the business of the Facility Obligors, to make payments to the Lender to the extent authorized by this Interim Order, and to make payments to BALC in respect of the BALC Lease Obligations accruing during the Gap Period, all of which payments to the Lender and BALC shall be deemed to have been made for fair and equivalent value and may be retained irrespective of the provisions of Section 549 of the Bankruptcy Code. The Lender is authorized to turn over to the Facility Obligors (or any of them) all such Cash Collateral received by the Lender during the Gap Period (to the extent representing collected and available funds) that is not applied to the Gap Credit Extensions (as defined below) and in no event shall any such turnover be deemed to be a loan or other extension of credit by the Lender under the Loan Agreement or otherwise. No Cash Collateral may be used by any Alleged Debtor that is not a Facility Obligor. The Lender shall have no responsibility for any Facility Obligor's use of any Cash Collateral.

5.    Adequate Protection. As adequate protection against any diminution in value of the Lender's and BALC's interests in the Pre-Petition Collateral (including any portion thereof consisting of Cash Collateral) during the Gap Period resulting from any Facility Obligor's use of Cash Collateral or use, sale, consumption or other disposition of any part of the Pre-Petition Collateral consisting of inventory (whether raw materials, work in process or finished goods) or BALC leased equipment, (a) the Lender shall have, and is hereby granted (effective as of the Involuntary Petition Date), a replacement lien (which shall be automatically and properly perfected) upon all of the Post-Petition Collateral; (b) the Facility Obligors shall make periodic payments to BALC in respect of the BALC Lease Obligations, as required by the BALC equipment leases, to the extent such payments relate to lease rentals accruing during the Gap Period; and (c) the Facility Obligors shall pay to the Lender any amount necessary to repay in

full any Overadvances (as defined below), regardless of whether such payment is applied to the Pre-Petition Debt or Gap Credit Extensions. Any payments made to BALC or the Lender pursuant to the foregoing provisions of this paragraph 5 shall not be recoverable under Section 549 of the Bankruptcy Code, inasmuch as all such payments shall be deemed to be for value received within the meaning of Section 549 of the Bankruptcy Code. For purposes of determining the use, sale or other disposition of inventory, it will be presumed that inventory in existence on the Involuntary Petition Date was the first inventory to be used, sold or otherwise disposed of and that any inventory acquired after the Involuntary Petition Date was not used, sold or otherwise disposed of until after the disposition of all inventory in existence on the Involuntary Petition Date. Notwithstanding anything to the contrary contained in paragraph 4 of this Interim Order, the Facility Obligors shall not be authorized to use any Cash Collateral if at the time of such use, or immediately after giving effect thereto, the aggregate amount of the Pre-Petition Debt and any additional extensions of credit after the Involuntary Petition Date under the Loan Agreement exceeds (or would exceed) the Borrowing Base (as defined in the Loan Agreement), with any such excess being referred to herein as an "*Overadvance.*" For the avoidance of doubt, accounts and inventory of Borrowers which comprise Post-Petition Collateral and that otherwise qualify as Eligible Accounts or Eligible Inventory (as defined in the Loan Agreement) shall be included in the Borrowing Base solely for the purpose of calculating an Overadvance. If a dispute arises between the Facility Obligors and the Lender regarding whether an Overadvance exists, such dispute shall be promptly brought to the attention of the Court for resolution in the absence of the parties' ability to resolve such dispute on their own. The Facility Obligors' authority to use Cash Collateral shall resume after any Overadvance

ceases to exist (provided all other conditions to such use as set forth in this Interim Order are satisfied) and until such time (if ever) that a subsequent Overadvance exists.

6.     Gap Period Extensions of Credit.  During the Gap Period (but not beyond January 30, 2011, unless otherwise consented to by the Lender in its discretion), the Borrowers are authorized to request extensions of credit from the Lender pursuant to the Loan Agreement and to incur indebtedness and other obligations under the Loan Agreement (including all interest, fees and other charges in connection therewith, the "*Gap Credit Extensions*"); and the Lender is authorized to honor such requests and to make such Gap Credit Extensions subject to and with the benefit of all of the terms, conditions, rights, benefits, privileges and security set forth in the Loan Agreement and other Loan Documents.  Unless and until the Non-Discretionary Funding Conditions (as defined below) are satisfied, the Lender shall have no obligation whatsoever to honor any request of the Borrowers for any Gap Credit Extensions, all of which will be made (or declined) by the Lender in its sole and absolute discretion and, if made, in such amounts and at such times as the Lender may in its sole discretion elect; provided, however, that it is acknowledged and understood that the Lender will be disinclined to make any Gap Credit Extensions (or to allow use of Cash Collateral) unless all of the Basic Funding Conditions are and remain satisfied.  If and for so long as the Non-Discretionary Funding Conditions are satisfied, the Lender's undertaking to honor requests for Gap Credit Extensions under the Loan Agreement during the Gap Period (but not beyond January 30, 2011, unless otherwise consented to by the Lender in its discretion) shall be as set forth in the Loan Agreement, but without regard to the Default currently existing by virtue of the pendency of the Involuntary Petitions.  As used herein, the term "*Basic Funding Conditions*" means that (a) no Default under (and as defined in) the Loan Agreement occurs or exists other than a Default arising from the pendency of the

Involuntary Petitions; (b) no Event of Default under (and as defined in) the Loan Agreement occurs or exists other than the Facility Obligors' failure to cause the Involuntary Petitions to be dismissed within 60 days after the Involuntary Petition Date; (c) Borrowers have complied with all of the terms and conditions of the Loan Agreement; and (d) no Overadvance exists (either immediately prior, or after giving effect, to any proposed use of Cash Collateral or the funding of any Gap Credit Extension). The term "*Non-Discretionary Funding Conditions*" means (x) each of the Basic Funding conditions has been satisfied; and (y) the Affiliate Loan Documents have been duly executed by the parties thereto, the Affiliate Loan Facility has been established thereunder as a committed unsecured revolving credit facility available to the Facility Obligors in an aggregate amount outstanding at any time of at least $3 million, and no event of default exists under any of the Affiliate Loan Documents. All Gap Credit Extensions shall constitute Obligations under (and as defined in) the Loan Agreement and shall be deemed to be secured by the Pre-Petition Liens upon the Pre-Petition Collateral and all proceeds thereof and by additional first priority security interests and liens (which are hereby granted by the Court in favor of the Lender and which shall be deemed automatically perfected without the necessity of any filing or recording) with respect to all of the Collateral. The Pre-Petition Liens with respect to the Pre-Petition Collateral, to the extent securing the Gap Credit Extensions, shall be deemed valid, perfected and unavoidable under Section 549 of the Bankruptcy Code or otherwise. Any payments made by any of the Facility Obligors with respect to any of the Obligations under (and as defined in) the Loan Agreement (which Obligations shall be inclusive of all Pre-Petition Debt and all Gap Credit Extensions) shall be deemed to have been applied first to the payment in full of the Gap Credit Extensions, and Lender shall be authorized to accept or decline payment with respect to any of the Pre-Petition Debt. In no event shall any payment with respect to any of the

Gap Credit Extensions be recoverable under Section 549 of the Bankruptcy Code, inasmuch as all such payments shall be deemed to be for value received within the meaning of Section 549 of the Bankruptcy Code. The Guaranty Agreements shall continue in effect with respect to all Gap Credit Extensions. The Lender shall have no responsibility for any Borrower's use of any Gap Credit Extension. No proceeds of Gap Credit Extensions may be used by any Alleged Debtor that is not a Facility Obligor.

7.     <u>Continuation of Cash Management System</u>. During the Gap Period, and unless and to the extent otherwise ordered prospectively in the Final Order, the Facility Obligors are authorized to continue to use, and the Lender is authorized to make available to the Facility Obligors for such use, the Cash Management System. Any indebtedness incurred by any Facility Obligor in connection with the Cash Management System after the Involuntary Petition Date (and, for the avoidance of doubt, any indebtedness arising from checks deposited to any Facility Obligor's bank account prior to the Involuntary Petition Date but returned unpaid thereafter, as well as any fees and charges incurred in connection with the Cash Management System that first become due and payable after the Involuntary Petition Date, shall be deemed to be indebtedness incurred after the Involuntary Petition Date) shall be secured by the Pre-Petition Liens and by first priority post-petition security interests and liens and rights of offset (which are hereby granted and conveyed by the Court in favor of the Lender and which shall be deemed to be automatically perfected without the necessity of any filing or recording). Without limiting the generality of the foregoing, (a) the Facility Obligors shall be authorized to make deposits to, and cause transfers to be made from, each bank account maintained by a Facility Obligor at the Lender, including ACH transfers and wire transfers initiated by a Facility Obligor from any such bank account, and (b) the Lender shall be authorized to honor any checks at any time drawn by

any Facility Obligor on any such bank account, whether drawn prior to or after the Involuntary Petition Date and whether relating to, or in payment of, an obligation incurred prior to or after the Involuntary Petition Date, provided that nothing herein shall require the Lender to extend any credit to any Facility Obligor in connection with any bank account (whether by overdraft, ACH transfer or otherwise), but the Lender may do so in its sole discretion pursuant to any pre-petition agreement with a Facility Obligor relating to any aspect of the Cash Management System. The Lender shall be authorized to allow the Facility Obligors to continue to use all corporate credit cards, and the Facility Obligors shall be authorized to incur and repay indebtedness to the Lender in connection therewith. The Lender may continue to administer, and the Facility Obligors shall be authorized to continue to utilize, all aspects of the Cash Management System, including all lockboxes and bank accounts at the Lender, as if the filing of the Involuntary Petitions had not occurred and, in connection therewith, Lender may honor stop payment orders initiated by a Facility Obligor with respect to any check, charge any bank account with all fees and expenses associated with the Cash Management System, offset any deposit balances in any bank account against overdrafts or other charges related to such bank account or any other aspect of the Cash Management System, and receive and retain all payments required to be made in connection with the Cash Management System (including corporate credit card payments and bank account charges). In no event shall any payment authorized to be made to the Lender pursuant to this paragraph 7 be recoverable under Section 549 of the Bankruptcy Code, inasmuch as all such payments shall be deemed to be for value received within the meaning of Section 549 of the Bankruptcy Code. The foregoing provisions of this Interim Order shall be without prejudice to the right, if any, of any Facility Obligor to recover from the payee of any check or other item of

payment (other than the Lender or BALC as recipients of any payments authorized by this Interim Order) any sums paid to such payee pursuant to Section 549(a) of the Bankruptcy Code.

8.      <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification of this Interim Order</u>.  The Affiliate Lender, the Lender and BALC have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the Affiliate Lender, the Lender and BALC are entitled to the protections provided in Section 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien created, or authorized hereby to continue, with respect to any Collateral.  Any liens granted to or continued in favor of the Lender hereunder and attaching to any Collateral prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including, without limitation, entitlement to all rights, remedies, privileges and benefits granted herein.

9.      <u>No Adjudication; Limitations on Authority</u>.  Nothing in this Interim Order shall (a) constitute a determination by this Court of (i) the amount, validity or enforceability of any of the Pre-Petition Debt, (ii) the validity, extent, perfection or priority of any of the Pre-Petition Liens with respect to the Pre-Petition Debt or BALC Lease Obligations, or (iii) the validity or enforceability of any of the Loan Documents; <u>provided</u>, <u>however</u>, that no objection or challenge may be asserted based on the contention that the advances or obligations that arose during the

Gap Period or the property to which the security interest or liens attached in accordance with this Interim Order was created or acquired by the Borrowers during the Gap Period; (b) impair the right of any interested party having standing to do so to challenge the validity, extent, perfection or priority of the Pre-Petition Liens as security for the Pre-Petition Debt or the BALC Lease Obligations; (c) impair the right of any holder of senior notes issued by Vitro and guaranteed by the Alleged Debtors (collectively, the "*Notes*") with respect to the Affiliate Funding, including any rights under the applicable indentures governing the Notes; or (d) be construed to grant to the Lender or BALC relief from the stay to exercise default remedies of foreclosure upon its Pre-Petition Liens or to exercise any rights to offset any bank account of a Facility Obligor against any Pre-Petition Debt incurred other than in connection with the administration of the Cash Management System. Notwithstanding anything to the contrary in this Interim Order, nothing in this Interim Order shall prejudice or impair the right (if any) of any party in interest having standing to do so to recover any payment made to the Lender during the Gap Period with respect to and applied to any Pre-Petition Debt (including, for the avoidance of doubt, any adequate protect payments in respect of any Overadvance to the extent such payments are applied to repayment of the Pre-Petition Debt) pursuant to Chapter 5 of the Bankruptcy Code to the extent that it is subsequently determined by final order of the Court that (x) the Pre-Petition Liens securing such Pre-Petition Debt were, on the Involuntary Petition Date, invalid or unperfected or are otherwise avoided, and (y) the Pre-Petition Debt did not constitute Pre-Petition Debt that is authorized to be paid to the Lender pursuant to paragraph 7 of this Interim Order, or impair or restrict any defense that the Lender may have to any such attempted recovery. In no event shall any payments made to the Lender with respect to any Gap Credit Extensions be recoverable.

10.    Rights Preserved.  Nothing herein shall prejudice or impair in any way the right of the Affiliate Lender, the Lender or BALC to seek other or additional relief in these involuntary Chapter 11 cases, including, without limitation, further protection of their interests in any property of the Facility Obligor, relief from the automatic stay and the imposition of additional restrictions of any Facility Obligor's authority to use any Collateral.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Facility Obligors', the Petitioners' or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.  Entry of this Interim Order is without prejudice to any and all rights of the Petitioners, the U.S. Trustee and any other party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in the involuntary Chapter 11 cases.

11.    Final Hearing.  A date for the Final Hearing to consider entry of the Final Order and final approval of the extension of credit and use of Cash Collateral shall be sought at the status conference on December 20, 2010 at 10:00 a.m.  Not later than five (5) days after entry of this Interim Order, the Facility Obligors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order, together with copies of the Interim Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing; and (b) any party which has filed prior to such date a request for notices with this Court.

12.    Immediate Effectiveness.  This Interim Order shall be effective as of November 24, 2010, and shall be valid, take full effect and be enforceable immediately upon entry hereof, notwithstanding any contrary Bankruptcy Rule, and there shall be no stay of execution or effectiveness of this Interim Order.  The authorization for ongoing advances under the Loan

Agreement, the Affiliate Funding and the use of Cash Collateral pursuant to this Interim Order shall be effective only through the Gap Period.

13. <u>Retention of Jurisdiction</u>. This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

****** END OF ORDER ******

Submitted by:

_____/s/ William R. Greendyke_____
Louis R. Strubeck, Jr.
State Bar No. (19425600)
William R. Greendyke
State Bar No. (08390450)
Ryan E. Manns
State Bar No. (24041391)
**Fulbright & Jaworski L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200
lstrubeck@fulbright.com
wgreendyke@fulbright.com

Dennis F. Dunne (*pro hac vice* pending)
Risa M. Rosenberg (*pro hac vice* pending)
**Milbank, Tweed, Hadley & McCloy LLP**
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219
ddunne@milbank.com
rrosenberg@milbank.com

Andrew M. Leblanc (*pro hac vice* pending)
**Milbank, Tweed, Hadley & McCloy LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586
aleblanc@milbank.com

**ATTORNEYS FOR ALLEGED DEBTORS**

and

_____ /s/ Robert W. Jones _____
Robert W. Jones, Esq.
State Bar No. 10951200
Brent R. McIlwain, Esq.
State Bar No. 24013140
**PATTON BOGGS LLP**
2000 McKinney Avenue, Suite 1700
Dallas, Texas 75201
Telephone: 214-758-1500
Telecopy: 214-758-1550

**COUNSEL FOR BANK OF AMERICA, N.A., AND
BANC OF AMERICA LEASING & CAPITAL, LLC**

C. Edward Dobbs, Esq.
(pending admission *pro hac vice*)
Joshua J. Lewis, Esq.
(pending admission *pro hac vice*)
**PARKER, HUDSON, RAINER & DOBBS LLP**
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
Telephone: 404-523-5300
Telecopy: 404-522-8409

**COUNSEL FOR BANK OF AMERICA, N.A., AND
BANC OF AMERICA LEASING & CAPITAL, LLC**