Josiah M. Daniel, III, SBT #05358500
Daniel C. Stewart, SBT #19206500
Bradley R. Foxman, SBT # 24065243
**VINSON & ELKINS L.L.P.**
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel: (214) 220-7700   Fax: (214) 220-7716
Email:  jdaniel@velaw.com; dstewart@velaw.com

Duston K. McFaul, SBT # 24003309
**VINSON & ELKINS L.L.P.**
2300 First City Tower
1001 Fannin
Houston, Texas 77002-6760
Tel: (713) 758-4740  Fax: (713) 615-5777
Email: dmcfaul@velaw.com

George C. Webster II (Cal. State Bar #82870)
K. John Shaffer (Cal. State Bar #153729)
**STUTMAN, TREISTER & GLATT P.C.**
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Tel: (310) 228-5600   Fax: (310) 228-5788
Email:  gwebster@stutman.com; kjshaffer@stutman.com

**ATTORNEYS FOR ELLIOTT INTERNATIONAL L.P.
AND THE LIVERPOOL LIMITED PARTNERSHIP**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 Case (Involuntary) |
| | ) | |
| **VITRO ASSET CORP., et al.,** | ) | Case No. 10-47470-RFN-11 |
| | ) | |
| **Alleged Debtors.** | ) | (Joint Administration) |

**STATEMENT OF ELLIOTT IN SUPPORT OF PETITIONING CREDITORS' MOTION TO TRANSFER VENUE OF CH. 15 PETITION TO NORTHERN DISTRICT OF TEXAS**

Elliott International L.P. and The Liverpool Limited Partnership (collectively, "Elliott") supports the "Motion of the Petitioning Creditors for Determination that Certain Bankruptcy Cases Should Proceed in the US Bankruptcy Court for the Northern District of Texas Pursuant to Fed. R. Bankr. P. 1014(b)" (the "Venue Motion") [Dkt. #76] filed by Knightland Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund L.P. and Lord Abbett Bond-Debenture Fund, Inc. (collectively, the "Petitioning Creditors") and opposes the cross motion [Dkt. #108] (the "Cross Motion") filed by the debtors in the above captioned cases (the "Debtors"). Granting the Venue Motion and denying the Cross Motion will

provide the most fair, efficient, and economical manner in which to proceed for these prior-filed cases and the subsequent proceeding filed by Vitro S.A.B. de C.V. ("Vitro SAB") under chapter 15 ("Ch. 15" and the "Ch. 15 Petition").

## BACKGROUND

1. To understand the positions of the parties requires an understanding of the history that has caused all of the parties to come to this Court for a number of hearings, including on November 23, December 16, December 20, January 5, and now January 6, 2011.

2. Stated succinctly, that history includes:

- Over two years of continuing payment default on over $1.2 billion of notes by Vitro SAB (a Mexican holding company) and by its affiliates, including the Debtors;

- an extraordinarily aggressive effort by Vitro SAB to discharge the debts of non-debtor affiliates (including two Texas debtors) without ever conducting a bankruptcy proceeding—in Mexico or the US—with respect to such affiliates;[1]

- Vitro SAB's contriving to issue massive intercompany obligations to its affiliates that will, it has announced, be voted by its subsidiaries to approve a discharge of affiliate debt over the objections of US creditors holding hundreds of millions of dollars in claims against such affiliates;

- the current attempt to discharge the liability of Mexican and independent US obligors for about 50 cents-on-the-dollar while retaining equity ownership, and all without filing bankruptcy proceedings for any entity other than Vitro SAB;

---

[1] The Debtors also allege that Vitro SAB is the primary obligor on the debts owed to the Petitioning Creditors and to Elliott. Cross Motion, ¶ 40 ("Vitro SAB is the primary obligor…"). This argument permeates all the Debtors' pleadings in these cases, but is incorrect. Each of the Debtors is independently liable to the noteholders under the express language of the 2012 and 2107 indentures (Sec. 10.01: "Irrevocably and unconditionally guarantees, jointly and severally, on an unsecured basis, the full and punctual payment (whether at Stated Maturity…or acceleration, or otherwise…)"). The Debtors are independently and directly liable to Elliott and other creditors under the notes regardless of any actions, assertions or alleged defenses by Vitro SAB. *See e.g., Ocean Transport, Inc. v. Greycas, Inc.,* 878 S.W.2d 256 (Tex. App. Corpus Christi 1994), *writ denied*, (Dec. 15, 1994) (involving guarantee agreements and explaining the guarantor's liability is primary, direct, and immediate, and the lender could sue the guarantors without first suing the borrower, and the guarantors could not defend on the basis that the statute of limitations barred the suit against the borrower); *Merchants Bank of New York v. Pearl*, 88 N.Y.S.2d 286, 287-88 (N.Y. Sup. Ct. 1949) (holding guarantee does not in any way limit the time in which lender might proceed against any one guarantor, and since it is several as well as joint, lender can sue any one of the guarantors individually and not proceed against the others, nor is it required to proceed first against the borrower before proceeding against the guarantors; defendant's liability to pay becomes fixed immediately upon the failure to pay); *95 Lorimer, LLC v. Insurance Co. of State of Pennsylvania*, 789 N.Y.S.2d 833, 837 (N.Y. Sup. Ct. 2004) (holding that a guarantee agreement is to be construed like other contracts in order to give effect to the parties' intentions; in particular, the obligations of the guarantor must be strictly construed according to the terms of the agreement); *Pollina v. Blatt*, 691 N.Y.S.2d 156, 157 (N.Y. App. Div. 1999) (a guarantee is a separate undertaking).

- Vitro SAB's management's approval earlier this year of substantial transfers and of the incurrence by its affiliates—including the U.S. affiliates—of hundreds of millions of dollars of new obligations during insolvency for no known value in exchange; and

- the issuance by Vitro SAB management of a barrage of misleading and pejorative press releases attacking the US creditors as "vultures."

3. Elliott is a major creditor of the Debtors and of Vitro SAB by virtue of owning and holding notes aggregating in excess of $106 million of defaulted principal and interest, which are independent joint and several obligations, and which the Debtors as well as Vitro SAB have wholly failed to pay.[2]

4. Controlled by Vitro SAB, the Debtors have pursued a strategy of delay of all US proceedings at all cost while they aggressively pursue the Mexican *concurso*,[3] all in an attempt to maneuver a release and discharge of the clear liability of the US affiliates to US creditors, without any due process or protections under the Bankruptcy Code for the creditors of the US subsidiaries. The ramifications of permitting this course to proceed are grave: any US business entity facing substantial liabilities could just create a holding company in Mexico to wipe out its liabilities to creditors while retaining ownership of the equity.

5. This Court provides the most appropriate venue for these cases. It has a vested history administering and adjudicating proceedings relating to the Vitro entities, and it is the venue supported by the US creditors of the Debtors and Vitro SAB. Two of the Debtors are in

---

[2] Vitro has persisted in referring to those such as the Petitioning Creditors and Elliott as the "dissident minority noteholders," which is grossly misleading. Only a very small minority percentage of the outstanding third party bonds support the *concurso* proceedings, while Elliott and the Petitioning Creditors belong to an organized group that represents a clear majority, approximately $750 million out of the $1.2 billion of the bonds.

[3] The Debtors, meanwhile, assert that the actions of the Petitioning Creditors "have evidenced a clear intention to use the Involuntary Cases as a vehicle to disrupt Vitro's consensual restructuring in Mexico." Cross Motion, ¶ 44. As this Court is aware, the restructuring attempts by Vitro SAB in Mexico are far from "consensual," nor is its filing in Mexico "prepackaged" as is also represented by the Debtors. Rather, the Mexican restructuring is an attempt to use a Mexican insolvency proceeding for one foreign holding company to discharge and release the debts of US affiliates to US creditors, all without the constitutional and statutory substantive and procedural protections that are available in a US insolvency proceeding (*See, e.g.,* statement by counsel for Vitro at the hearing in this Court on 11/23/10, top of p. 47: "We believe it [the *concurso*] will also have the effect of restructuring the indebtedness of these Debtors."). Calling Vitro's ploy "consensual" contravenes the most basic of facts about these cases.

<u>**STATEMENT OF SUPPORT OF ELLIOTT**</u>                                          Page 3 of 14

Texas; two of Vitro America's five US fabrication facilities are in Texas, and more of the Debtors' Binswanger Glass locations are in Texas than in any other state. Moreover, Texas is the closest US state to Vitro SAB's headquarters in Monterrey, Mexico.[4]

6. Accordingly, Elliott supports the Petitioning Creditors' request to transfer the Ch. 15 Petition to the Fort Worth Division of the Northern District of Texas.

### Jurisdiction; Procedural History in this Court

7. The Court has jurisdiction over the fifteen Debtors in these jointly administered Ch. 11 cases as well as jurisdiction over all matters that arise under the Bankruptcy Code or arise in or are related to these Ch. 11 cases. 28 U.S.C. § 1334(a)&(b); *id.* § 157(a)&(b); Order of Reference of Cases and Proceedings Nunc Pro Tunc, US District Court, Northern District of Texas, Miscellaneous Rule No. 33 (Aug. 3, 1984). The matter presented in the Venue Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A)&(O). The venue of these involuntary Ch. 11 cases is proper.

8. The Court is well familiar with the procedural history of these involuntary Ch. 11 cases from the petition date, November 17, 2010, as all proceedings have been conducted within this Court. Moreover, the Court has held extensive and substantive hearings detailing the facts and issues surrounding Vitro SAB and its affiliates, as well as its intentions for restructuring and releasing their debt obligations. The Court is well aware of the relationships and positions among the parties, as much has been evidenced through the hundreds of pages of exhibits and substantive pleadings which have been submitted to this Court.

---

[4] Meanwhile, Vitro SAB opposes the transfer of its late-filed Ch. 15 Petition. It wants all cases to proceed in New York City. However, neither Vitro SAB nor any of the Debtors is domiciled in New York, and their closest fabrication facility to New York is in North Carolina. Rather, Vitro SAB knows that the Fort Worth bankruptcy court is well ahead on the learning curve, and starting anew in New York would only advance its goal to delay everything except for the Mexican *concurso*.

9. Vitro SAB, the holding company that owns the Debtors, filed its Ch. 15 recognition petition on December 14, 2010, in the US Bankruptcy Court for the Southern District of New York. Also on December 14, the Petitioning Creditors filed in this Court the Venue Motion, as appropriate under Bankruptcy Rule 1014, and filed a notice of the Venue Motion in the Ch. 15 case. As this Court has recognized, the venue decision for all these matters is vested in this Court under Bankruptcy Rule 1014.

## SUPPORT OF VENUE MOTION AND OBJECTION TO CROSS-MOTION

10. Elliott supports the Venue Motion and objects to the Cross Motion. Elliott requests that this Court transfer Vitro SAB's later-filed Ch. 15 Petition to the Bankruptcy Court for the Northern District of Texas, Fort Worth Division. Leaving Vitro SAB's Ch. 15 in New York will cause delay and inefficiency to the administration of these cases.

11. When determining whether to transfer a case from one venue to another, the court must take into account two general considerations: the convenience of the parties and the interests of justice. *In re Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1247 (5th Cir. 1979), *cert. denied* 444 U.S. 1045 (1980); *In re Moss*, 249 B.R. 411, 425 (N.D. Tex. 2000) (citing *Commonwealth*). The "convenience of the parties" may be guided by six factors: (1) proximity of creditors to court; (2) proximity of debtors to court; (3) proximity of witnesses necessary to administration of estate; (4) location of the assets; (5) economic administration of the estate; and, (6) necessity for the ancillary administration if a liquidation results. *Commonwealth Oil*, 596 F.2d at 1247. The *Commonwealth Oil* court observed, **"[T]he most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate."** *Commonwealth*, 596 F.2d at 1247 (bolding added).

12. In a pertinent Northern District of Texas precedent, the petitioning creditors were large creditors of the debtor and filed an involuntary petition in Texas. *In re Moss*, 249 B.R. 411

(Bankr. N.D. Tex. 2000). Although the debtor resided in California, had certain assets in California, and wished for the venue of the case to be transferred to California, Judge Houser held that the Northern District of Texas was the appropriate venue, could administer the case efficiently, and explained that the petitioning creditors are the debtors' largest creditors and want the case to proceed in Texas. *Id*. at 426. Similar to the situation in *Moss*, the largest creditors of the Debtors want these cases to proceed in Fort Worth, and this Court is well ahead of any other US court with regard to the facts and issues surrounding these proceedings as well as the respective positions of the constituencies involving Vitro SAB.[5]

13. In addition to the overwhelming desire of the Debtors' creditor constituency, the important *Commonwealth Oil* factors weigh heavily in favor of transferring the venue of the Ch. 15 Petition to Texas to be heard in connection with these cases.

*Economic Administration of the Estate*

14. The most important factor is whether the requested transfer would promote the economic and efficient administration of the estate. *Commonwealth Oil,* 596 F.2d at 1241. This Court is significantly more familiar with the facts and issues involved than the Court in New York. Vigorous and detailed evidentiary hearings have already been held in front of this Court, and hundreds of pages of hearing transcripts have already been generated from proceedings in this Court. This Court has already dedicated its resources and made an investment that has educated it regarding the many dynamics and facts involved in these cases.

15. Importantly, the interests of justice are closely intertwined with the interest of an economic and efficient administration of the estate. *In re Enron Corp.,* 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002). Serving these interests requires the court to consider its own "learning

---

[5] Although this Court issued the Stay Order, modifying the Bankruptcy Rule 1014 stay for limited purposes, it made very clear that any activity in New York as a result of such ruling would not be considered in attempts to argue against a transfer of venue from New York. Transcript of Stay Motion hearing, 12/20/10, pg. 66-68.

curve" of the case in deciding the venue of these cases. *Id*. The home court of well over a hundred docket entries relating to theses cases, this Court has already learned from the scores of pleadings that have been filed, the substantial and factually detailed motions which have previously been before the Court, the exhaustive oral argument by counsel for the parties, and the wide array of issues that have already arisen and been presented to the Court.

16. This Court has dealt extensively with the Vitro related cases, not only contentions regarding the petitions, but the entire *concurso* process.[6] It would create an indefensible inefficiency for a new judge to "re-learn" all that this Court has experienced. As stated by former Chief Judge Buchmeyer:

> This Court has dealt extensively with this litigation and is familiar with the claims. To transfer this action to another venue would unnecessarily create a steep learning curve for the new court and thereby delay the proceedings. Therefore, without persuasive evidence that continuing to litigate this case in Texas would impose a serious burden upon the Beckman defendants, and because the Receiver's decision as plaintiff to file in Texas should be granted deference, this Court will not transfer venue of this case.

*SEC v. Cook*, No. 3:01-CV-481-R, 2001 U.S. Dist. LEXIS 11326 at *8-9 (Bankr. N.D. Tex. Aug. 2, 2001); s*ee also, Thys Chevrolet, Inc. v. General Motors LLC*, No. 10-CV-46, 2010 U.S. Dist. LEXIS 108469 at *33 (N.D. Iowa Oct. 12, 2010) ("Transfer will also promote judicial efficiency because of the bankruptcy court's relative familiarity with the issues Plaintiffs raise in this action."); *Wittes v. Interco Inc. (In re Interco Inc.)*, 139 B.R. 718, 721 (Bankr. E.D. Mo. 1992) ("This Court is very familiar with this bankruptcy case and is already familiar with this Claimant and this Claim Objection. In other words, this Court has developed a substantial 'learning curve'…

---

[6] *See e.g., generally*, Stay Order; Interim Order Pursuant to 11 U.S.C. §§ 105, 303, 361, 363 and 364 (I) Authorizing Certain Facility Obligors (A) to Continue to Obtain Secured Financing, (B) to Continue to Utilize their Existing Cash Management System and (C) to Use Cash Collateral, (II) Approving Post-Petition Financing, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing [Dkt. #60]; Order Granting Motion of the Petitioning Creditors for Entry of an Order Directing Production of Documents by, and Examination by Oral Deposition of, Debtors Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure [Dkt. # 65]; Order Denying Docket No. 5, Emergency Motion of the Petitioning Creditors Under Sections 105(a) and 303(f) of the Bankruptcy Code for an Order Conditioning the Debtors Use of Property [Dkt. #86].

It is in the best interests of the efficient and economic administration of this bankruptcy estate to proceed with this claim objection in the Eastern District of Missouri.").[7]

17. The knowledge and familiarity of this Court with the parties, the key lawyers, the central issues, and the procedural history, and this Court's immediate proximity to the Debtors in Texas and close proximity to Vitro SAB are key determinants in the decision whether to transfer venue. As another Texas bankruptcy judge previously held:

> What, for example, does a judge in Chicago, or Detroit, or Los Angeles, really know about the survivability of a restaurant on the Riverwalk in San Antonio?....Can a judge in Pittsburgh have any real sense of the likelihood of reorganization of an oil drilling venture whose most valuable prospects are horizontal wells to be drilled in the Austin chalk? ....Better, then, that in evaluating a request for transfer of venue, the court take into account the extent to which a judge 'on the ground' as it were might more effectively and efficiently (and perhaps even more fairly) administer the case than might a judge far removed from the debtor's operations.

*In re Abacus Broadcasting Corp.,* 154 B.R. 682 (Bankr. W.D. Tex. 1993); *see also, In re Interlink Home Health Care, Inc.,* 283 B.R. 429, 439 (Bankr. N.D. Tex. 2002) (explaining the Court's experience with Interlink militates its finding for venue with the first filed case).

18. In addition, any work done by the New York bankruptcy court as a result of the Stay Order (if any shall have occurred by January 6) should not serve as a factor in determining

---

[7] Courts in the Second Circuit also appreciate the significance of the learning curve factor. *See, e.g., Gulf States Exploration Co. v. Manville Forest Prod. (In re Manville Forest Prod. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990) ("Judge Sprizzo . . . found that the convenience of the parties and witnesses weighed in favor of Gulf's position. However, he correctly found other factors relating to the efficient administration of the bankruptcy estate which cut against transferring venue. He found that the bankruptcy court had developed a substantial learning curve and that transferring venue would have delayed the final resolution of the bankruptcy case. Thus, he agreed with the bankruptcy court's view that it would have been inappropriate to shift the burden of adjudicating the instant proceeding to another court….We hold that Judge Sprizzo correctly balanced the appropriate factors in a § 1412 inquiry."); *In re Enron Corp.*, 274 B.R. 327 at 349 ("[I]n considering both the efficient administration of the estates and judicial economy, it is also necessary to take account of the learning curve. The learning curve analysis involves consideration of the time and effort spent by the current judge and the corresponding effect on the bankruptcy case in transferring venue."); *In re Vienna Park Prop.*, 128 B.R. 373, 377-78 (Bankr. S.D.N.Y. 1991) ("[T]his Court has gained such a familiarity with, and insight into, this case, that a transfer of venue would only thwart the efficient administration of the case and work an injustice in the case and to all parties involved. . . . [A]s explained above, the learning curve issue must be given much deference because it strikes at the efficient and timely reorganization of this estate. The end result is that this single consideration, the learning curve established in this case, works to deny a transfer of venue.").

the most economical venue for the estate. *See* Court's Ruling, Transcript of Stay Motion hearing, p. 67-68; *see also*, p. 15-16 and representations by Debtors.[8]

19. The Debtors argue that disparate treatment would result if proceedings were held both in Texas and New York. Elliott agrees that separate bankruptcy proceedings for Vitro SAB in New York and for the Debtors in Fort Worth would be more inefficient, but the solution is simple: all of these cases should proceed in Texas. The Debtors further argue, "If the venue of the Involuntary Cases remains in this Court, Vitro and its counsel will face the prospect of defending essentially the same case in Texas…and in New York…" *See* Cross Motion, ¶ 41. As discussed above, if the Venue Motion is granted, the Vitro SAB shell entity and the Debtors will be jointly administered in proceedings in Fort Worth. The fact that there are affiliates of Vitro SAB that are not debtors under any insolvency proceedings in any jurisdiction (including Mexico) is simply not material to proceedings involving these debtors. The non-debtor entities have *not* been substantively consolidated with Vitro SAB or the Debtors, and accordingly, whether or not a proceeding could be pending which involves one of them somewhere does not affect the venue choice for these Debtors (at least two of which are Texas business entities), and Vitro SAB as their shell foreign parent. The inescapable reality is that it is *much* more efficient for these cases and the Ch. 15 Petition to proceed in Forth Worth.

### *Proximity of the Debtors and Proximity of Witnesses Necessary to Administration*

20. According to the Debtors, two of the Debtors are located in Texas (*see* Cross Motion, ¶ 39) and none are located in New York. *Id*. Further, according to Vitro America's own

---

[8] In addition to the Court's ruling confirming that actions in New York as a result of its ruling would not influence venue, counsel for Vitro represented, "we're prepared to say, to represent to this Court and to have this Court conclude, that we cannot argue that anything that happened in New York prejudices the transfer of venue motion." 12/20/10 Transcript, pp.15-16.

website, two of the debtors' five US fabrication facilities are located in Texas (including one in Dallas),[9] and more of Binswanger Glass' locations are in Texas than in any other state.[10]

21. Moreover, Vitro SAB is located significantly closer to Texas than New York. According to the Debtors, Vitro SAB has no employees, assets, or operations in the US. *See* Cross Motion, ¶ 36. All of Vitro SAB's assets are alleged to be in Mexico, not in New York. Despite the Debtors' assertion that Vitro SAB is equally proximate to Fort Worth and New York (*see* Cross Motion, ¶ 36), rudimentary geography shows that Vitro SAB's Monterrey, Mexico headquarters is substantially closer to Fort Worth than New York.[11]

22. In addition, the travel times are dramatically in favor of Fort Worth. *See* the relevant flight schedules on American Airlines attached as **Exhibit D**. For an officer of Vitro SAB to travel from Monterrey to Fort Worth requires a flight of 1 hour 45 minutes. However, to fly from Monterrey to LaGuardia Airport (one way) requires all day (up to 11 hours)—and the Vitro SAB officer will likely be changing planes at Dallas/Fort Worth International Airport! *See* **Exhibit D**. Accordingly, it is significantly closer for the Vitro SAB officers and related parties in Mexico to travel to Fort Worth than to New York City.[12] The proximity of the Debtors and Vitro SAB to Fort Worth weighs heavily in favor of granting the Venue Motion and denying the Cross Motion.[13] Accordingly, both the proximity of the Debtors and the proximity of witnesses to Fort Worth militates in favor of the Venue Motion and against the Cross Motion.[14]

---

[9] See http://www.vitroamerica.com/locations.asp, a copy of which is attached hereto as **Exhibit A**.

[10] See http://www.binswangerglass.com/location.htm, a copy of which is attached hereto as **Exhibit B**.

[11] As shown on the map attached hereto as **Exhibit C**, Fort Worth is only 561 driving miles from Monterrey, Mexico, while New York City is approximately 2,122 driving miles from Monterrey, Mexico. Fort Worth is approximately four times closer to Monterrey, and one could travel from Monterrey to Fort Worth about four times in the period of just one trip to New York.

[12] In fact, the Vitro SAB Chief Financial Officer could fly to Fort Worth for a hearing and easily return to Monterrey the same day. Whereas, travel to New York would likely take an extra day to get to the hearing as well as an extra day to return.

[13] Counsel to the Debtors and to Vitro SAB also admitted in Court at the hearing on the Stay Motion that it is not much materially more difficult for him to travel to New York than Texas. *See* Transcript of Stay Hearing, pg. 46, lines 11-13 ("I actually live in Washington. So, it's only slightly less convenient for me to get here than it is to get to New York."); and its counsel has had extensive residence in the City of Fort Worth in connection with a prior recent Ch. 11 case in this Division of the Northern

*Location of the Assets*

23. The Debtors' and Vitro SAB's assets and operations are closer to Texas than New York. See the map attached as **Exhibit B** and the list of Binswanger Glass regional offices and retail locations in Texas attached as **Exhibit E**. If Vitro SAB is correct that it has no assets within the boundaries of the US, but that it owns the US Subsidiaries, and with its headquarters in Monterrey, then once again Mexico is much, much closer to Fort Worth than to New York.[15]

*Additional Arguments by the Debtors*

24. The Debtors argue that Elliott has chosen New York as a forum to litigate actions against certain non-debtor subsidiaries of Vitro SAB and that "each of such plaintiffs has obviously chosen New York as a convenient forum to litigate Vitro SAB's and the Guarantors' obligations under the Old Notes." Cross Motion, ¶ 31. This ignores the entity structure of the Debtors, Vitro SAB, and its non-debtor affiliated entities. If the Venue Motion is granted, Vitro SAB's and the Debtors' proceedings will be in Fort Worth. Many of the Debtors' venue

---

District of Texas (as well as the location of its long-time co-counsel in Texas). Multiple creditors, as well as the Debtors, have deeply involved Texas counsel in the proceedings in Texas, as evidenced by the public docket of this Court. Meanwhile, the Petitioning Creditors filed the cases in Fort Worth, a proper venue, and that choice is supported by Elliott and the other principal creditors of the Debtors and Vitro SAB. It is important to note that the Court made it clear in *Moss* that transferring venue is not justified by the mere preference of the debtors. *Moss*, 249 B.R. at 426 ("The fact that Moss resides in California is beyond dispute. Obviously, it would be more convenient for her if the case were transferred to California.").

[14] As discussed above, the brunt of the Debtors' operations and relevant witnesses are in either Texas or Mexico, not New York. As a result, witnesses are closer to Fort Worth than New York City. The Debtors allege that "…it is more than likely that the witnesses necessary for the administration of the Involuntary Cases are located throughout multiple locations in Mexico and the US. Thus, this consideration should not way in favor of either venue." Cross Motion, ¶ 40. However, as discussed above, Mexico is close to Texas (its adjacent neighbor), and New York is remote. Further, if other witnesses are located throughout the US, a central location such as Fort Worth—with the nation's second largest and most centrally located airport, DFW—is closer to more witnesses than a court location in the far northeast. Further, witnesses may have an easier time traveling to Texas as it has less severe weather. See *Lord of the Fliers: Will Anarchy Break Out Among Throngs of Stranded Air Travelers,* December 28, 2010 http://abcnews.go.com/Travel/stranded-fliers-home-till-thursday/story?id=12487463, ("The nightmare continued Tuesday for travelers trying to fly to or from the Northeast. Airports opened but there were plenty of delays, even more lines and fears that delays could stretch on for days.").

[15] The Debtors argue that the location of assets only becomes a salient factor when the case at issue is a liquidation (Cross Motion, ¶ 43) and that there "is no indication that the Involuntary Cases will be converted into liquidations." *Id.* As discussed above, each of the Debtors is jointly and severally (independently) liable to the Petitioning Creditors, Elliott and the other Noteholders in an amount of approximately $1.2 billion. While Elliott does not know if a liquidation or a reorganization will be the end result of these cases, the asset values supplied by the Debtors are certainly an "indication" that the Debtors' cases may end up in liquidations (as is the case with many Ch. 11 filings). Accordingly, an analysis even of this factor weighs heavily in favor of these cases continuing in Fort Worth as well as the Ch. 15 Petition being transferred to Fort Worth. Moreover, recent courts in Texas Ch. 11 cases still evaluate the location of assets as a substantial factor in determining proper venue. *See e.g., In re Reichmann Petroleum,* 364 B.R. 916 (E.D. Tex. 2007).

**STATEMENT OF SUPPORT OF ELLIOTT**  Page 11 of 14

arguments seem predicated on the idea that Vitro SAB and its affiliates are all one entity, but these non-debtor entities have not been substantively consolidated with Vitro SAB or the Debtors, and accordingly, whether or not a proceeding was instituted against one of them does not affect the venue choice for these actual Debtor entities or Vitro SAB.

25. The Debtors then argue that each of its indentures contains a forum-selection clause pursuant to which New York is indicated as the appropriate jurisdiction for all litigation. Cross Motion, ¶ 32. However, the forum selection clause in the referenced indenture is unambiguously permissive, not exclusive, and would clearly not apply here.[16] Further, even if the forum selection clause was exclusive (which it is not) and applicable (which it is not), courts have held that when policy issues (such as the bankruptcy policy of considering issues affecting the estate and the fact that an action, at least in part, arose to protect creditors who were not parties to the forum clause) favor it and the claims are core matters, then courts may disregard a forum selection clause. *See, e.g., Charys Liquidating Trust v. McMahan Securities Co. (In re Charys Holding Company, Inc.)*, Case No. 08-10289 (BLS), Adv. No. 10-50213 (BLS) (Bankr. Del., August 27, 2010) (J. Shannon). As to the Ch. 15 Petition, it is a recognition petition which is a creature of the Bankruptcy Code; it is not a suit against anybody on the notes. Accordingly, even if the forum-selection clause was exclusive (which it is not), it should not impact the Venue Motion.

26. Finally, the Debtors allege that the Petitioning Creditors have been engaged in "forum shopping and gamesmanship." Cross Motion, ¶ 3. The opposite is true: the Debtors in

---

[16] Section 11.09 of both the 2012 and the 2017 Indentures states: 'The parties hereto irrevocably agree that any legal suit, action or proceeding **against any of them** arising out of, based on, or relating to the Notes, this Indenture or the transactions contemplated hereby **may** be instituted in any U.S. Federal or state court in the Borough of Manhattan in The City of New York. Each of the parties hereto expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any **such** suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum." *See* 2012 and 2017 Indentures, § 11.09 (emphasis added).

these cases are US entities; two of the Debtors are Texas entities; and, the Debtors have Texas operations. None of the Debtors are New York entities. As noted by the Court in the hearing on the Stay Motion, this Court has jurisdiction to hear a request for injunctive relief. *See* Transcript at 65-66. Rather than seeking injunctive relief in this Court, Vitro SAB and the Debtors fought hard instead to pursue a hook to New York, all notwithstanding their claims of an urgent need for injunctive relief. The position by the Debtors is ironic, considering that in the context of restructuring the debt of the Debtors, counsel for the Debtors have clearly represented that this Court is the proper forum for adjudicating the restructuring of their liabilities. *See e.g.,* 11/23/10 Transcript, p. 47 (counsel for the Debtors representing, "They [creditors] may take issue with that [the effect of restructuring the indebtedness of these Debtors], and they'll have a forum now before Your Honor [this Court] to adjudicate that to the extent there is some dispute about that."). The Debtors have clearly recognized the propriety of proceeding before this Court, and they should be estopped from now, only weeks later, asserting arguments to the contrary.

## PRAYER

**WHEREFORE,** Elliott prays the Court grant the Venue Motion and deny the Cross-Motion.

Respectfully submitted,

*/s/     Josiah M. Daniel III*
Josiah M. Daniel, III, SBT #05358500
Daniel C. Stewart, SBT #19206500
Bradley R. Foxman, SBT # 24065243
**VINSON & ELKINS L.L.P.**
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201-2975
Tel: (214) 220-7700   Fax: (214) 220-7716
Email:  jdaniel@velaw.com; bfoxman@velaw.com

Duston K. McFaul, SBT # 24003309
**VINSON & ELKINS L.L.P.**
2300 First City Tower

>1001 Fannin
>Houston, Texas 77002-6760
>Tel: (713) 758-4740  Fax: (713) 615-5777
>Email: dmcfaul@velaw.com
>
>and
>
>George C. Webster II (Cal. State Bar #82870),
>K. John Shaffer (Cal. State Bar #153729),
>**STUTMAN, TREISTER & GLATT P.C.**
>1901 Avenue of the Stars, 12th Floor
>Los Angeles, CA 90067
>Tel: (310) 228-5600   Fax: (310) 228-5788
>Email:  gwebster@stutman.com; kjshaffer@stutman.com
>
>**ATTORNEYS FOR ELLIOTT INTERNATIONAL L.P. AND THE LIVERPOOL LIMITED PARTNERSHIP**

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on January 5, 2011, by the Electronic Case Filing system to the persons on the clerk's list who receive electronic notification of filings thereby.

>/s/  Bradley R.  Foxman
>One of Counsel