Dennis F. Dunne (admitted *pro hac vice*)
Risa M. Rosenberg (admitted *pro hac vice*)
**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219
ddunne@milbank.com
rrosenberg@milbank.com

Andrew M. Leblanc (admitted *pro hac vice*)
**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586
aleblanc@milbank.com

Louis R. Strubeck, Jr.
State Bar No. (19425600)
William R. Greendyke
State Bar No. (08390450)
**FULBRIGHT & JAWORSKI L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200
lstrubeck@fulbright.com
wgreendyke@fulbright.com

**ATTORNEYS FOR ALLEGED DEBTORS**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | § | |
|---|---|---|
| In re: | § § | Involuntary Chapter 11 |
| **VITRO ASSET CORP., et al.,** | § § | Case No. 10-47470-rfn-11 |
| Alleged Debtors.[1] | § § § | Jointly Administered |

**MOTION OF ALLEGED DEBTORS PURSUANT TO FED. R. CIV. P. 56(b)
AND FED. R. BANKR. P. 7056 FOR SUMMARY JUDGMENT
<u>WITH RESPECT TO INVOLUNTARY CHAPTER 11 PETITIONS</u>**

---

[1] The Alleged Debtors are: Vitro Asset Corp. (f/k/a American Asset Holdings Corp.) (Case No. 10-47470), Vitro Chemicals, Fibers & Mining, LLC (Case No. 10-47472), Vitro America, LLC (Case No. 10-47473), Troper Services, Inc. (Case No. 10-47474), Super Sky Products, Inc. (Case No. 10-47475), Super Sky International, Inc. (Case No. 10-47476), VVP Holdings, Inc. (Case No. 10-47477), Amsilco Holdings, Inc. (Case No. 10-47478), B.B.O. Holdings, Inc. (Case No. 10-47479), Binswanger Glass Company (f/k/a Troper Inc.) (Case No. 10-47480), Crisa Corporation (Case No. 10-47481), VVP Finance Corporation (Case No. 10-47482), VVP Auto Glass, Inc. (Case No. 10-47483), V-MX Holdings, LLC (f/k/a Crisa Holdings Corp.) (Case No. 10-47484), and Vitro Packaging, LLC (Case No. 10-47485).

#

TO THE HONORABLE RUSSELL F. NELMS,
UNITED STATES BANKRUPTCY JUDGE:

The alleged debtors (collectively, the "Alleged Debtors") in the above-captioned involuntary chapter 11 cases hereby submit this motion (the "Motion"), pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (as amended, the "Civil Rules"), made applicable to this matter by Rules 1018 and 7056 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), for judgment, as a matter of law, denying entry of orders for relief with respect to the involuntary chapter 11 petitions (the "Involuntary Petitions") filed by Knightland Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund L.P., and Lord Abbett Bond-Debenture Fund, Inc. (collectively, the "Dissident Minority Noteholders").[2] In support of the Motion, the Alleged Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1. The filing of the Involuntary Petitions is but one facet of a larger, multi-jurisdictional strategy by the members of the ad hoc group (the "Steering Committee") of the holders of the notes issued by Vitro S.A.B. de C.V. ("Vitro SAB"), the ultimate parent company of the Alleged Debtors, to frustrate, if not derail, Vitro SAB's efforts to consummate a prepackaged consensual restructuring under Mexican law. Unfortunately for the Dissident Minority Noteholders, this first of their legal maneuvers is fundamentally flawed. The claims on which the Dissident Minority Noteholders purport to base their right to file the Involuntary Petitions were, as of the Involuntary Petition Date (as defined below), both contingent and

---

[2] The Alleged Debtors have filed an answer to the Involuntary Petitions pursuant to Bankruptcy Rule 1011 (Docket No. 70; the "Answer"), and a hearing with respect to the Involuntary Petitions (the "Hearing") is currently scheduled to commence on February 10, 2011 at 9:30 a.m. (prevailing Central Time). Together with this Motion, the Alleged Debtors have filed a motion pursuant to N.D. Tex. L.B.R. 7056-1(b)(1) requesting leave to seek summary judgment within the 45-day period before the Hearing.

2

subject to a *bona fide* dispute as to amount, rendering them ineligible as a matter of law as a basis for commencing involuntary cases against the Alleged Debtors.[3]

2.  It is undisputed that no demand was made on the Alleged Debtors as of the Involuntary Petition Date as required by each Indenture. Without such demand, the liability of the Alleged Debtors under the Guarantees (as defined below) was not triggered and remained contingent as of the Involuntary Petition Date.

3.  Furthermore, Congress was clear in enacting changes to the Bankruptcy Code in 2005 that any *bona fide* dispute as to the amount of claims, in addition to disputes as to liability, mandate dismissal of involuntary petitions. The claims of the Dissident Minority Noteholders against the Alleged Debtors are subject to the provision in each Indenture (as defined below) entitled "Limitation on Amount of Guaranty," which limits the amount guaranteed by each Alleged Debtor to an amount that would not render such Alleged Debtor's Guarantee avoidable. There can be no dispute that the Alleged Debtors could not each have guaranteed the full indebtedness under the Old Notes without their Guarantees being avoidable – thus, each Guarantee must be limited through the application of the "Limitation on Amount of Guaranty" Indenture provision. Accordingly, the amount of the Dissident Minority Noteholders' claim against each of the Alleged Debtors is uncertain. As a result, no genuine issue of material fact exists regarding the Dissident Minority Noteholders' ineligibility, pursuant to section 303(b) of the Bankruptcy Code, to file the Involuntary Petitions. Accordingly, the Involuntary Petitions should be dismissed.

---

[3] The Motion deals solely with those of the Alleged Debtors' affirmative defenses on which they are entitled to judgment as a matter of law. As set forth in the Answer, the Alleged Debtors have other affirmative defenses to the validity of the Involuntary Petitions; however, such other affirmative defenses require factual determinations.

# I. BACKGROUND

4. On October 22, 2003 and on February 1, 2007, respectively, Vitro SAB issued (i) $225 million in aggregate principal amount of 11.75% Senior Notes due 2013 (the "2013 Notes"), (ii) $300 million in aggregate principal amount of 8.625% Senior Notes due 2012 (the "2012 Notes") and (iii) $700 million in aggregate principal amount of 9.125% Senior Notes due 2017 (the "2017 Notes" and, together with the 2013 Notes and the 2012 Notes, the "Old Notes"). Each issuance of the Old Notes is governed by an indenture (including all supplements, collectively, the "Indentures"). As of September 30, 2010, the aggregate outstanding principal amount of the Old Notes was approximately $1.216 billion.

5. Pursuant to the terms of the Indentures, more than fifty of Vitro SAB's wholly-owned direct and indirect subsidiaries, including each of the Alleged Debtors (in such capacities, the "Guarantors") guaranteed Vitro SAB's obligations under the Old Notes (the "Guarantees"). In filing the Involuntary Petitions, the Dissident Minority Noteholders have relied solely on the Alleged Debtors' alleged obligations under the Guarantees.

6. Each Indenture expressly provides that the Guarantors' obligations under their respective Guarantees are triggered by demand made upon them by certain authorized persons. As of the filing of the Involuntary Petitions on November 17, 2010 (the "Involuntary Petition Date"), none of the Alleged Debtors had received a demand with respect to their obligations as Guarantors.

# II. RELIEF REQUESTED

7. The Alleged Debtors respectfully request that the Court enter an order, pursuant to Civil Rule 56(b), made applicable hereto by Bankruptcy Rules 1018 and 7056, denying orders for relief with respect to the Involuntary Petitions because the claims on which the Dissident Minority Noteholders premised their filing of the Involuntary Petitions are both contingent as to

liability and the subject of a *bona fide* dispute as to amount, which makes them ineligible as the basis for such filing under section 303(b) of the Bankruptcy Code.

### III. BASIS FOR RELIEF REQUESTED

8. Bankruptcy Rule 1018 provides, in relevant part, that Bankruptcy Rule 7056 (and, thereby, Civil Rule 56) applies to all proceedings related to a contested involuntary petition. See Fed. R. Bankr. P. 1018 and 7056. Civil Rule 56 provides, in turn, that "[a] party against whom relief is sought may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b).

9. The affirmative defenses addressed by this Motion present no need for further factual discovery and are ripe for disposition as a matter of law.[4] Accordingly, before the parties expend further time and effort in taking discovery and otherwise preparing for the Hearing, this Court can and should make the gate-keeping determination of whether the Involuntary Petitions meet the statutory requirements that would allow this Court to enter the orders for relief the Dissident Minority Noteholders seek – which, as demonstrated below, they do not.

10. Section 303(b) of the Bankruptcy Code, which governs the commencement of involuntary cases, provides, in relevant part, as follows:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is ***not contingent as to liability*** or the subject of ***a bona fide dispute as to liability or amount*** . . . .

---

[4] At the December 20, 2010 hearing, counsel for the Dissident Minority Noteholders explicitly acknowledged that the Alleged Debtors' *bona fide* dispute defense is "purely legal" in nature. (See Dec. 20, 2010 Tr. at 78:4, 78:19-79:8 (referring to such defense as "purely legal" and stating that "if [the Alleged Debtors] want to proceed without discovery on [such defense] or proceed without expert valuations . . . , that's their choice").)

5

11 U.S.C. § 303(b)(1) (emphasis added). The Fifth Circuit "has acknowledged that the jurisdictional prerequisites for filing an involuntary bankruptcy proceeding constitute more than mere formalities." In re Norriss Bros. Lumber Co., 133 B.R. 599, 608 (Bankr. N.D. Tex. 1991) (quoting In re Walden, 781 F.2d 1121 (5th Cir.1986)). The Fifth Circuit has also admonished that "[a]n allegation of bankruptcy invokes remedies not available to any ordinary debt collection procedures. It should not be invoked unadvisedly and contrary to statutory right." In re Walden, 781 F.2d at 1123.

11. Accordingly, the Dissident Minority Noteholders must demonstrate, by a preponderance of the evidence, that the requirements of section 303(b) of the Bankruptcy Code have been satisfied. See, e.g., In re Moss, 249 B.R. 411, 418 (Bankr. N.D. Tex. 2000); In re Xacur, 216 B.R. 187, 194 (Bankr. S.D. Tex. 1997). The Dissident Minority Noteholders cannot meet this evidentiary burden because the claims on which they purport to base their right to file the Involuntary Petitions are both (i) contingent as to liability and (ii) subject to a *bona fide* dispute.

A. <u>Dissident Minority Noteholders' Claims Are Contingent as to Liability</u>

12. As stated above, to be eligible to file an involuntary petition, a creditor must, among other things, hold a claim that is "not contingent as to liability." 11 U.S.C. § 303(b)(1). For the purposes of section 303(b), "[a] claim is contingent as to liability if the debtor's **_legal duty to pay_** does not come into existence until triggered" by the occurrence of an extrinsic event. In re All Media Prop's, Inc., 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), aff'd 646 F.2d 193 (5th Cir. 1981) (emphasis added).

13. Each Indenture contains an identical guarantee provision, which states that "[u]pon failure by the [Issuer] to pay punctually any such amount [due under the Old Notes], each Guarantor shall forthwith **_on demand_** pay the amount not so paid at the place and in the

6

manner specified in the Indenture." (2013 Indenture § 11.01 (emphasis added); 2012 Indenture § 10.01 (same); 2017 Indenture § 10.01 (same).) Thus, the Alleged Debtors' liability under the Guarantees remains contingent until a demand is made on them that triggers their "legal duty to pay." See, e.g., In re Rosenberg, 414 B.R. 826, 844 (Bankr. S.D. Fla. 2009) ("a default under the [primary obligation] *and demand for payment* are the required extrinsic events which must occur before [guarantor's] liability, if any, is triggered." (emphasis added; internal citations omitted)). See also United States v. Gottlieb, 948 F.2d 1128, 1129 (9th Cir. 1991) ("guarantor had no obligation to pay off the loan until the borrower had defaulted *and* a written demand for payment had been made" (emphasis in original)) (citing United States v. Vanornum, 912 F.2d 1023, 1027 (8th Cir. 1990)); United States v. Gordon, 1994 WL 514533, at *6 (S.D.N.Y. July 5, 1994), aff'd 78 F.3d 781 (2d Cir. 1996) (same); United States v. Stark, 1994 WL 323651, *2 (S.D.N.Y. 1994) (same).

14. As stated above, as of the Involuntary Petition Date, no demand had been made on the Alleged Debtors with respect to their obligations under the Guarantees. The Dissident Minority Noteholders do not even allege that the requisite demand was made on the Alleged Debtors.[5] Instead, they appear to rely on the proposition that some sort of constructive notice, stemming from the delivery of acceleration notices to Vitro SAB,[6] was sufficient to constitute compliance with the explicit provision for a "demand" in the Guarantee provisions of each Indenture. That is simply not true. Notwithstanding the Dissident Minority Noteholders'

---

[5] See Joint Pre-Conference Statement of the Petitioning Creditors and Alleged Debtors (Docket No. 91; the "Joint Statement") ¶¶ 1-18 (setting forth the Dissident Minority Noteholders' statement of facts in support of entry of orders for relief, none of which alleges that any demand for payment was made on the Alleged Debtors).

[6] In fact, it is unclear whether effective notices of acceleration under the 2012 Indenture and the 2017 Indenture were, in fact, served on Vitro SAB.

7

suggestion to the contrary, constructive notice is *not* tantamount to compliance with an explicit contractual provision governing the relationship between the parties. See, e.g., In re Watson, 325 B.R. 380, 387 (Bankr. S.D. Tex. 2005) (holding that "constructive notice was not sufficient" to supplant an explicit notice provision in a contract).

15. Here, none of the notices of acceleration were addressed to the Alleged Debtors, contained a reference to the Guarantee provisions in the Indentures, or included a demand for the payment under the Guarantees.[7] This undisputed evidence before the Court, as well as applicable case law, clearly show that these acceleration notices did not constitute a proper demand for payment on the Guarantees. See, e.g., In re Rosenberg, 414 B.R. at 836, 844 (dismissing involuntary petition filed against guarantor based on contingent nature of petitioning creditors' claims, where petitioning creditors had provided notices of acceleration to both guarantor and primary obligor, but had not demanded payment of guarantor, as was required under relevant instrument).[8] (See Acceleration Notices.)

16. Accordingly, because the Dissident Minority Noteholders had not, as of the Involuntary Petition Date, complied with the Indenture provision that would have triggered the liability of the Alleged Debtors under the Guarantees, their obligations under the Guarantees

---

[7] See (i) Letter dated January 4, 2010 (Re: Notice of Acceleration of 8.625% Senior Notes due 2012), attached as Exhibit O to the Summons and Complaint of Aurelius dated December 2, 2010 (the "Aurelius Complaint"), which is attached to Alleged Debtors' (I) Witness and Exhibit List and (II) Exhibits [Docket No. 95] (filed under seal pursuant to this Court's Order [Docket No. 99]) and which was accepted into evidence without objection at the December 20, 2010 hearing before this Court; (ii) Letter dated January 4, 2010 (Re: Notice of Acceleration of 9.125% Senior Notes due 2017), attached as Exhibit P to the Aurelius Complaint; and (iii) Letter dated April 7, 2010 (Re: Notice of Default and Acceleration with respect to 2013 Notes), attached as Exhibit Q to the Aurelius Complaint (together, the "Acceleration Notices"). By submitting these notices to the Court for the limited purpose of demonstrating their content, the Alleged Debtors do not acknowledge their validity.

[8] As an initial matter, the Dissident Minority Noteholders should not be allowed to argue they require additional factual discovery to support such a tenuous legal thread. To grant summary judgment on this issue, the Court need only determine what the applicable contractual provision requires and whether the Dissident Minority Noteholders have satisfied their burden to first allege and then prove (undoubtedly through documentary evidence that, if it existed, would have been in their possession) that such requirements were satisfied (both of which the Dissident Minority Noteholders have failed to do).

were contingent as of such date for purposes of section 303(b) of the Bankruptcy Code.

17.  The Dissident Minority Noteholders have attempted to downplay this inescapable conclusion by pointing to another indenture provision (again identical for each Indenture) that states, in relevant part, that "[e]ach Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the [Issuer] or any other Person." (2013 Indenture § 11.04; 2012 Indenture § 10.04 (same); 2017 Indenture § 10.04 (same).)  This provision, however, does not change the fact that, as of the Involuntary Petition Date, the Alleged Debtors' liability under the Guarantees was contingent.

18.  First, the above waiver is clearly qualified by the words "not provided for herein," which (along with the explicit demand requirement contained in each Indenture) would be rendered meaningless by the interpretation offered by the Dissident Minority Noteholders.  Each Indenture, by its terms, is governed by New York law,[9] under which "[i]t is well-settled that when interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties."  John E. Andrus Memorial Home v. De Buono, 260 A.D.2d 635, 638 (N.Y.A.D. 2 Dept.  1999).  See also Joseph v. Creek & Pines, Ltd., 217 A.D.2d 534, 535 (N.Y.A.D. 2 Dept.  1995) ("A contract should not be interpreted in such a way as would leave one of its provisions substantially without force or effect").

19.  Moreover, it is equally well settled that waiver provisions such as the one above "affect the relationship between *the borrower* and the lender and authorize foreclosure on the borrower's collateral without notice to the guarantor.  These provisions do not pertain to direct enforcement of the guaranty.  They do not conflict with the express provisions in the guaranty

---

[9] (See 2013 Indenture § 12.08; 2012 Indenture § 11.08 (same); 2017 Indenture § 11.08 (same).)

that ***the guarantor becomes liable for direct repayment of the loan only upon written demand.***" United States v. Gottlieb, 948 F.2d at 1130 (emphasis added). See also United States v. Gordon, 1994 WL 514533 at *6 (interpreting guaranty with similar waiver and finding that "the [g]uaranty's waiver provision did not modify the [obligee's] obligation to provide written demand for payment" to the guarantor); United States v. Stark, 1994 WL 323651 at *2 (holding that "the demand requirement remains intact" despite presence of waiver language similar to that contained in the Indentures).

20. Accordingly, because the Dissident Minority Noteholders' claims against the Alleged Debtors were contingent as to liability as of the Involuntary Petition Date, the Dissident Minority Noteholders were ineligible, as a matter of law, to file the Involuntary Petitions under section 303(b) of the Bankruptcy Code.

**B. <u>Dissident Minority Noteholders' Claims Are Subject to a *Bona Fide* Dispute as to Amount</u>**

21. To have the right to file an involuntary petition, a creditor must hold a claim that is not "the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1). While in a typical civil litigation the party seeking summary judgment must demonstrate that no disputed issue of material fact exists, the existence of a *bona fide* dispute with respect to the amount of the Dissident Minority Noteholders' claims mandates dismissal of the Involuntary Petitions. The very existence of such a dispute is dispositive as to such claims not being eligible to serve as the basis for an involuntary petition pursuant to section 303(b) of the Bankruptcy Code. See, e.g., In re Staxxring, Inc., 2010 WL 2218935, *1 (Bankr. N.D. Tex. May 28, 2010) (on motion to dismiss involuntary petition, "the bankruptcy court must 'determine whether there is an objective basis for either a factual or legal dispute as to the [claim underlying the filing].'")

(quoting In re Sims, 994 F.2d 210, 221 (5th Cir. 1993), cert. denied sub nom., Sims v. Subway Equip Leasing Corp., 510 U.S. 1049 (1994)).

22. The phrase "subject of a bona fide dispute" was first added to section 303(b)(1) of the Bankruptcy Code as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (effective July 10, 1984). As the proponent of such language explained:

> [M]y amendment is designed to correct what I perceive to be an unintended inequity in the law of involuntary bankruptcies.
>
> . . . The problem can be explained simply. Some courts have interpreted section 303's language . . . as allowing the filing of involuntary petitions and the granting of involuntary relief even when the debtor's reason for not paying [a petitioning creditor's claim] is a legitimate and good-faith dispute over his or her liability. This interpretation allows creditors to use the Bankruptcy Code as a club against debtors who have bona fide questions about their liability [on such claims] . . . . .
>
> My amendment would correct this problem. ***Under my amendment, the original filing of an involuntary petition could not be based on debts that are the subject of a good-faith dispute between the debtor and his or her creditors.***
>
> . . . I believe this amendment, although a simple one, is necessary to protect the rights of debtors and ***to prevent misuse of the bankruptcy system as a tool of coercion***. I also believe it corrects a judicial misinterpretation of existing law and congressional intent as to the proper basis for granting involuntary relief.

30 Cong. Rec. S7618 (June 19, 1984) (comments of Senator Baucus); see also In re DSC, Ltd., 486 F.3d 940, 945 (6th Cir. 2007) (recognizing that, by enacting section 303(b)(1), Congress has made clear that it "intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal.") (citing In re Lough, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986) (quoting above comments of Senator Baucas)).

23. Subsequent to the 1984 amendments, some courts continued to allow creditors to initiate involuntary cases even when such creditors' claims were subject to a dispute as to amount, so long as the undisputed portion of that claim exceeded the statutory minimum. In the

11

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress clarified its original intent by adding the words "as to liability *or* amount" to qualify the language added in 1984. See Pub. L. No. 109-8, § 1234(a)(l)(A), 119 Stat. 204 (2005) (emphasis added). See also, H.R. Rep. No. 109-31(I), 109th Cong., 1st Sess. (2005); 151 Cong. Rec. H1993-01, at H2044 (2005).

24. The remarks of Representative Edward R. Royce, as memorialized in the Congressional Record, clearly reflect this Congressional intent:

> Section 1234 restates and strengthens ***Congress' long-standing intent that an involuntary bankruptcy action should not be predicated on disputed claims***. Otherwise, opportunistic litigants seeking to gain advantage in contract disputes may improperly employ the leverage of the bankruptcy court.
>
> Because bankruptcy courts should not be used to resolve disputed claims in involuntary cases, the clarification in Section 1234 reemphasizes that ***a person who disputes the amount of***, or liability for, ***a claim should not be disadvantaged by the stigma and expense of an involuntary bankruptcy proceeding***. Put simply, the bankruptcy courts in this nation should now uniformly hold that any claim that is subject to a dispute or litigation, or if it is contested, whether as to the amount of the claim, or as to liability for the claim, that claim cannot be used to commence an involuntary bankruptcy case. This is the bright line that Congress intended to create in 1984 because involuntary bankruptcy carries with it, not only a responsibility, but the burden on behalf of petitioning creditors to be accurate and certain that their provable claims are qualified by being without dispute as to either liability or amount before commencing an involuntary bankruptcy case. The consequence of bad faith or even sloppy work here is more disastrous than in garden-variety litigation or through the voluntary use of the bankruptcy laws.
>
> It is incomprehensible that an involuntary bankruptcy petition could be based on claims that are inaccurate as to either liability or amount; the injustice that would result from such a filing is so manifest. Despite this manifest injustice of national significance, judges continue to condone the filing of involuntary petitions brought by creditors using disputed claims. For this reason, section 1234 was made a necessary part of this legislation.
>
> There has never been a vote recorded in opposition to this provision because ***it clearly expresses the unanimous will of Congress***; it is the furthest thing from the mind of any Congressman that an involuntary case could be brought on the basis of claims that are disputed. To the contrary, as expressed by this legislation, ***it has been the will of Congress since 1984 that any claim used to commence an involuntary case must be without dispute***.

> The bankruptcy courts should not be enjoyed by involuntary petitioning creditors who cannot then prove up claims as to liability or amount. That party should stand in the most accountable legal position. This clarification is necessary because the intent of Congress has been blurred by judicial decisions that go so far as to split disputed claims into 'disputed' and 'undisputed' parts, or to describe disputes as 'potential disputes.' These decisions are wrong and the damage they have caused to the victims of involuntary bankruptcy cases brought using such claims is incalculable. The remedy for such victims rests on an expansive reading of Section 303(i) . . . .

151 Cong. Rec. E677-04, at E677-E678 (2005) (emphasis added). See also 149 Cong. Rec. E551-02 (2003) (remarks by Representative Luis V. Gutierrez to an identical amendment under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2003 noting that "[t]he purpose of the 1984 language was to bar bringing involuntary bankruptcy action in cases which where already subject of a 'bona fide dispute' on either the existence of liability or the amount of that liability"); 148 Cong. Rec. S7735-01 (2002) (remarks by Senator Patrick Leahy to an identical amendment under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2002); 147 Cong. Rec. S2343-01, at S2357 (2001) (remarks by Senator Orrin G. Hatch to an identical amendment under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2001).

25. Post-BAPCPA, courts, including courts in the Northern District of Texas, have fully acknowledged the intent and import of this amendment. See, e.g., In re Staxxring, Inc., 2010 WL 2218935, *4 ("Congress has expressed an intent in section 303 of the Bankruptcy Code that creditors with questionable claims ought not be allowed to force companies into bankruptcy, and in light of this policy, has put forth somewhat stringent standards in section 303(b)(1)."); In re Henry S. Miller Commercial, LLC, 418 B.R. 912, 923 (Bankr. N.D. Tex. 2009) (stating that "the amendment cannot be ignored . . . . Now, it is clear that a claim is the subject of a bona fide dispute [even] if . . . merely the amount is in dispute. If nothing else, this signals that Congress

13

continues to caution that holders of questionable claims ought not to be allowed to force companies into bankruptcy against their will.").[10]

26.     Thus, section 303(b)(1) of the Bankruptcy Code forbids claims subject to any *bona fide* dispute as to liability or amount from serving as the basis for the entry of an order for relief on an involuntary petition.

27.     The claims of the Dissident Minority Noteholders are, in fact, subject to a *bona fide* dispute as to amount and, accordingly, cannot be the basis for entry of orders for relief with respect to the Involuntary Petitions. Substantial factual (and potentially legal) questions must be resolved before the amount of the Dissident Minority Noteholders' claim against each Alleged Debtor may be ascertained. See, e.g., In re Sims, 994 F.2d at 221 (if there are any unresolved factual or legal questions bearing on issue, *bone fide* dispute with respect to such issue exists for purposes of section 303(b)); In re Medical Group, Inc., 2005 WL 4677807 (Bankr. E.D. La. March 04, 2005) ("[A] claim is subject to a bona fide dispute when there is an objective basis for either a factual or a legal dispute as to the validity of the debt."); In re Xacur, 219 B.R. 956 (Bankr. S.D. Tex. 1998) (dismissing involuntary case due to finding *bona fide* dispute surrounding effectiveness of signature).

28.     Here, each Indenture contains a section entitled "Limitation on Amount of Guaranty," which provides, in relevant part, as follows:

> [E]ach Guarantor, and by its acceptance of [the Old Notes], each Holder, hereby confirms that it is the intention of all such parties that the Note Guaranty of such Guarantor not

---

[10] This is particularly true where the filing is based on a two-party dispute better settled in a non-bankruptcy forum. See, e.g., In re Mountain Dairies, Inc., 372 B.R. 623, 635-36 (Bankr. S.D.N.Y. 2007) (granting motion to dismiss what was "essentially a two-party dispute for which the parties have adequate remedies in state court" and finding that the "bankruptcy court is not a collection agency"); In re Trina Assocs., 128 B.R. 858, 869 (Bankr. E.D.N.Y) (granting motion to dismiss and finding that the "bankruptcy court should not be used as an alternative to state court procedures"); In re Fax Station, Inc., 118 B.R. 176, 178 (Bankr. D.R.I. 1990) (granting motion to dismiss where court found that case was simply a dispute between competing interests over the ownership of a business better litigated in state courts).

constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable provision of state law. To effectuate that intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that ***the obligations of each Guarantor under its Note Guaranty are limited to the maximum amount that would not render the Guarantor's obligations subject to avoidance*** under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable provision of state law or Mexican law, as the case may be.

(2013 Indenture § 11.07; 2012 Indenture § 10.07 (same); 2017 Indenture § 10.07 (same) (emphasis added))

29. Thus, the determination of the exact amount of the Dissident Minority Noteholders' claim against each Alleged Debtor requires determining "the maximum amount" that would not have rendered each Alleged Debtor's obligations under the Indentures, at the time they were incurred, "subject to avoidance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable provision of state law." See, e.g., In re Capmark Financial Group, Inc., 438 B.R. 471, 494-495, 517 (D. Del. 2010) (determining whether certain claims were limited by savings clause on basis of extensive expert testimony as to debtor's solvency at time claims were incurred). Cf. In re Erstmark Capital Corp., 2003 WL 21756460, *2 (5th Cir. June 23, 2003) (stating generally that, for purposes of determining whether transaction constituted fraudulent conveyance, relevant determination is debtor's solvency at time of transaction).

30. Therefore, to determine such "maximum amount" with respect to each Alleged Debtor requires a determination of the maximum liability that such Alleged Debtor would have been able to incur in 2007 without rendering such liability avoidable. This determination, in turn, requires establishing (a) the value of each Alleged Debtor in 2007 and (b) the value that each Alleged Debtor received in consideration for incurring such liability. See 11 U.S.C. § 548(a). Clearly, such determinations will require resolution of a variety of substantial factual issues. It is plain that each of the Alleged Debtors could not have incurred the full $1.2 billion worth of debt

15

and remained solvent, nor did any Alleged Debtor receive value equal to $1.2 billion – both of which would have to be true for the Dissident Minority Noteholders' claims not to be subject to the limitation under the Indentures. As such, the claims of the Dissident Minority Noteholders are subject to a *bona fide* dispute as to amount and, therefore, the Dissident Minority Noteholders were ineligible, as a matter of law, to file the Involuntary Petitions under section 303(b) of the Bankruptcy Code.

31. Accordingly, based on all of the foregoing, no orders for relief can be entered on the Involuntary Petitions because the claims of the Dissident Minority Noteholders fail to meet the statutory requirements of section 303(b)(1) of the Bankruptcy Code.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

**WHEREFORE**, the Alleged Debtors respectfully request that the Court enter an order (i) denying orders for relief with respect to the Involuntary Petitions and (ii) granting the Alleged Debtors such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
January 5, 2011

**FULBRIGHT & JAWORSKI L.L.P.**

/s/ William R. Greendyke
Louis R. Strubeck, Jr.
State Bar No. (19425600)
William R. Greendyke
State Bar No. (08390450)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200

-and-

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Risa M. Rosenberg (admitted *pro hac vice*)
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Andrew M. Leblanc (admitted *pro hac vice*)
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (212) 835-7500
Facsimile: (212) 263-7586

***Attorneys for Alleged Debtors***