Dennis F. Dunne (admitted *pro hac vice*)
Risa M. Rosenberg (admitted *pro hac vice*)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219
ddunne@milbank.com
rrosenberg@milbank.com

Andrew M. Leblanc (admitted *pro hac vice*)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586
aleblanc@milbank.com

Louis R. Strubeck, Jr.
State Bar No. (19425600)
William R. Greendyke
State Bar No. (08390450)
**FULBRIGHT & JAWORSKI L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200
lstrubeck@fulbright.com
wgreendyke@fulbright.com

**ATTORNEYS FOR ALLEGED DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § § § | Involuntary Chapter 11 |
| **VITRO ASSET CORP., et al.,** | § § | Case No. 10-47470-rfn-11 |
| Alleged Debtors.[1] | § § | Jointly Administered |

## MEMORANDUM OF LAW OF ALLEGED DEBTORS IN SUPPORT OF DISMISSAL OF INVOLUNTARY CHAPTER 11 PETITIONS

---

[1]   The Alleged Debtors are:  Vitro Asset Corp. (f/k/a American Asset Holdings Corp., "Asset Corp.") (Case No. 10-47470) , Vitro Chemicals, Fibers & Mining, LLC ("Chemicals") (Case No. 10-47472), Vitro America, LLC ("Vitro America") (Case No. 10-47473), Troper Services, Inc. ("Troper") (Case No. 10-47474), Super Sky Products, Inc. ("Super Sky Products") (Case No. 10-47475), Super Sky International, Inc. ("Super Sky International") (Case No. 10-47476), VVP Holdings, Inc. ("VVP Holdings") (Case No. 10-47477), Amsilco Holdings, Inc. ("Amsilco") (Case No. 10-47478), B.B.O. Holdings, Inc. ("BBO") (Case No. 10-47479), Binswanger Glass Company (f/k/a Troper Inc., "Binswanger") (Case No. 10-47480), Crisa Corporation ("Crisa") (Case No. 10-47481), VVP Finance Corporation ("VVP Finance") (Case No. 10-47482), VVP Auto Glass, Inc. ("Auto Glass") (Case No. 10-47483), V-MX Holdings, LLC (f/k/a Crisa Holdings Corp., "V-MX") (Case No. 10-47484), and Vitro Packaging, LLC ("Packaging") (Case No. 10-47485).

# TABLES OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

I.     BACKGROUND..............................................................................................................3

    A.    Alleged Debtors .................................................................................................... 3

    B.    Indebtedness of Alleged Debtors ......................................................................... 5

       (1)     Secured Indebtedness...................................................................................5
       (2)     Unsecured Indebtedness...............................................................................6
          (a)     Ordinary Course Debt Owed to Third Parties ...............................6
          (b)     Unsecured Indebtedness to Affiliates ........................................10
          (c)     Super Sky Surety Bond Facility .................................................11
          (d)     Guarantee of Vitro SAB Notes...................................................12
    C.    Events Leading to Filing of Involuntary Cases................................................... 13

    D.    Filing Of Involuntary Petitions ......................................................................... 18

    E.    Vitro SAB's Voluntary *Concurso* Proceeding.................................................... 18

    F.    Involuntary *Concurso* Proceedings ................................................................... 19

II.     ARGUMENT ................................................................................................................20

    A.    Petitioning Creditors Lacked Standing Under Bankruptcy Code Section 303(b)
         to Commence Involuntary Cases ....................................................................... 20

       (1)     Petitioning Creditors Are Not "Holders" of Claims On Which Involuntary
            Petitions Are Based .....................................................................................21
       (2)     Petitioning Creditors' Claims Are Contingent as to Liability.........................22
       (3)     Petitioning Creditors' Claims Are Subject to a Bona Fide Dispute as to
            Amount .......................................................................................................27
    B.    No Orders for Relief Can be Entered Because the Alleged Debtors Are
         Generally Paying their Debts as They Come Due ............................................... 34

    C.    Dismissal is Warranted Because Involuntary Cases were not Commenced in
         Good Faith ........................................................................................................ 39

    CONCLUSION ..............................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

In re All Media Props., Inc.,
    5 B.R. 126 (Bankr. S.D. Tex. 1980), aff'd sub nom.,
    All Media Props., Inc. v. Best, 646 F.2d 193 (5th Cir. 1981) .............................................. 22

In re Allied Riser Communications Corp.,
    No. 02-32607 (SAF) (Bankr. N.D. Tex. March 27, 2002) ............................................ 31, 35

In re Better Care, Ltd.,
    97 B.R. 405 (Bankr. N.D. Ill. 1989) .................................................................................. 37

In re Briggs,
    No. 07-34534 (SGJ), 2008 WL 190463 (Bankr. N.D. Tex. Jan. 18, 2008) ........................ 38

In re Brooklyn Res. Recovery, Inc.,
    216 B.R. 470 (Bankr. E.D.N.Y. 1997) ............................................................................. 38

In re Capmark Fin. Grp., Inc.,
    438 B.R. 471 (Bankr. D. Del. 2010) .................................................................................. 32

In re Demirco Holdings, Inc.,
    2006 WL 1663237 (Bankr. C.D. Ill. June 9, 2006) ........................................................... 42

In re ELRS Loss Mitigation, LLC,
    325 B.R. 604 (Bankr. N.D. Okla. 2005) ............................................................................ 41

In re Fax Station, Inc.,
    118 B.R. 176 (Bankr. D.R.I. 1990) ................................................................................... 41

In re Henry S. Miller Commercial, LLC,
    418 B.R. 912 (Bankr. N.D. Tex. 2009) ............................................................................. 30

In re Karber,
    25 B.R. 9 (Bankr. N.D. Tex. 1982) ................................................................................... 36

In re Kingston Square Assocs.,
    214 B.R. 713 (Bankr. S.D.N.Y. 1997) ............................................................................. 40

In re Laclede Cab Co.,
    76 B.R. 687 (Bankr. E.D. Mo. 1987) ................................................................................ 37

In re Lough,
    57 B.R. 993 (Bankr. E.D. Mich. 1986) ............................................................................. 28

In re Metropolitan Realty Corp.,
    433 F.2d 676 (5th Cir. 1970) .................................................................................. 41

In re Milton M. Smith,
    415 B.R. 222 (Bankr. N.D. Tex. 2009) ................................................................. 34

In re Moss,
    249 B.R. 411 (Bankr. N.D. Tex. 2000) ...................................................... 21, 34, 39

In re Mountain Dairies, Inc.,
    372 B.R. 623 (Bankr. S.D.N.Y. 2007) ................................................................. 41

In re Norris,
    183 B.R. 437 (Bankr. W.D. La. 1995) ................................................................. 39

In re Norriss Bros. Lumber Co.,
    133 B.R. 599 (Bankr. N.D. Tex. 1991) ................................................................. 20

In re Privada, Inc.,
    No. 07-10940 (FRM), 2008 WL 4692372 (Bankr. W.D. Tex. Oct. 22, 2008) ................. 40, 41

In re Ramm Indus., Inc.,
    83 B.R. 815 (Bankr. M.D. Fla. 1988) ............................................................. 36, 38

In re Reed,
    11 B.R. 755 (Bankr. S.D. W. Va. 1981) ................................................................. 34

In re Rosenberg,
    414 B.R. 826 (Bankr. S.D. Fla. 2009) ............................................................. 23, 25

In re Sherwood Enters., Inc.,
    112 B.R. 165 (Bankr. S.D. Tex. 1989) ............................................................. 40, 41

In re Silverman,
    230 B.R. 46 (Bankr. N.J. 1998) ................................................................. 37

In re Smith,
    243 B.R. 169 (Bankr, N.D. Ga. 1999) ................................................................. 41

In re Spade,
    258 B.R. 221 (Bankr. D. Col. 2001) ................................................................. 41

In re State Park Building Group, Ltd.,
    316 B.R. 466 (Bankr. N.D. Tex. 2004) ................................................................. 40

In re Staxxring, Inc.,
    No. 10-30668 (SGJ), 2010 WL 2218935 (Bankr. N.D. Tex. May 28, 2010) ................. 27, 30

In re Sys. Commc'ns, Inc.,
    234 B.R. 145 (Bankr. M.D. Fla. 1999) ................................................................. 35, 37, 41

In re TLC Medical Group, Inc.,
    No. 04-15739 (JAB), 2005 WL 4677807 (Bankr. E.D. La. March 04, 2005) ...................... 31

In re Trans-High Corp.,
    3 B.R. 1.................................................................................................................. 37

In re Trina Assocs.,
    128 B.R. 858 (Bankr. E.D.N.Y 1991) ........................................................................ 41

In re VII Holdings Co.,
    362 B.R. 663 (Bankr. D. Del. 2007) .......................................................................... 41

In re Xacur,
    216 B.R. 187 (Bankr. S.D. Tex. 1997) ....................................................................... 21

In re Xacur,
    219 B.R. 956 (Bankr. S.D. Tex. 1998) ....................................................................... 31

John E. Andrus Mem'l Home v. De Buono,
    260 A.D.2d 635 (N.Y. App. Div. 2d Dep't 1999) ....................................................... 26

Joseph v. Creek & Pines, Ltd.,
    217 A.D.2d 534 (N.Y. App. Div. 2d Dep't 1995) ....................................................... 26

Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev.
    Co.),
    779 F.2d 1068 (5th Cir. 1986) .................................................................................. 40

Marrama v. Citizens Bank of Mass.,
    549 U.S. 365 (2007)................................................................................................ 39

Mongiello Bros. Coal Corp. v. Houghtailing Props. Inc.,
    309 F.2d 925 (5th Cir. 1962) .................................................................................... 40

Norris v. Johnson (In re Norris),
    No. 96-30146, 1997 WL 256808 (5th Cir. Apr. 11, 1997) ........................................... 35

Randall v. Erstmark Capital Corp. (In re Erstmark Capital Corp.),
    73 F. App'x 79 (5th Cir. 2003) ................................................................................. 33

Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.),
    486 F.3d 940 (6th Cir. 2007) .................................................................................... 28

Subway Equip. Leasing Corp. v. Sims (In re Sims),
    994 F.2d 210 (5th Cir. 1993) ............................................................................... 27, 31

United States v. Gordon,
No. 90-4016 (SWK), 1994 WL 514533 (S.D.N.Y. Sept. 21, 1994), aff'd 78
F.3d 781 (2d Cir. 1996) ........................................................................................ 23, 26

United States v. Gottlieb,
948 F.2d 1128 (9th Cir. 1991) .............................................................................. 23, 26

United States v. Stark,
No. 92-9501 (CSH), 1994 WL 323651 (S.D.N.Y. July 5, 1994) ..................... 23, 26

United States v. Vanornum,
912 F.2d 1023 (8th Cir. 1990) .................................................................................... 23

Walden v. Bright Prods., Inc. (In re Walden),
781 F.2d 1121 (5th Cir. 1986) ...................................................................... 20, 21, 41

West v. Parker (In re Watson),
325 B.R. 380 (Bankr. S.D. Tex. 2005)....................................................................... 24

**STATUTES**

11 U.S.C. § 303(b)(1) ....................................................................................20, 21, 22, 27

11 U.S.C. § 303(h)(1) ................................................................................................... 34

11 U.S.C. § 548(a)......................................................................................................... 33

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
Pub. L. No. 109-8, § 1234(a)(l)(A), 119 Stat. 204 (2005) ....................................... 28

Federal Judgeship Act of 1984,
Pub. L. No. 98-353, 98 Stat. 333 (effective July 10, 1984)....................................... 27

**LEGISLATIVE HISTORY**

147 Cong. Rec. S2343-01 (2001) ................................................................................. 30

148 Cong. Rec. S7735-01 (2002) ................................................................................. 30

149 Cong. Rec. E551-02 (2003) ................................................................................... 30

151 Cong. Rec. E677-04 (2005).................................................................................... 30

151 Cong. Rec. H1993-01 (2005).................................................................................. 28

30 Cong. Rec. S7618 (June 19, 1984) .......................................................................... 28

H.R. Rep. No. 109-31(I), 109th Cong., 1st Sess. (2005) ............................................. 28

**TREATISES AND OTHER AUTHORITIES**

Collier International Business Insolvency Guide ¶ 32.04[1][d] and [e] ...................................... 20

TO THE HONORABLE RUSSELL F. NELMS,
UNITED STATES BANKRUPTCY JUDGE:

The alleged debtors (collectively, the "Alleged Debtors") in the above-
captioned involuntary chapter 11 cases (the "Involuntary Cases") hereby submit this
memorandum of law in support of the dismissal of the involuntary chapter 11 petitions (the
"Involuntary Petitions") filed against them on November 17, 2010 (the "Involuntary
Petition Date") by Knighthead Master Fund, L.P., Brookville Horizons Fund, L.P.,
Davidson Kempner Distressed Opportunities Fund L.P., and Lord Abbett Bond-Debenture
Fund, Inc. (collectively, the "Petitioning Creditors") based on the affirmative defenses set
forth in the Answer of Alleged Debtors Contesting Involuntary Chapter 11 Petitions [Dkt.
No. 70] (the "Answer") filed on December 9, 2010.  The Alleged Debtors are relying on
the Declarations in Support of the Dismissal of the Involuntary Chapter 11 Petitions of
Ricardo Maiz Rodriguez (the "Maiz Decl."), Stephen Rich (the "Rich Decl."), Carlos
Martinez (the "Martinez Decl."), and Kevin Jackson (the "Jackson Decl." and, together
with the Maiz Decl., Rich Decl. and Martinez Decl., the "Declarations") filed
simultaneously herewith.

## PRELIMINARY STATEMENT

1.      The Court is fully aware by now that the filing of the Involuntary Cases is
but an episode in the full-scale battle launched by the members of the Steering Committee
against Vitro SAB, the parent company of the Alleged Debtors.  While the Petitioning
Creditors are entitled to enforce their rights under the Notes and the Guarantees, they
should not be allowed to destroy the viable businesses of the Alleged Debtors in the
process (particularly by means that fail to comply with the enforcement procedures

#4828-5694-9512v20

provided by the Indentures). To the extent the Petitioning Creditors wished to enforce

their Guarantees against the Alleged Debtors – rather than gain undue leverage over Vitro

SAB – they should have, upon making the requisite demands, enforced their rights in state

court, where two-party disputes belong. Filing involuntary bankruptcy petitions against

healthy companies that pay their non-contingent obligations as they become due in the

ordinary course of their businesses is wrong. When this is done for the obvious purpose of

pressuring a non-debtor parent company, it borders on bad faith. Moreover, one cannot

over-emphasize the fact that, in the more than three months these Involuntary Cases have

been pending, not one single creditor that deals with the Alleged Debtors in the ordinary

course of their businesses has come forward to join the Petitioning Creditors in their

attempt to put these companies into chapter 11 against their will.

      2.     The Involuntary Cases should be dismissed because (i) the Petitioning

Creditors were not eligible, pursuant to section 303(b) of the Bankruptcy Code, to file the

Involuntary Petitions because (a) they are not "holders" of the claims on which they

purported to base these filings and, (b) as of the Involuntary Petition Date, such claims

were both contingent as to liability and subject to a *bona fide* dispute as to amount,

(ii) pursuant to section 303(h)(1) of the Bankruptcy Code, no order for relief may be

entered against the Alleged Debtors because the Alleged Debtors are generally paying all

of their undisputed non-contingent debts as they come due in the ordinary course of their

businesses, and (iii) the Involuntary Petitions were not filed in good faith.

# I.    BACKGROUND

## A.    Alleged Debtors

3.    The Alleged Debtors are wholly-owned indirect subsidiaries of Vitro S.A.B.

de C.V. ("Vitro SAB"), a corporation organized under the laws of Mexico, which is a

holding company for an international enterprise (together with Vitro SAB, "Vitro") that is

the largest manufacturer of glass containers and flat glass in Mexico.[2]  Vitro has

manufacturing facilities in 11 countries and distribution centers throughout the Americas

and Europe, and exports its products to more than 50 countries worldwide.  (Sol. Stmt. at

114)  As of the Involuntary Petition Date, Vitro employed approximately 17,600 personnel,

of which 1,860 were employed by the Alleged Debtors:  1,647 were employed by Vitro

America, 18 were employed by Auto Glass, 2 – by VVP Finance, 64 – by Super Sky

Products, 4 – by Chemicals, and 125 – by Packaging.  (Maiz Decl. ¶ 9; Martinez Decl. ¶ 8;

Jackson Decl. ¶ 8)  VVP Holdings, Super Sky International, Binswanger, Troper, Asset

Corp., V-MX, Amsilco, BBO and Crisa do not employ any personnel.  (Maiz Decl. ¶ 9;

Rich Decl. ¶ 8)

4.    Certain of the Alleged Debtors (the "Non-Operating Alleged Debtors")[3]

have little or no third party liabilities (other than their contingent and unliquidated liability,

if any, under the Guarantees).  Certain other Alleged Debtors[4] are shell companies that

conduct no business and have no material ordinary course liabilities to third parties.  (Rich

---

[2]    See Solicitation Statement dated November 1, 2010 issued by Vitro SAB in connection with its Exchange Offer and Consent Solicitation (the "Solicitation Statement" or "Sol. Stmt.") at 22.  The Solicitation Statement was previously put into the record of the Involuntary Cases as Exhibit A to the Alleged Debtors' Objection to the Motion of the Petitioning Creditors to Restrict Certain Transfers of Property Pursuant to Section 303(f) of the Bankruptcy Code (the "303(f) Objection") [Dkt. No. 20].

[3]    The Non-Operating Alleged Debtors are Amsilco, BBO, Crisa, V-MX, Binswanger, Troper, Asset Corp., VVP Finance, VVP Holdings and Super Sky International.

[4]    Amsilco, BBO, Crisa, V-MX, Binswanger and Troper.

Decl. ¶ 7; Maiz Decl. ¶ 7)  Asset Corp. is a holding company that has no material ordinary

course liabilities to third parties other than certain tax obligations.[5]  (Rich Decl. ¶ 7)

Similarly, VVP Finance, VVP Holdings and Super Sky International, while being obligors

on the Prepetition Secured Debt (as defined below) in addition to the Guarantees, are either

holding companies or provide certain specialized services to their affiliates and have no

material ordinary course liabilities to third parties.  (Maiz Decl. ¶ 8)

       5.      Of the remaining Alleged Debtors (the "Operating Alleged Debtors"),[6]

(i) Vitro America fabricates and distributes flat glass for architectural applications  and

installs glass for both the architectural and automotive end user segments (Maiz Decl. ¶ 8),

(ii) Super Sky Products designs, fabricates and installs skylights for commercial buildings

and private residences (Maiz Decl. ¶ 8), (iii) Auto Glass provides representation services

for certain of Vitro's Mexican affiliates, interfacing with Original Equipment

Manufacturers which purchase such affiliates' auto glass products for use in domestic

automobile production (Maiz Decl. ¶ 8), (iv) Chemicals distributes products manufactured

by certain of the Alleged Debtors' Mexican affiliates to customers in the United States and

Canada (Martinez Decl. ¶ 7), and (v) Packaging provides administrative and sales services

to the Alleged Debtors' Mexican affiliate, Vitro Packaging de Mexico S.A. de C.V., in

connection with the distribution in the U.S. of glass containers (Jackson Decl. ¶ 7).

---

[5]    Asset Corp. periodically engages third party ordinary course professionals.  Prior to the Involuntary
Petition Date, the fees and expenses of these professionals were paid by its wholly owned non-
debtor subsidiary, Vitro International Services Corporation, which, in turn, invoiced Asset Corp. for
reimbursement of such fees on an annual basis.  (Rich Decl. ¶ 7)

[6]    The Operating Alleged Debtors are Vitro America, Auto Glass, Super Sky Products, Chemicals and
Packaging.

**B.**   **Indebtedness of Alleged Debtors**

    **(1)**   ***Secured Indebtedness***

    6.    Vitro America and VVP Finance (together, the "Borrowers") are party to that certain Loan and Security Agreement, dated as of June 27, 2003 (as modified from time to time, the "Prepetition Loan Facility"), pursuant to which Bank of America, N.A. provided them with a revolving loan facility of up to $35 million. (Maiz Decl. ¶ 10) As of the Involuntary Petition Date, there were outstanding under the Prepetition Loan Facility (i) revolving loans in the approximate principal amount of $8,591,106, (ii) reimbursement obligations for draws made upon letters of credit issued thereunder in the aggregate face amount of approximately $14,180,000, and (iii) corporate credit card debt of approximately $410,000. (Maiz Decl. ¶ 10) As of the Involuntary Petition Date, no payment defaults existed under the Prepetition Loan Facility. (Maiz Decl. ¶ 10)

    7.    In addition, Vitro America is party to capital equipment leases (the "Capital Leases" and, together with the Prepetition Loan Facility, the "Prepetition Secured Debt") with Banc of America Leasing & Capital, LLC, as lessor. (Maiz Decl. ¶ 11) As of the Involuntary Petition Date, approximately $3,603,000 was outstanding under the Capital Leases. (Maiz Decl. ¶ 11) As of the Involuntary Petition Date, no payment defaults existed under any of the Capital Leases. (Maiz Decl. ¶ 11)

    8.    Pursuant to those certain Continuing Guaranty Agreements, dated June 27, 2003, VVP Holdings, Auto Glass, Super Sky International, and Super Sky Products (together with the Borrowers, the "Secured Obligors") guaranteed the Borrowers' obligations under the Prepetition Loan Facility and Vitro America's obligations under the Capital Leases. (Maiz Decl. ¶ 12) Additionally, all of the Prepetition Secured Debt is secured by first-priority security interests in and liens upon (i) all of the personal property

of the Secured Obligors (other than Super Sky Products), and (ii) certain real property located in California, Colorado, Mississippi, North Carolina, Oklahoma, Texas, and Virginia. (Maiz Decl. ¶ 12)

9.      As of the Involuntary Petition Date, none of Packaging, Chemicals, Binswanger, Troper, Asset Corp., V-MX, Amsilco, BBO or Crisa had any secured indebtedness. (Jackson Decl. ¶ 9; Martinez Decl. ¶ 9; Maiz Decl. ¶ 14; Rich Decl. ¶ 10)

     (2)    ***Unsecured Indebtedness***

           (a)    <u>Ordinary Course Debt Owed to Third Parties</u>

10.      As of the Involuntary Petition Date, none of the Non-Operating Alleged Debtors had any unsecured liabilities to third-parties that were past due. (Maiz Decl. ¶ 14; Rich Decl. ¶ 10)

11.      In the ordinary course of their business operations, the Operating Alleged Debtors incur ordinary course unsecured obligations[7] (collectively, the "<u>Ordinary Course Debt</u>") to third party providers of goods and services (the "<u>Trade Creditors</u>"), as well as employees, taxing authorities, and lessors of leased real and personal property. Each month, the Operating Alleged Debtors process approximately 7,365 individual payments on account of more than 16,800 invoices from Trade Creditors and holders of other Ordinary Course Debt. (Maiz Decl. ¶ 15; Martinez Decl. ¶ 11; Jackson Decl. ¶ 11) The average monthly number of payments made by each Operating Alleged Debtor during 2010 on account of Ordinary Course Debt, the monthly average aggregate amount of such

---

[7]      From time to time, certain Trade Creditors (as defined below) may assert a possessory, mechanics', artisans' or other statutory lien against the assets of an Operating Alleged Debtor; however, as of the Involuntary Petition Date, the Operating Alleged Debtors were not aware of any such liens. (Maiz Decl. ¶ 15; Martinez Decl. ¶ 10; Jackson Decl. ¶ 10)

payments and the aggregate amount of undisputed Ordinary Course Debt as of the

Involuntary Petition Date, are as follows:



(Maiz Decl. ¶ 15; Martinez Decl. ¶ 10; Jackson Decl. ¶ 10)

12.    Vitro America processes more than 15,800 invoices per month from more

than 1,400 Trade Creditors.  (Maiz Decl. ¶ 16)

Accordingly, as of the

Involuntary Petition Date Vitro America was paying all of its Trade Creditors in

accordance with its ordinary business practices. (Maiz Decl. ¶ 16)

13.    Auto Glass and Super Sky Products process approximately 66 and 500

invoices per month from their Trade Creditors, respectively. (Maiz Decl. ¶ 17)  Auto

Glass and  Super Sky Products pay these obligations as invoiced in the ordinary course of

their businesses. (Maiz Decl. ¶ 17)

14.    Chemicals and Packaging process approximately 170[8] and 290 invoices per

month from their Trade Creditors, respectively. (Martinez Decl. ¶ 11; Jackson Decl. ¶ 11)

---

[8]    With invoices from affiliates, Chemicals processes approximately 350 invoices per month.
(Martinez Decl. ¶ 11)

Accordingly, neither Chemicals nor Packaging believes that any amounts owing to their

respective Trade Creditors as of the Involuntary Petition Date were past due.  (Martinez

Decl. ¶ 11; Jackson Decl. ¶ 11)



   15.

Moreover, not a single Trade Creditor of any of the Operating Alleged

Debtors has joined in the Involuntary Petitions pursuant to section 303(c) of the

Bankruptcy Code.  (Maiz Decl. ¶ 18; Martinez Decl. ¶ 12; Jackson Decl. ¶ 12)

(b)    Unsecured Indebtedness to Affiliates

17.    As noted above, the Alleged Debtors are part of an international enterprise and perform many functions and services to provide their corporate family access to a broad U.S. customer base.

10



(c)    <u>Super Sky Surety Bond Facility</u>

19.    In the ordinary course of its business, Super Sky Products undertakes

commercial glazing and skylight projects which sometimes are required to be bonded.

Pursuant to that certain Underwriting and Continuing Indemnity Agreement dated

November 16, 2009 (the "<u>Surety Bond Facility</u>") among Super Sky Products, as principal,

Super Sky International, Vitro America, VVP Holdings, and Asset Corp. as indemnitors,

and International Fidelity Insurance Company, as surety ("<u>IFIC</u>"), IFIC has agreed to bond

the performance of Super Sky Products with respect to such projects up to an aggregate

amount of $35 million. (Maiz Decl. ¶ 22)  As of the Involuntary Petition Date,

approximately $13.0 million of surety bonds were outstanding under the Surety Bond

Facility, and premiums payments were payable thereunder in amounts based on the type

and size of the relevant project. (Maiz Decl. ¶ 22)  As of the Involuntary Petition Date,

none of such premium payments were past due. (Maiz Decl. ¶ 22)

---

[10]    As of the Involuntary Petition Date, none of VVP Finance, Super Sky International, Super Sky
Products, Binswanger, Troper, V-MX, Amsilco, and BBO had any outstanding liabilities to their
foreign affiliates. (Maiz Decl. ¶ 21; Rich Decl. ¶ 11)



(d)    Guarantee of Vitro SAB Notes

21.    On October 22, 2003 and on February 1, 2007, respectively, Vitro SAB issued (i) $225 million in aggregate principal amount of 11.75% Senior Notes due 2013 (the "2013 Notes"), (ii) $300 million in aggregate principal amount of 8.625% Senior Notes due 2012 (the "2012 Notes") and (iii) $700 million in aggregate principal amount of 9.125% Senior Notes due 2017 (the "2017 Notes" and, together with the 2013 Notes and the 2012 Notes, the "Notes"). As of September 30, 2010, the aggregate outstanding principal amount of the Notes was approximately $1.216 billion.

22.    The indentures governing the Notes (collectively, the "Indentures") provide for guarantees (the "Guarantees") of Vitro SAB's obligations under the Notes by a number of Vitro SAB's wholly-owned direct and indirect subsidiaries, including each of the Alleged Debtors (in such capacities, the "Guarantors"). As of the Involuntary Petition Date, no demand had been made on the any of the Alleged Debtors with respect to their obligations as Guarantors, as required by each Indenture. (Maiz Decl. ¶ 24; Martinez Decl. ¶ 14; Jackson Decl. ¶ 14; Rich Decl. ¶ 14)

C.   **Events Leading to Filing of Involuntary Cases**

23.   As described above, the Alleged Debtors are generally paying all of their

non-contingent, undisputed debts as they become due in the ordinary course of business.

Thus, all of the material circumstances leading to the commencement of the Involuntary

Cases concern the financial difficulties and restructuring efforts of their parent company,

Vitro SAB.   In fact, the claims asserted by the Petitioning Creditors as the basis for their

commencement of the Involuntary Cases are primary obligations of Vitro SAB.

24.   Vitro's financial difficulties are due to the global financial crisis and severe

economic recession beginning in the second half of 2008, which affected each of its major

markets, Mexico, the United States and Spain.   (Sol. Stmt. at 24)   The sharp decline in

demand for new cars and trucks in the automobile industry and for new homes and

buildings in the construction industry, as well as reduced beer bottle demand from Vitro's

significant client for glass containers, resulted in a 36.8% decline in Vitro's consolidated

operating income for 2008 compared to 2007, and a further 22.3% decline for 2009

compared to 2008.   (Sol. Stmt. at 24)   Even though the economy began showing moderate

signs of recovery during 2010, some of Vitro's markets are still experiencing contraction

and excess capacity, including the construction sector in the United States and Spain.   (Sol.

Stmt. at 24)

25.   Vitro's glass container furnaces are large consumers of natural gas,

consuming approximately 20 million British Thermal Units ("MMBTU") in 2008 and 17

MMBTUs in 2009.   (Sol. Stmt. at 24)   Accordingly, Vitro was strongly negatively affected

by a sharp price increase for natural gas in the first seven months of 2008 from $6.51 to

$12.60 per MMBTU.   (Sol. Stmt. at 25)   During this period, in order to hedge against

further increases in natural gas prices, Vitro entered into various derivative financial

13

instruments that were different in characteristics and notional amounts from the derivative

contracts Vitro had historically been party to. (Sol. Stmt. at 24)  The ensuing high

volatility in commodity and currency markets in the second half of 2008[11] placed

additional financial pressure on Vitro's hedging positions and forced Vitro to unwind the

majority of its open positions in the fourth quarter of 2008.  (Sol. Stmt. at 25)  The

unwinding of these hedging positions not only led to substantial claims, but also triggered

cross-default provisions in the majority of Vitro's debt instruments, including the

Indentures.  (Sol. Stmt. at 25)

26.     Due to the foregoing, in February 2009, Vitro SAB stopped making interest

payments on the Notes and announced its intention to restructure the Notes and certain

other debt (collectively, the "Restructured Debt").[12]  (Sol. Stmt. at 25)  Thereafter, Vitro

SAB engaged in good faith negotiations regarding a potential restructuring with various

creditor constituencies, including the *ad hoc* committee of the holders of the Notes (the

"Steering Committee").  (Sol. Stmt. at 25-29)  Unfortunately, those negotiations did not

result in an agreement, as the Steering Committee rejected three separate restructuring

proposals by Vitro SAB between August 2009 and July 2010.  (Sol. Stmt. at 28)

27.     On January 4, 2010, a group of entities claiming to hold at least 25% of the

outstanding principal amount of the relevant Notes sent purported acceleration notices to

Vitro SAB with respect to the 2017 Notes and the 2012 Notes, and, on April 7, 2010, the

---

[11]     Specifically, between July 2008 and December 2008, natural gas prices plummeted more than 50%,
and the Mexican peso registered a 30% devaluation against the dollar, reversing the appreciation
trend experienced in the first seven months of the year and making it substantially more expensive
for Vitro to service its U.S. dollar-denominated debt. (Sol. Stmt. at 25)

[12]     The Restructured Debt consists of (i) $1.216 billion in outstanding principal amount under the
Notes, (ii) $253 million relating to the settlement of certain derivatives-related litigation (the "DFI
Litigation"), and (iii) $58.5 million of certain medium-term peso-denominated notes and other
unsecured debt. (Sol. Stmt. at ii)

indenture trustee for the 2013 Notes sent an acceleration notice with respect to the 2013

Notes (collectively, the "Acceleration Notices").[13]  (Sol. Stmt. at 26)  In addition, in

April 2010, Vitro SAB and certain of its Mexican subsidiaries were found liable by the

Supreme Court of New York in the DFI Litigation.  (Sol. Stmt. at 25)  These developments,

among other things, led Vitro SAB to explore alternative means to implement a

restructuring, such as an in-court restructuring in Mexico.

      28.     Accordingly, Vitro SAB formulated a new proposal (the "*Concurso* Plan")

for restructuring of the Restructured Debt that was to be effectuated through a tender offer

(the "Tender Offer") and an exchange offer and consent solicitation (the "Exchange Offer

and Consent Solicitation," and, together with the Tender Offer, the "Offers") followed by a

*concurso mercantil* proceeding (the "*Concurso* Proceeding") under the *Ley de Concursos*

*Mercantiles* (the "Mexican Business Reorganization Act").  (Sol. Stmt. at 86)  The

*Concurso* Plan provided for the cancelation of approximately $1.5 billion of the

Restructured Debt, including the Notes and the Guarantees, in exchange for consideration

that included new unsecured notes issued by Vitro SAB and guaranteed by sixty of its

subsidiaries (including the Alleged Debtors), as well as cash and other new debt.  (Sol.

Stmt. at 26)  Vitro SAB has expressed its belief that the *Concurso* Plan will provide the

---

[13]      The Acceleration Notices include that certain (i) Letter dated April 7, 2010 (Re: Notice of Default
and Acceleration with respect to 2013 Notes), (the "2013 Acceleration Notice"), (ii) Letter dated
January 4, 2010 (Re: Notice of Acceleration of 9.125% Senior Notes due 2017) (the "2017
Acceleration Notice"), and (iii) Letter dated January 4, 2010 (Re: Notice of Acceleration of 8.625%
Senior Notes due 2012) (the "2012 Acceleration Notice"), which are being provided to the Court as
Alleged Debtors' Exhibits 33, 34, and 35, respectively.  By discussing the Acceleration Notices and
their content in this memorandum, the Alleged Debtors do not concede their validity or
effectiveness, and hereby expressly reserve all of their rights with respect thereto.

holders of the Restructured Debt with recovery of 68% to 75% of the face value of their
claims.[14]

29.     Even before the Solicitation Statement was filed, the Steering Committee
announced its opposition to Vitro SAB's restructuring proposal.  In fact, *six days prior* to
the launch of the Offers, the Steering Committee issued a press release denouncing the yet-
to-be-publicly-disclosed terms of the Offers as allegedly providing an "unacceptably poor
economic outcome" for the holders of the Notes, and encouraged all holders of Notes to
reject the proposal.[15]

30.     On December 2, 2010 and December 9, 2010, certain members of the
Steering Committee commenced two law suits against Vitro SAB and 49 Guarantors (other
than the Alleged Debtors) in the Supreme Court of the State of New York (the "New York
State Court"), in each of which the plaintiffs obtained *ex parte* orders of attachment (the
"Attachment Orders") with respect to all property of any defendant located in the State of
New York.  Thereafter, the plaintiffs served copies of the Attachment Orders on certain of
Vitro's customers.[16]  In response, some of these customers suspended payments on account
of goods and services being provided by the defendants – including payments on account

---

[14]  See November 1, 2010 Release ("Vitro Announces Offers for its Outstanding Senior Notes"), attached as Exhibit C to the 303(f) Objection.

[15]  See October 26, 2010 Release ("Ad Hoc Committee of Noteholders Reject Vitro's Initial Consent Solicitation"), attached as Exhibit D to the 303(f) Objection.

[16]  The plaintiffs also served the Attachment Orders on D.F. King & Co., Inc. ("D.F. King"), the Depositary for the Tender Offer and Information and Exchange Agent for the Exchange Offer and Consent Solicitation, in yet another attempt to disrupt Vitro SAB's reorganization efforts.  As a result, D.F. King refused to take certain steps necessary to effectuate the transfer of the Notes tendered in the Tender Offer or disburse the Consent Payment to those holders of the Notes that consented to the *Concurso* Plan, until – after nearly two weeks of expedited litigation before the New York State Court and the New York Appellate Division – an order was entered clarifying that the Attachment Orders did not apply to the Notes tendered or exchanged as part of the Offers. Subsequently, D.F. King took the requisite actions and the Offers were completed.

of receivables previously assigned by the defendants to a trust[17] – pending an order by the

New York State Court vacating the Attachment Orders or otherwise clarifying that such

payments were not subject thereto.

31.     On February 8, 2011, Justice Kornreich of the New York State Court heard

argument on cross-motions by the plaintiffs to confirm and defendants to vacate the

Attachment Orders, as well as an order to show cause by Invex seeking entry of an order

clarifying that payments due to the Flat Glass Payment Trust from customers on account of

receivables generated by Automotriz were not subject to the Attachment Orders.  At the

conclusion of the hearing, Justice Kornreich took the cross-motions under advisement and

entered an order on Invex's order to show cause (the "Partial *Vacatur* Order") vacating the

Attachment Orders with respect to the Flat Glass Payment Trust receivables.  Justice

Kornreich briefly stayed the Partial *Vacatur* Order and the plaintiffs appealed.  On

February 10, 2011, the New York Appellate Division, First Department denied plaintiffs'

application for a stay pending appeal and the Partial *Vacatur* Order became final.  (See

Order Denying App. for Stay, Feb. 10, 2011, attached hereto as Exhibit A.)

32.

---

[17]     Several defendants, including Vitro Automotriz, S.A. de C.V. ("Automotriz"), established an
independent trust, pursuant to a *contrato de fideicomiso* signed on August 3, 2005 in Mexico (the
"Flat Glass Payment Trust"), to which they sold and assigned their trade receivables.  The trustee of
the Flat Glass Payment Trust is Banco Invex, S.A., Institución de Banca Múltiple, Division
Fiduciaria Invex Grupo Financiero ("Invex").

████████████████████████████████████

████████████████████████████████

**D.      Filing Of Involuntary Petitions**

33.     On November 17, 2010, while the Offers were pending, four other members

of the Steering Committee – Knighthead Master Fund, L.P., Brookville Horizons Fund,

L.P., Davidson Kempner Distressed Opportunities Fund L.P., and Lord Abbett Bond-

Debenture Fund, Inc. – beneficially holding in the aggregate *a mere 6%* of the outstanding

principal amount of the Notes,[18] filed the Involuntary Petitions commencing the

Involuntary Cases.

34.     On December 9, 2010 the Alleged Debtors filed the Answer, denying a

number of allegations made in the Involuntary Petitions and asserting a number of

affirmative defenses that require the dismissal of the Involuntary Petitions.

**E.      Vitro SAB's Voluntary *Concurso* Proceeding**

35.     On December 13, 2010, to accomplish its proposed in-court restructuring as

contemplated by the Exchange Offer and Consent Solicitation, Vitro SAB commenced a

voluntary *concurso mercantil* proceeding (the "Voluntary *Concurso* Proceeding") under

the Mexican Business Reorganization Act by filing a petition and a pre-packaged

---

[18]      Contrary to the Petitioning Creditors' suggestion, it is the Petitioning Creditors, not the Alleged
Debtors, who are misleading the Court by continuously conflating the amounts held by them and the
amounts purportedly held or represented by all members of the Steering Committee.  Unless and
until additional members of the Steering Committee join in the Involuntary Petitions pursuant to
section 303(c) of the Bankruptcy Code (and make the required disclosures verifying the amounts
and the circumstances of their individual holdings), the Petitioning Creditors will continue to
represent solely the approximately $75 million, or 6% in face amount, of the Notes identified in
their respective Rule 1003 Statements attached to the Involuntary Petitions.  In their Answers and
Objections to the Alleged Debtors' Interrogatories to Petitioning Creditors dated February 18, 2011
(attached hereto as Exhibit B, the "Amended Answers to Interrogatories"), the Petitioning Creditors
have asserted that, as of the date thereof,  their aggregate holdings have increased to approximately
$135 million in face amount of the Notes.  However, even accounting for this increased amount
(which the Alleged Debtors do not concede to be relevant for purposes of section 303 of the
Bankruptcy Code), the Petitioning Creditors still represent a mere 11% of the outstanding Notes.

*Concurso* Plan in the Fourth District Court for Civil and Labor Matters for the State of

Nuevo León (the "Mexican Bankruptcy Court").  After being provided with the additional

information that it had requested, the Mexican Bankruptcy Court admitted the petition on

December 24, 2010 as having complied with all of the requirements of the Mexican

Business Reorganization Act.  Notwithstanding the foregoing, by resolution dated

January 7, 2011, Judge Francisco Eduardo Flores Sánchez of the Mexican Bankruptcy

Court denied Vitro SAB's request for issuance of a "business reorganization judgment"

(*sentencia de concurso mercantil*), stating that Vitro SAB's petition and *Concurso* Plan did

not meet the requirements for a pre-packaged proceeding under the Mexican Business

Reorganization Act.

36.   Vitro SAB timely appealed this denial, but the Mexican Appellate Court

rejected that appeal on January 31, 2011.  Vitro SAB has timely requested reconsideration

(*revocación*) of this rejection, as permitted under applicable Mexican law.  This request is

currently pending and Vitro SAB anticipates that the Mexican Appellate Court will issue

its ruling thereon within the next few days.

F.   **Involuntary *Concurso* Proceedings**

37.   On December 10, 2010, certain members of the Steering Committee

(including Petitioning Creditors Brookville Horizons Fund, L.P., Davidson Kempner

Distressed Opportunities Fund L.P., and Knighthead Master Fund L.P.) filed involuntary

petitions against Vitro SAB in the Mexican Bankruptcy Court, and – beginning on

December 15, 2010 – also filed involuntary petitions against certain of its Mexican

subsidiaries.  The Mexican Bankruptcy Court has entered orders admitting the involuntary

petitions (each, an "Involuntary *Concurso* Proceeding") against Vitro SAB and 17 of its

Mexican subsidiaries.  On December 20, 2010, the Mexican Bankruptcy Court appointed a

19

*visitador* in the Involuntary *Concurso* Proceeding of Vitro SAB.  Thereafter, on January 6

and 19, 2011 and February 10, 2011 the Mexican Bankruptcy Court appointed a *visitador*

in the Involuntary *Concurso* Proceedings of Vitro SAB's 17 Mexican subsidiaries that

have been sued. As of the date hereof, none of the *visitador's* had submitted his report

with respect to any of the Involuntary *Concurso* Proceedings and no *concurso mercantil*

ruling has been issued against Vitro SAB or any of the 17 subsidiaries.[19]

## II.   ARGUMENT

### A.   Petitioning Creditors Lacked Standing Under Bankruptcy Code Section 303(b) to Commence Involuntary Cases

38.    Section 303(b) of the Bankruptcy Code, which governs the commencement

of involuntary cases, provides, in the relevant part, as follows:

> (b) An involuntary case against a person is commenced by the filing with
> the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either *a holder of a claim*
> against such person that is *not contingent as to liability* or the subject of *a
> bona fide dispute as to liability or amount* . . . .

11 U.S.C. § 303(b)(1) (emphasis added).  The Fifth Circuit "has acknowledged that the

jurisdictional prerequisites for filing an involuntary bankruptcy proceeding constitute more

than mere formalities." In re Norriss Bros. Lumber Co., 133 B.R. 599, 608 (Bankr. N.D.

Tex. 1991) (quoting Walden v. Bright Prods., Inc. (In re Walden), 781 F.2d 1121 (5th Cir.

1986)).  The Fifth Circuit has also admonished that "[a]n allegation of bankruptcy invokes

---

[19]    Under the Mexican Business Reorganization Act, before the Mexican Bankruptcy Court considers
whether to issue a declaration of *concurso mercantil* in any of the Involuntary *Concurso*
Proceedings, a court-appointed "*visitador*" must examine each alleged debtor's books and records to
determine if it satisfies the eligibility requirements to be a debtor in *concurso mercantil* and issue a
report to the court.  This process may last several weeks from the appointment of the *visitador*, and
is followed by a 10-day period during which final submissions can be made regarding whether a
declaration of *concurso mercantil* should be issued.  Thereafter, the Mexican Bankruptcy Court will
issue a ruling on whether the Involuntary Concurso Proceedings will proceed or be dismissed.  See
Collier International Business Insolvency Guide ¶ 32.04[1][d] and [e] (discussing procedure under
Mexican Business Reorganization Act).

remedies not available to any ordinary debt collection procedures. It should not be

invoked unadvisedly and contrary to statutory right." In re Walden, 781 F.2d at 1123. See

also infra Part II.C (discussing requirement of good faith in filing involuntary petition).

39.     Accordingly, the Petitioning Creditors must demonstrate, by a

preponderance of the evidence, that the requirements of section 303(b) of the Bankruptcy

Code have been satisfied. See, e.g., In re Moss, 249 B.R. 411, 418 (Bankr. N.D. Tex.

2000); In re Xacur, 216 B.R. 187, 194 (Bankr. S.D. Tex. 1997). The Petitioning Creditors

cannot meet this evidentiary burden because (a) they are not "holders" of the claims on

which they purport to base their right to commence the Involuntary Cases, and (b) such

claims are both (i) contingent as to liability and (ii) subject to a *bona fide* dispute.

### (1)     Petitioning Creditors Are Not "Holders" of Claims On Which Involuntary Petitions Are Based

40.     A threshold requirement for an entity that wishes to file an involuntary

petition against a debtor under section 303(b) of the Bankruptcy Code is that such entity is

"a holder of a claim" against such debtor. 11 U.S.C. § 303(b)(1). Yet, the Petitioning

Creditors are not, in fact, "holders" of the claims against the Alleged Debtors on which

they purport to base the Involuntary Petitions.

41.     The Petitioning Creditors allege that they are beneficial owners of certain of

the Notes. However, the Notes have been issued in global form, and exist only as part of

the "Global Notes" held by their sole registered holder, the Depository Trust Company (the

"DTC") (acting through its nominee, Cede & Co.).[20] Each Indenture clearly states that

DTC participants (through which all beneficial holders of the Notes hold their interests

---

[20]     See 2012 Indenture § 2.09(b)(1) ("[e]ach Global Note will be registered in the name of the [DTC]"); 2017 Indenture § 2.09(b)(1) (same); 2013 Indenture § 2.07(a) (same).

therein) "have *no rights* under the Indenture with respect to any Global Note held on their

behalf by the [DTC], and the [DTC] may be treated by the Company, the Trustee and any

agent of the Company or the Trustee as the *absolute owner and Holder* of such Global

Note *for all purposes whatsoever.*"[21]  (emphasis added)

42.     While the Indentures allow beneficial owners of the Notes to obtain proxies

from the DTC or otherwise get authorization from the DTC or its nominees to "take any

action" that only the DTC is authorized to take under the Indentures or the Notes,[22] the

Petitioning Creditors did not receive such proxy or authorization and, therefore, were not

authorized to act on the DTC's behalf.  (Bastable Dep. Tr. 76:15-77:7, 97:8-98:23;

Petrakov Dep. Tr. 47:20-48:14; Sheehan Dep. Tr. 63:2-19)[23]  As such, the Petitioning

Creditors cannot be considered "holders" of the claims on which they purport to have

based the Involuntary Petition.[24]

### (2)     *Petitioning Creditors' Claims Are Contingent as to Liability*

43.     As stated above, to be eligible to file an involuntary petition, a creditor must,

among other things, hold a claim that is "not contingent as to liability."  11 U.S.C.

§ 303(b)(1).  For the purposes of section 303(b), "[a] claim is contingent as to liability if

the debtor's *legal duty to pay* does not come into existence until triggered" by the

---

[21]     See 2012 Indenture § 2.09(b)(3); 2017 Indenture § 2.09(b)(3); 2013 Indenture § 2.07(a).

[22]     See Id. ("[T]he [DTC] or its nominee may grant proxies and otherwise authorize any Person
(including any [DTC participant] and any Person that holds a beneficial interest in a Global Note
through [a DTC participant]) to take any action which a Holder is entitled to take under the
Indenture or the Notes, and nothing herein will impair, as between the [DTC] and [DTC
participants], the operation of customary practices governing the exercise of the rights of a holder of
any security. ").

[23]     The Bastable, Petrakov and Sheehan deposition transcripts are being provided to the Court as
Alleged Debtors' Exhibits 62, 63, and 64, respectively.

[24]     Analogously, upon information and belief, none of the alleged beneficial holders of the Notes who
sent the 2012 Acceleration Notice or the 2017 Acceleration Notice had been granted a proxy or
otherwise authorized to do so by the DTC or Cede & Co.  Accordingly, the 2012 Notes and 2017
Notes do not appear to have been validly accelerated.

occurrence of an extrinsic event that was "within the actual or presumed contemplation of

the parties at the time the original relationship of the parties was created." In re All Media

Props., Inc., 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), aff'd sub nom., All Media Props., Inc.

v. Best, 646 F.2d 193 (5th Cir. 1981) (emphasis added).

44.    Each Indenture contains an identical guarantee provision, which states that

"[u]pon failure by the [Issuer] to pay punctually any such amount [due under the Notes],

each Guarantor shall forthwith *on demand* pay the amount not so paid at the place and in

the manner specified in the Indenture."[25] Thus, the Alleged Debtors' liability under the

Guarantees remains contingent until a demand – explicitly contracted for by the parties – is

made on them that triggers their "legal duty to pay." See, e.g., In re Rosenberg, 414 B.R.

826, 844 (Bankr. S.D. Fla. 2009) ("a default under the . . . [g]uaranty *and demand for

payment* are the required extrinsic events which must occur before [guarantor's] liability,

if any, is triggered.") (emphasis added; internal citations omitted). See also United States v.

Gottlieb, 948 F.2d 1128, 1130 (9th Cir. 1991) ("guarantor had no obligation to pay off the

loan until the borrower had defaulted *and* a written demand for payment had been made")

(emphasis in original) (citing United States v. Vanornum, 912 F.2d 1023, 1027 (8th Cir.

1990)); United States v. Gordon, No. 90-4016 (SWK), 1994 WL 514533, at *6 (S.D.N.Y.

Sept. 21, 1994), aff'd 78 F.3d 781 (2d Cir. 1996) (same); United States v. Stark, No. 92-

9501 (CSH), 1994 WL 323651, *2 (S.D.N.Y. July 5, 1994) (same).

---

[25]    See 2013 Indenture § 11.01 (emphasis added); 2012 Indenture § 10.01 (same); 2017 Indenture
§ 10.01 (same). The requirement that a demand be made on the Guarantors is carried through to
other provisions of the Indentures as well. For example, each Indenture contains an identical stay of
acceleration provision, which states that "[i]f acceleration of the time for payment of any amount
payable by the Company under the Indenture or the Notes is stayed upon the insolvency, bankruptcy
or reorganization of the Company, all such amounts otherwise subject to acceleration under the
terms of the Indenture are nonetheless payable by the Guarantors hereunder forthwith *on demand*
by the Trustee or the Holders." See 2013 Indenture § 11.06 (emphasis added); 2012 Indenture
§ 10.06 (same); 2017 Indenture § 10.06 (same).

45.    As stated above and in the Declarations, as of the Involuntary Petition Date, no demand had been made on the Alleged Debtors with respect to their obligations under the Guarantees.  The Petitioning Creditors do not even allege that the requisite demand was made on the Alleged Debtors.[26]  Instead, they appear to rely on the proposition that some sort of constructive notice, stemming from the delivery of the Acceleration Notices to Vitro SAB,[27] was sufficient to constitute compliance with the explicit provision for a "demand" in the Guarantee provisions of each Indenture.  That is simply not true.

46.    As an initial matter, constructive notice is *not* tantamount to compliance with an explicit contractual provision governing the relationship between the parties.  See, e.g., West v. Parker (In re Watson), 325 B.R. 380, 387 (Bankr. S.D. Tex. 2005) (holding that "[c]onstructive notice was not sufficient" to supplant an explicit notice provision in a contract).  ████████████████████████████████████████████

████████████████  █ ████████████████████████████████

████████████████████████████████████████████████████

---

[26]    See Joint Pre-Conference Statement of the Petitioning Creditors and Alleged Debtors (Docket No. 91; the "Joint Statement") ¶¶ 1-18 (setting forth the Petitioning Creditors' statement of facts in support of entry of orders for relief, none of which alleges that any demand for payment was made on the Alleged Debtors).

[27]    Upon information and belief, it is uncertain whether the 2012 Acceleration Notice and 2017 Acceleration Notice were effectively served on Vitro SAB.

[28]    Thus, the Petitioning Creditors' attempted reliance upon section 11.04 of the 2012 and 2017 Indentures, which provides that "[n]otices or communications to a Guarantor will be deemed given if given to the Company," is ineffectual.  Even assuming the 2012 Acceleration Notice and 2017 Acceleration Notice were deemed "given" to the Guarantors if validly executed and delivered to Vitro SAB (neither of which has been established), such notices did not constitute an actual *demand for payment from the Guarantors*.  In fact, the Indentures themselves clearly distinguish between a notice of acceleration and a demand for payment from the Guarantors.  As noted above in footnote 25, the stay of acceleration provision in each Indenture provides that if the Notes are accelerated but such acceleration is stayed against the Company, the accelerated amounts "are nonetheless payable by the Guarantors hereunder forthwith on demand . . . ."  See 2013 Indenture § 11.06 (emphasis added); 2012 Indenture § 10.06 (same); 2017 Indenture § 10.06 (same).  Clearly, this entire provision would be unnecessary if a notice of acceleration to Vitro SAB constituted a demand for payment on the Guarantors.

███████████████████████[29] This undisputed evidence before the Court, as well as applicable case law, clearly show that the Acceleration Notices did not constitute a proper demand for payment on the Guarantees. See, e.g., In re Rosenberg, 414 B.R. at 836, 844 (dismissing involuntary petition filed against guarantor based on contingent nature of petitioning creditors' claims, where petitioning creditors had provided notices of acceleration to both guarantor and primary obligor, but had not demanded payment of guarantor, as was required under relevant instrument).

47.     Accordingly, because the Petitioning Creditors had not, as of the Involuntary Petition Date, complied with the Indenture provision that would have triggered the liability of the Alleged Debtors under the Guarantees, their obligations under the Guarantees were contingent as of such date for purposes of section 303(b) of the Bankruptcy Code.

48.     The Petitioning Creditors have attempted to downplay this inescapable conclusion by pointing to another indenture provision (again identical for each Indenture) that states, in relevant part, that "[e]ach Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the [Issuer] or any other Person."[30] This provision, however, does not change the fact that, as of the Involuntary Petition Date, the Alleged Debtors' liability under the Guarantees was contingent.

49.     First, the above waiver is clearly qualified by the words "not provided for herein," which (along with the explicit demand requirement contained in each Indenture)

---

[29]    See Acceleration Notices.

[30]    See 2013 Indenture § 11.04; 2012 Indenture § 10.04 and 2017 Indenture § 10.04.

would be rendered meaningless by the interpretation offered by the Petitioning Creditors. Each Indenture, by its terms, is governed by New York law,[31] under which "[i]t is well-settled that when interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties." John E. Andrus Mem'l Home v. De Buono, 260 A.D.2d 635, 638 (N.Y. App. Div. 2d Dep't 1999). See also Joseph v. Creek & Pines, Ltd., 217 A.D.2d 534, 535 (N.Y. App. Div. 2d Dep't 1995) ("A contract should not be interpreted in such a way as would leave one of its provisions substantially without force or effect").

50.    Moreover, it is equally well settled that waiver provisions such as the one above

> affect the relationship between *the borrower* and the lender and authorize foreclosure on the borrower's collateral without notice to the guarantors. These provisions do not pertain to direct enforcement of the guaranty. *They do not conflict with the express provisions in the guaranty that the guarantor becomes liable for direct repayment of the loan only upon written demand.*

United States v. Gottlieb, 948 F.2d at 1130 (emphasis added). See also United States v. Gordon, 1994 WL 514533 at *6 (interpreting guaranty with similar waiver and finding that "the [g]uaranty's waiver provision did not modify the [obligee's] obligation to provide written demand for payment" to the guarantor); United States v. Stark, 1994 WL 323651 at *3 (holding that "the demand requirement remains intact" despite presence of similar waiver).

51.    Accordingly, because the Petitioning Creditors' claims against the Alleged Debtors were contingent as to liability as of the Involuntary Petition Date, they were

---

[31]    See 2013 Indenture § 12.08; 2012 Indenture § 11.08 and 2017 Indenture § 11.08.

ineligible, under section 303(b) of the Bankruptcy Code, to commence the Involuntary

Cases.

> **(3)** **_Petitioning Creditors' Claims Are Subject to a Bona Fide Dispute as to_**
> **_Amount_**

52.    To have the right to file an involuntary petition, a creditor must hold a claim

that is not "the subject of a bona fide dispute as to liability or amount." 11 U.S.C.

§ 303(b)(1). The existence of a _bona fide_ dispute with respect to the amount of the

Petitioning Creditors' claims is dispositive as to such claims not being eligible to serve as

the basis for an involuntary petition pursuant to section 303(b) of the Bankruptcy Code.

See, e.g., In re Staxxring, Inc., No. 10-30668 (SGJ), 2010 WL 2218935, *1 (Bankr. N.D.

Tex. May 28, 2010) (on motion to dismiss involuntary petition, "the bankruptcy court must

'determine whether there is an objective basis for either a factual or legal dispute as to the

[claim underlying the filing].'") (quoting Subway Equip. Leasing Corp. v. Sims (In re

Sims), 994 F.2d 210, 221 (5th Cir. 1993)). Thus, the court must simply establish whether a

claim is subject to a _bona fide_ dispute, rather than resolve any such dispute. See, e.g., id.,

2010 WL 2218935, at *1 ("[T]he court's task is to decide whether a dispute that is bona

fide exists; the court is not to actually resolve the dispute.").

53.    The phrase "subject of a bona fide dispute" was first added to section

303(b)(1) of the Bankruptcy Code as part of the Bankruptcy Amendments and Federal

Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (effective July 10, 1984). As the

proponent of such language explained:

> [M]y amendment is designed to correct what I perceive to be an unintended
> inequity in the law of involuntary bankruptcies.
>
> . . . The problem can be explained simply. Some courts have interpreted
> section 303's language . . . as allowing the filing of involuntary petitions
> and the granting of involuntary relief even when the debtor's reason for not

> paying [a petitioning creditor's claim] is a legitimate and good-faith dispute over his or her liability. This interpretation allows creditors to use the Bankruptcy Code as a club against debtors who have bona fide questions about their liability [on such claims] . . . .
>
> My amendment would correct this problem. ***Under my amendment, the original filing of an involuntary petition could not be based on debts that are the subject of a good-faith dispute between the debtor and his or her creditors.***
>
> . . . I believe this amendment, although a simple one, is necessary to protect the rights of debtors and ***to prevent misuse of the bankruptcy system as a tool of coercion***. I also believe it corrects a judicial misinterpretation of existing law and congressional intent as to the proper basis for granting involuntary relief.

30 Cong. Rec. S7618 (June 19, 1984) (comments of Senator Baucus); see also <u>Riverview</u>

<u>Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.</u>), 486 F.3d 940, 945 (6th Cir. 2007)

(recognizing that, by enacting section 303(b)(1), Congress has made clear that it "intended

to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the

debt, whether that basis is factual or legal.") (citing <u>In re Lough,</u> 57 B.R. 993, 997 (Bankr.

E.D. Mich. 1986) (quoting above comments of Senator Baucas)).

     54.    Subsequent to the 1984 amendments, some courts continued to allow

creditors to initiate involuntary cases even when such creditors' claims were subject to a

dispute as to amount, so long as the undisputed portion of that claim exceeded the statutory

minimum. In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("<u>BAPCPA</u>"), Congress clarified its original intent by adding the words "as to liability ***or***

amount" to qualify the language added in 1984. <u>See</u> Pub. L. No. 109-8, § 1234(a)(l)(A),

119 Stat. 204 (2005) (emphasis added). <u>See also,</u> H.R. Rep. No. 109-31(I), 109th Cong.,

1st Sess. (2005); 151 Cong. Rec. H1993-01, at H2044 (2005).

     55.    The remarks of Representative Edward R. Royce, as memorialized in the

Congressional Record, clearly reflect this Congressional intent:

Section 1234 restates and strengthens *Congress' long-standing intent that an involuntary bankruptcy action should not be predicated on disputed claims*. Otherwise, opportunistic litigants seeking to gain advantage in contract disputes may improperly employ the leverage of the bankruptcy court.

Because bankruptcy courts should not be used to resolve disputed claims in involuntary cases, the clarification in Section 1234 reemphasizes that *a person who disputes the amount of*, or liability for, *a claim should not be disadvantaged by the stigma and expense of an involuntary bankruptcy proceeding*. Put simply, the bankruptcy courts in this nation should now uniformly hold that any claim that is subject to a dispute or litigation, or if it is contested, whether as to the amount of the claim, or as to liability for the claim, that claim cannot be used to commence an involuntary bankruptcy case. This is the bright line that Congress intended to create in 1984 because involuntary bankruptcy carries with it, not only a responsibility, but the burden on behalf of petitioning creditors to be accurate and certain that their provable claims are qualified by being without dispute as to either liability or amount before commencing an involuntary bankruptcy case. The consequence of *bad faith* or even sloppy work here is more disastrous than in garden-variety litigation or through the voluntary use of the bankruptcy laws.

It is incomprehensible that an involuntary bankruptcy petition could be based on claims that are inaccurate as to either liability or amount; the injustice that would result from such a filing is so manifest. Despite this manifest injustice of national significance, judges continue to condone the filing of involuntary petitions brought by creditors using disputed claims. For this reason, section 1234 was made a necessary part of this legislation.

There has never been a vote recorded in opposition to this provision because *it clearly expresses the unanimous will of Congress*; it is the furthest thing from the mind of any Congressman that an involuntary case could be brought on the basis of claims that are disputed. To the contrary, as expressed by this legislation, *it has been the will of Congress since 1984 that any claim used to commence an involuntary case must be without dispute*.

The bankruptcy courts should not be enjoyed by involuntary petitioning creditors who cannot then prove up claims as to liability or amount. That party should stand in the most accountable legal position. This clarification is necessary because the intent of Congress has been blurred by judicial decisions that go so far as to split disputed claims into 'disputed' and 'undisputed' parts, or to describe disputes as 'potential disputes.' These decisions are wrong and the damage they have caused to the victims of involuntary bankruptcy cases brought using such claims is

> incalculable. The remedy for such victims rests on an expansive reading of
> Section 303(i) . . . .

151 Cong. Rec. E677-04, at E677-E678 (Apr. 18, 2005) (emphasis added). See also 149

Cong. Rec. E551-02 (Mar. 21, 2003) (remarks by Representative Luis V. Gutierrez to an

identical amendment under the Bankruptcy Abuse Prevention and Consumer Protection

Act of 2003 noting that "[t]he purpose of the 1984 language was to bar bringing

involuntary bankruptcy action in cases which where already subject of a 'bona fide

dispute' on either the existence of liability or the amount of that liability"); 148 Cong. Rec.

S7735-01 (July 31, 2002) (remarks by Senator Patrick Leahy to an identical amendment

under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2002); 147 Cong.

Rec. S2343-01, at S2357 (2001) (remarks by Senator Orrin G. Hatch to an identical

amendment under the Bankruptcy Abuse Prevention and Consumer Protection Act of

2001).

56.     Post-BAPCPA, courts, including courts in the Northern District of Texas,

have fully acknowledged the intent and import of this amendment. See, e.g., In re

Staxxring, Inc., 2010 WL 2218935 at *4 ("Congress has expressed an intent in section 303

of the Bankruptcy Code that creditors with questionable claims ought not be allowed to

force companies into bankruptcy, and in light of this policy, has put forth somewhat

stringent standards in section 303(b)(1)."); In re Henry S. Miller Commercial, LLC, 418

B.R. 912, 923 (Bankr. N.D. Tex. 2009) (stating that "the amendment cannot be

ignored . . . . Now, it is clear that a claim is the subject of a bona fide dispute [even] if . . .

merely the amount is in dispute. If nothing else, this signals that Congress continues to

caution that holders of questionable claims ought not to be allowed to force companies into

bankruptcy against their will.").

57.    The claims of the Petitioning Creditors are, in fact, subject to a *bona fide* dispute as to amount and, accordingly, cannot be the basis for the filing of the Involuntary Cases against the Alleged Debtors.  Substantial factual (and potentially legal) questions must be resolved before the amount of the Petitioning Creditors' claims against each Alleged Debtor may be ascertained.  See, e.g., In re Sims, 994 F.2d at 221 (if there are any unresolved factual or legal questions bearing on issue, *bona fide* dispute with respect to such issue exists for purposes of section 303(b)); In re TLC Medical Group, Inc., No. 04-15739 (JAB), 2005 WL 4677807, at *2 (Bankr. E.D. La. March 04, 2005) ("[A] claim is subject to a bona fide dispute when there is an objective basis for either a factual or a legal dispute as to the validity of the debt."); In re Xacur, 219 B.R. 956 (Bankr. S.D. Tex. 1998) (dismissing involuntary case due to finding *bona fide* dispute surrounding effectiveness of signature).[32]

58.    Here, each Indenture contains a section entitled "Limitation on Amount of Guaranty," which provides, in relevant part, as follows:

---

[32]    Judge Felsenthal's decision in In re Allied Riser Communications Corp., No. 02-32607 (SAF) (Bankr. N.D. Tex. March 27, 2002) is highly instructive on this issue.  In that case, a group of noteholders filed an involuntary petition against an issuer of notes after purportedly accelerating the issuer's obligations thereunder based on the its alleged default stemming from the breach of a "change of control" provision in the governing indenture.  In response, the debtor-issuer moved to dismiss the petition, arguing that no default had occurred because no change of control had actually occurred triggering the "change of control" provision and, even if it had, the debtor-issuer had complied with the requirements of such provision.  Weighing the parties' respective factual and legal arguments concerning the meaning and purpose of the relevant provisions of the governing indenture, Judge Felsenthal found that a *bona fide* dispute existed precluding entry of an order for relief:

> Under these circumstances, the Court concludes that objectively, a legal dispute exists; namely, number one, what does "tradable" and "immediately following such merger" mean in [the "change of control" provision] when the indenture, as supplemented, is read as a whole?  Two, if an ambiguity exists, then a factual dispute of what the parties intended also exists.  Three have [the debtor-issuer and its acquirer] substantively complied with the ["change of control" provision]?

Allied Riser, June 11, 2002 Hr'g Tr. at 13:19--14-5 (attached hereto as Exhibit C).

[E]ach Guarantor, and by its acceptance of [the Old Notes], each Holder, hereby confirms that it is the intention of all such parties that the Note Guaranty of such Guarantor not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable provision of state law. To effectuate that intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that *the obligations of each Guarantor under its Note Guaranty are limited to the maximum amount that would not render the Guarantor's obligations subject to avoidance* under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable provision of state law or Mexican law, as the case may be.[33]

59.     Thus, the determination of the exact amount of the Petitioning Creditors' claim against each Alleged Debtor requires determining "the maximum amount" that would not have rendered each Alleged Debtor's obligations under the Indentures, at the time they were incurred, "subject to avoidance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable provision of state law."[34] See, e.g., In re Capmark Fin. Grp., Inc., 438 B.R. 471, 494-495, 517 (Bankr. D. Del. 2010) (determining whether certain claims were limited by savings clause on basis of extensive expert testimony as to debtor's solvency at time claims were incurred). Cf.

---

[33]     See 2013 Indenture § 11.07; 2012 Indenture § 10.07 and 2017 Indenture § 10.07 (emphasis added).

[34]     In fact, in describing the risk factors associated with the issuance the Notes, the 2007 Offering Memorandum explicitly identified potential fraudulent transfer exposure with respect to the incurrence of the liabilities under the Guarantees and the limitation on the amount of each Guarantee under the terms of the Indentures. See 2007 Offering Memorandum dated January 25, 2007 (being provided to the Court as Alleged Debtors' Exhibit 53) at 137-38 ("Each guaranty of the notes by a Restricted Subsidiary (a "Note Guaranty") will be limited to the maximum amount that would not render the Guarantors obligations subject to avoidance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable provision of state law or Mexican law, as the case may be. ... *By virtue of this limitation, a Guarantor's obligation under its Note Guaranty could be significantly less than amounts payable with respect to the notes of the applicable series, or a Guarantor may have effectively no obligation under its Note Guaranty.* ") (emphasis added); id. at 33 ("Under certain circumstances, including a finding that a guarantor was insolvent at the time its guarantee was issued, a court could hold that the obligations of the guarantor under the guarantee may be voided or is subordinate to other obligations of the guarantors *or that the amount for which a guarantor is liable under a guarantee may be limited.*") (emphasis added); id. ("In addition, although *the Indentures will limit the amount of the guarantees to the amount that will result in the guarantees not constituting fraudulent transfers or improper corporate distributions,* we cannot be certain which standard a court would apply in determining the maximum liability of the guarantors.") (emphasis added).

Randall v. Erstmark Capital Corp. (In re Erstmark Capital Corp.), 73 F. App'x 79, *2 (5th

Cir. 2003) (stating generally that, for purposes of determining whether transaction

constituted fraudulent conveyance, relevant determination is debtor's solvency at time of

transaction).

60.    Therefore, to determine such "maximum amount" with respect to each

Alleged Debtor requires a determination of the maximum liability that such Alleged

Debtor would have been able to incur in 2007 without rendering such liability avoidable.

This determination, in turn, requires establishing the value that each Alleged Debtor

received in consideration for incurring such liability. See 11 U.S.C. § 548(a). Clearly,

such determinations will require resolution of a variety of substantial factual and legal

issues.

61.    Each Petitioning Creditor has asserted that the amount that each Alleged

Debtor owes to such Petitioning Creditor on account of its Guarantee is equal to the full

amount owed to such Petitioning Creditor under the Notes it allegedly owns. (See

Amended Answers to Interrogatories at 5-9) If this position is extrapolated to the other

holders of the Notes, as would be the case in a collective proceeding such as bankruptcy,

then the Petitioning Creditors are alleging that each Alleged Debtor's aggregate liability

under its Guarantee is $1.2 billion. In fact, it is plain that none of the Alleged Debtors

could have incurred the full $1.2 billion worth of liabilities and remained solvent, nor did

any Alleged Debtor receive value equal to $1.2 billion – both of which would have to be

true for the Petitioning Creditors' claims not to be subject to the limitation under the

Indentures. Indeed, the testimony that the Alleged Debtors intend to present at the hearing

will conclusively demonstrate that the aggregate value of each Guarantee is substantially

less than $1.2 billion.  (See Expert Report of Edward M. McDonough, dated February 16, 2011.)

62.    As a result, the claims of the Petitioning Creditors are subject to a *bona fide* dispute as to amount and, therefore, the Petitioning Creditors were ineligible, as a matter of law, under section 303(b) of the Bankruptcy Code, to file the Involuntary Petitions.

**B.**    **No Orders for Relief Can be Entered Because the Alleged Debtors Are Generally Paying their Debts as They Come Due**

63.    Section 303(h)(1) of the Bankruptcy Code provides, in the relevant part:

[T]he court shall order relief against the debtor in an involuntary case . . . *only if—*

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . .

11 U.S.C. § 303(h)(1) (emphasis added).  To determine whether a debtor is "generally" paying its undisputed and non-contingent obligations as they come due for the purposes of section 303(h), "the court must look to four factors: '(1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the non-payments; and (4) the debtor's overall conduct in her financial affairs.'"  In re Milton M. Smith, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (quoting In re Moss, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000)).  As this Court recognized at a prior hearing in these Involuntary Cases, when applying these factors its appropriate to consider the totality of the circumstances.  (See December 1, 2010 Hearing Transcript, attached hereto as Exhibit D, at 24:23-25.)  Furthermore, "the debts should be examined to determine whether there is any reasonable basis for nonpayment. ***Either a bona fide dispute or commercial practice might not only explain, but in fact fully justify the debtor's failure to pay.***"  In re Reed, 11 B.R. 755, 760 (Bankr. S.D. W. Va. 1981) (emphasis added).  A petitioning creditor has the burden of establishing, by a

preponderance of the evidence, that a purported debtor is "generally not paying" its debts.

See, e.g., Norris v. Johnson (In re Norris), No. 96-30146, 1997 WL 256808, at *3 (5th Cir.

Apr. 11, 1997).

64.    As the evidence will show, the Petitioning Creditors cannot establish

evidence that the Alleged Debtors had *any* past due obligations as of the Involuntary

Petition Date, let alone establish by a preponderance of the evidence that the Alleged

Debtors are "generally not paying" their debts as they become due for the purposes of

section 303(h).

65.    With respect to the Alleged Debtors' obligations on the Petitioning

Creditors' own claims under the Guarantees, such claims are not currently "due" because

no demand has been made on the Alleged Debtors as required by the Indentures.  Again,

Judge Felsenthal's decision in Allied Riser is instructive.  In moving to dismiss the

noteholders' involuntary petition in that case, the debtor-issuer – contending it was

otherwise current with all of its creditors – argued that because no change of control

resulting default had actually occurred, "the notes have not been effectively accelerated

and that, as a result, no amount is due."  See Allied Riser, June 11, 2002 Hr'g Tr. at 10:23-

25. In dismissing the petition, Judge Felsenthal concluded that, because "a bona fide

dispute regarding the effectiveness of the acceleration of the notes exists under section

303(h)(1) [of the Bankruptcy Code] . . . [t]he petition must, therefore, be dismissed." Id. at

15:7-12. This Court should similarly dismiss the Involuntary Petitions where, in the

absence of a demand on the Alleged Debtors, no amounts were due under their respective

Guarantees at the Involuntary Petition Date.  See also In re Sys. Commc'ns, Inc., 234 B.R.

145, 147 (Bankr. M.D. Fla. 1999) (dismissing involuntary petition where, among other

things, there were "no current pressing obligations" due to lack of demand from bondholders).  Cf. In re Karber, 25 B.R. 9, 15 (Bankr. N.D. Tex. 1982) (dismissing involuntary petition after refusing to consider non-payment of bank's claim in making 303(h) determination because claim was subject to *bona fide* dispute as to liability, but also noting that interests of debtor in dismissal would outweigh interests of bank in entering order for relief "even if only the *amount* of the claim is [disputed]," particularly in light of fact that bank had adequate remedies against debtor available to it in state court).

66.



For example, in Ramm Industries, the evidence indicated that

> [The Debtor] has done business with a number of its suppliers *for over a year or more* prior to the date of the filing [of the involuntary petitions] and continued to do so up through the time of trial. *The established course of conduct between the Debtor and its creditors did allow for payment in some instances longer than 30 days after the invoice date.*

In re Ramm Indus., Inc., 83 B.R. 815, 822 (Bankr. M.D. Fla. 1988).  In concluding that the debtor was generally paying its debts when they came due and dismissing the involuntary petitions, the court found:

> The evidence in this proceeding shows a clearly established course of conduct between the Debtor and several of its creditors allowing for payment in some instances longer than 30 days after invoice date. *Having demonstrated such a course of conduct, however, the petitioning creditors should not be allowed to claim that some shorter, more stringent period of time is required for payment, in an attempt to prove the Debtor is not generally paying its debts as they become due.*

Id. at 825 (emphasis added); see also Sys. Comm'cs, 234 B.R. at 147-148 (dismissing

petition upon finding that petitioning creditors failed to prove that debtor was not generally

paying debts as they came due, stating that "failure to recognize that the creditors have

agreed to a moratorium would be a failure to evaluate the basis for nonpayment or the

materiality factor"); In re Silverman, 230 B.R. 46, 48 (Bankr. N.J. 1998) (dismissing

involuntary petition where all obligations of alleged debtor were either on time or "paid as

agreed"); In re Better Care, Ltd., 97 B.R. 405, 409 (Bankr. N.D. Ill. 1989) (dismissing

involuntary petition and holding that "where a creditor engages in a course of conduct

allowing for late payments . . . creditors cannot rely on such late payments to show that

[the debtor] is not paying its debts when due"); In re Laclede Cab Co., 76 B.R. 687, 692

(Bankr. E.D. Mo. 1987) (dismissing involuntary petition and holding that where the

"established course of conduct" between the debtor and certain creditors "clearly" allowed

for late payments, such late payments could not be used as evidence that the debtor was not

generally paying its debt as they came due); In re Trans-High Corp., 3 B.R. 1, 3 ("[T]he

common sense interpretation of [section 303(h) of the Bankruptcy Code] means that an

order for relief is proper where the debtor is not paying its debts in *the regular course of*

*business*. To find that a debtor is not paying its debts in the regular course of its business

requires evidence of what that regular course of business actually is.") (emphasis in

original).

67.    It is certainly telling that, in the more than three months that has passed

since the commencement of these Involuntary Cases, *none* of the Trade Creditors of any

Operating Alleged Debtor chose to join the Petitioning Creditors despite their right to do

so under section 303(c) of the Bankruptcy Code.  Under similar circumstances in <u>Ramm</u>

<u>Industries,</u> the court explained

> The [Debtor's] companies have numerous creditors.  Notwithstanding
> intensive solicitation by the petitioning creditors to this proceeding, *no
> other business or trade creditors have sought to join the petition and none
> testified in this case that they were dissatisfied with [the Debtor's]
> payment record as to them.*  The Court concludes that *if the Debtor were
> not generally paying its debts as they became due, more evidence would
> have been forthcoming from trade creditors* aside from the petitioning
> creditors, who themselves may be characterized as [not trade creditors].

83 B.R. at 825 (emphasis added).  <u>See also</u> <u>In re Briggs</u>, No. 07-34534 (SGJ), 2008 WL

190463, at *4 (Bankr. N.D. Tex. Jan. 18, 2008) (Jernigan, J.) (holding that "the equities do

not support keeping" the involuntary debtors in bankruptcy where "*no other creditors*

*hav[e] joined in the Involuntary Petition or hav[e] appeared at the hearings to support*

*the entries of orders for relief*") (emphasis added); <u>In re Brooklyn Res. Recovery, Inc.,</u>

216 B.R. 470, 485 (Bankr. E.D.N.Y. 1997) (finding that failure of particular creditors to

join petitioning creditors should be viewed as indication that such creditors do not consider

their debts to be past due

68. ███████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████Case law is clear that, to the extent the debtor reasonably expects to

reach a negotiated resolution for a particular liability, such liability is not considered to be

"past due" for the purposes of section 303(h).  <u>See, e.g.,</u> <u>In re Brooklyn Res.</u>, 216 B.R. at

484 (holding that where debtor and creditor were in the middle of negotiating an extension,

"the posture of [the applicable] obligations weigh[ed] against a determination that [debtor]

was generally not paying its debts within the meaning of § 303(h)(1)").

69.     Finally, the Alleged Debtors consistently have conducted their businesses in

a responsible and financially prudent manner, and have not acted in any way that would

defraud creditors. Thus, the Alleged Debtors' "overall conduct in their financial affairs"

should also weigh heavily in favor of the Court dismissing the Involuntary Petitions

because it presents a marked contrast to the conduct of the debtors in other cases where this

factor influenced a court to decide otherwise. Cf. In re Moss, 249 B.R. at 423 ("[Debtor's]

overall conduct of her financial affairs has been poor."); In re Norris, 183 B.R. 437, 459

(Bankr. W.D. La. 1995) (referring to the debtor's "stealthy handling of his financial

affairs").

70.     Accordingly, the Petitioning Creditors have failed to (and, indeed, cannot)

establish that any of the relevant Smith factors are present here. As a result, the Court

should find that the Alleged Debtors were "generally" paying their debts as they became

due within the meaning of section 303(h) of the Bankruptcy Code and dismiss the

Involuntary Petitions.

## C.    Dismissal is Warranted Because Involuntary Cases were not Commenced in Good Faith

71.     As the Supreme Court recently emphasized, no right under the Bankruptcy

Code is absolute and immune from the requirement that the party seeking to prosecute that

right act in good faith. See Marrama v. Citizens Bank of Mass., 549 U.S. 365 (2007)

(denying right of debtor under section 706 of Bankruptcy Code to convert case from

chapter 7 to chapter 13 because of debtor's bad faith conduct). Courts have long

recognized that the equitable nature of the bankruptcy process requires creditors seeking

relief to act in "good faith." As the Fifth Circuit has explained, "[e]very bankruptcy statute

since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith

*for the commencement*, prosecution, and confirmation of bankruptcy proceedings." <u>Little

Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)</u>, 779 F.2d

1068, 1071 (5th Cir. 1986) (emphasis added). This good faith standard "protects the

jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable

weapons . . . available only to those debtors *and creditors* with 'clean hands.'" <u>Id.</u>

(emphasis added).

72.    The good faith requirement certainly applies to petitioning creditors in an

involuntary case. <u>See, e.g.</u>, <u>In re State Park Building Group, Ltd.</u>, 316 B.R. 466, 475-76

(Bankr. N.D. Tex. 2004) (Hale, J.) (applying good faith requirement and citing <u>Little Creek</u>

in considering dismissal of involuntary chapter 11 case); <u>In re Privada, Inc.</u>, No. 07-10940

(FRM), 2008 WL 4692372, at *5 (Bankr. W.D. Tex. Oct. 22, 2008) (Monroe, J.) (citing

<u>Little Creek</u> and noting that "bad faith" involuntary filing constitutes "cause" for dismissal

under sections 707 or 1112 of Bankruptcy Code); <u>In re Sherwood Enters., Inc.</u>, 112 B.R.

165, 168-71 (Bankr. S.D. Tex. 1989) (noting that "[i]nvoluntary petitions are subject to the

good faith inquiry" and dismissing involuntary petitions under section 1112 as bad faith

filings); <u>In re Kingston Square Assocs.</u>, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ("The

inquiry into whether a bankruptcy petition was filed in good faith does not change even if

the petitions under scrutiny are involuntary ones.") (citing <u>Little Creek</u>). <u>See also</u>

<u>Mongiello Bros. Coal Corp. v. Houghtailing Props. Inc.</u>, 309 F.2d 925 (5th Cir. 1962)

(remanding for consideration of whether involuntary petition filed by four creditors under

Bankruptcy Act of 1898 was filed in bad faith).

73.     "'Good faith' implies an honest intent and genuine desire on the part of the petitioner to use the [bankruptcy] process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose." In re Metropolitan Realty Corp., 433 F.2d 676, 678 (5th Cir. 1970). See also In re Walden, 781 F.2d at 1123 ("An allegation of bankruptcy invokes remedies not available to any ordinary debt collection procedures. It should not be invoked unadvisedly and contrary to statutory right.") When an involuntary petition is filed as a "litigation tactic" rather than to serve a reorganization purpose, courts consistently dismiss the petition as a bad faith filing.[35] See, e.g., In re Privada, Inc., 2008 WL 4692372, at *5 (dismissing involuntary petition filed as litigation tactic, observing "[c]ommencement of a case under title 11 should not create a weapon for dissident creditors to attempt to increase their negotiating leverage to the detriment of a debtor and its other creditors"); In re Sherwood Enters., Inc., 112 B.R. at 169-71 ("Use of the bankruptcy process as a litigation tactic is abuse of the reorganization process constituting a lack of good faith in filing which warrants dismissal."); In re VII Holdings

---

[35]     This is particularly true where the filing is based on a two-party dispute better settled in a non-bankruptcy forum. See, e.g., In re Mountain Dairies, Inc., 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007) (granting motion to dismiss what was "essentially a two-party dispute for which the parties have adequate remedies in state court" and finding that the "bankruptcy court is not a collection agency"); In re ELRS Loss Mitigation, LLC, 325 B.R. 604, 633-35 (Bankr. N.D. Okla. 2005) (holding that dismissal was warranted because involuntary petition primarily implicated a two-party dispute); In re Spade, 258 B.R. 221, 234-37 (Bankr. D. Col. 2001) (dismissing involuntary petition filed against debtor-guarantor who was current on all non-guarantee debts because case was "little more than a two-party collection dispute" and interests of non-petitioning creditors would be better served by dismissal because, if order for relief was entered, "regular payments these [non-petitioning] creditors are presently receiving would likely be halted"); In re Sys. Commc'ns, Inc., 234 B.R. at 148 (dismissing petition where petitioning creditors were already pursuing litigation against debtor in state court that gave them appropriate remedy); In re Smith, 243 B.R. 169, 196-202 (Bankr. N.D. Ga. 1999) (dismissing involuntary petition as having been filed in bad faith on findings, among others, that petitioning creditor "made no effort to exhaust its state court collection remedies"); In re Trina Assocs., 128 B.R. 858, 869 (Bankr. E.D.N.Y 1991) (granting motion to dismiss and finding that the "bankruptcy court should not be used as an alternative approach to state court procedures"); In re Fax Station, Inc., 118 B.R. 176, 178 (Bankr. D.R.I. 1990) (granting motion to dismiss where court found that case was simply a dispute between competing interests over the ownership of a business better litigated in state courts); In re Sherwood Enters., Inc., 112 B.R. at 169-71 (dismissing involuntary petitions as bad faith filings because the petitions were filed "as a litigation tactic in what is essentially a two-party dispute").

Co., 362 B.R. 663, 666 (Bankr. D. Del. 2007) (dismissing involuntary petition upon

finding that it was "filed in bad faith and for no other purpose than to improperly frustrate

the efforts [of other creditors]"). Cf. In re Demirco Holdings, Inc., 2006 WL 1663237, at

*4 (Bankr. C.D. Ill. June 9, 2006) (noting that courts scrutinized involuntary filings

"closely to make sure that an involuntary petition is not filed unfairly or abusively by a

creditor to put an operating company into bankruptcy in order to gain leverage in resolving

legitimate disputes").

74.    There can be little doubt that the Petitioning Creditors did **not** commence

these Involuntary Cases with the pure motive of creditors trying to reorganize, rehabilitate,

or maximize their interests **in the Alleged Debtors**.  In fact, as noted above in paragraph

15, while the Alleged Debtors continue to pay their debts as they come due, the

commencement of these Involuntary Cases has actually harmed the Alleged Debtors by

causing some of their Trade Creditors to seek accelerated payment terms, not to mention

the apprehension among their customers, employees and other stakeholders.  Harm to the

Alleged Debtors and their stakeholders is a risk the Petitioning Creditors have been more

than willing to take, however, to gain leverage against Vitro SAB in the global

restructuring of the Notes that will take place in the appropriate *forum* in Mexico.

75.    The Petitioning Creditors' allegations against the Alleged Debtors – which

serve as a mere pretext for their intended use of the bankruptcy process and this Court as a

weapon in a battle they anticipate to wage in a different *forum* – ring hollow.  It should be

abundantly clear to the Court that the true motivations of the Petitioning Creditors lie

outside the Congressional goals for, and the intended consequences of, chapter 11.

Abundant case law on the issue, much of which stems from the Fifth Circuit's decision in

Little Creek, confirms that the actions of the Petitioning Creditors fall well outside the

boundaries of good faith.  Accordingly, this Court should dismiss the Involuntary Cases.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

**WHEREFORE**, based on all of the foregoing, the Alleged Debtors

respectfully request that the Court (i) dismiss the Involuntary Petitions, (ii) retain

jurisdiction to determine the amount of damages to be paid by the Petitioning Creditors

pursuant to section 303(i) of the Bankruptcy Code, (iii) schedule a hearing to determine

such damages, and (iv) grant the Alleged Debtors such other and further relief as the Court

deems just and appropriate.

Dated: February 22, 2011

**FULBRIGHT & JAWORSKI L.L.P.**

/s/William R. Greendyke
Louis R. Strubeck, Jr.
State Bar No. (19425600)
William R. Greendyke
State Bar No. (08390450)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200

-and-

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Risa M. Rosenberg (admitted *pro hac vice*)
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Andrew M. Leblanc (admitted *pro hac vice*)
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (212) 835-7500
Facsimile: (212) 263-7586

***Attorneys for Alleged Debtors***