# SUBORDINATED
# LOAN AND SECURITY AGREEMENT

This Subordinated Loan and Security Agreement dated _____, 2011 (this "**Agreement**"), between **VITRO, S.A.B. DE C.V.**, a Mexican company ("**Vitro SAB**" or the "**Lender Agent**"), **FIC REGIOMONTANO, S.A.P.I. DE C.V.**, a Mexican company ("**FIC**", and together with Vitro SAB, the "**Lenders**"), **VITRO AMERICA, LLC**, a Delaware limited liability company ("**Vitro America**"), **VVP FINANCE CORPORATION**, a Delaware corporation ("**Finance**", and collectively with Vitro America, the "**BAC Borrowers**"), **VVP HOLDINGS, LLC**, a Delaware limited liability company ("**Holdings**"), **VVP AUTO GLASS, INC.**, a Delaware corporation ("**Auto Glass**"), **SUPER SKY INTERNATIONAL, INC.**, a Wisconsin corporation ("**International**") and **SUPER SKY PRODUCTS, INC.**, a Wisconsin corporation ("**Products**," and collectively with Holdings, Auto Glass and International, the "BAC Guarantors" and collectively with the BAC Borrowers, the "**Borrowers**").

W I T N E S S E T H:

The BAC Borrowers are parties to that certain Amended and Restated Loan and Security Agreement dated June 27, 2003 (as at any time amended, restated, supplemented or otherwise modified, the "**BAC Loan Agreement**") among Bank of America, N.A., as lender (the "**Senior Creditor**") and the BAC Borrowers, pursuant to which the Senior Creditor has made certain loans and other financial accommodations to the BAC Borrowers from time to time. In connection therewith, each of the BAC Guarantors executed in the Senior Creditor's favor certain Continuing Guaranty Agreements by which they guaranteed payment and performance of all Obligations under (and as defined in) the BAC Loan Agreement.

Each Borrower is an alleged debtor in an involuntary case under Chapter 11 of the Bankruptcy Code (collectively, the "**Involuntary Cases**") pending in the United States Bankruptcy Court for the Northern District of Texas (Fort Worth Division) (together with any other court having jurisdiction over the Involuntary Cases or any proceedings therein from time to time, the "**Court**"), as Case Nos. 10-47470 (RFN-11), 10-47472 (DML-11), 10-47473 (DML-11), 10-47474 (RFN-11),10-47475 (DML-11), 10-47477 (DML-11), 10-47478 (RFN-11), 10-47479 (DML-11), 10-47480 (RFN-11), 10-47481 (RFN-11), 10-47482 (DML-11), 10-47483 (DML-11), 10-47484 (RFN-11),10-47485 (DML-11), and 10-47486 (RFN-11).

The Senior Creditor is, subject to the terms and conditions set forth herein, in the Subordination Agreement and in the Financing Orders, willing to consent to the loans and the security interest in the Collateral granted hereunder.

The Lenders may, in their discretion, make loans and other extensions of credit to Borrowers subject to the terms and conditions contained herein and subject to the terms and conditions set forth in the Financing Orders.

Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed thereto in Annex A which is attached hereto and incorporated herein.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement and for good and valuable consideration, the Lenders and the Borrowers agree as follows:

## ARTICLE 1
## SUBORDINATED LOANS

SECTION 1.1. <u>Subordinated Loans</u>.  The Lenders, to the extent and in the manner hereinafter set forth, may make available term loans ("**Subordinated Loans**") to the Borrowers during the term of this Agreement.

SECTION 1.2. <u>Making of Loans</u>.

(a) From time to time on or after the date hereof, the Lenders may, at their discretion make Subordinated Loans to the Borrowers as set forth in the Financing Orders.

(b) The parties hereto agree and acknowledge that on March 15, 2011, the Lenders advanced $700,000 to the Borrowers (the "**March 15 Advance**"), receipt of which is acknowledged by the Borrowers.  The parties hereto agree that the March 15 Advance constitutes Subordinated Loans for all purposes of this Agreement.

SECTION 1.3. <u>Use of Proceeds</u>.

The proceeds of the Subordinated Loans shall be used by Borrowers for general corporate purposes, subject to any limitations in the Financing Orders.

## ARTICLE 2
## INTEREST

(a) All outstanding Subordinated Loans shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on interest thereon not paid when due) from the date made until paid in full in cash at a rate equal to 5.25% per annum (the "**Interest Rate**").  The Borrowers shall pay to the Lenders interest accrued on all Subordinated Loans on the Termination Date.

(b) The Borrowers shall pay to the Lenders, on demand, interest at the Default Rate on any amounts payable hereunder not paid when due for any period during which the same shall be overdue, in each case for the period the same is overdue.  Amounts shall be overdue if not paid when due (whether at stated maturity, by acceleration or otherwise).

## ARTICLE 3
## PAYMENTS AND PREPAYMENTS

SECTION 3.1. <u>Repayment of Loans</u>.  The Borrowers shall repay the outstanding principal balance of the Subordinated Loans, plus all accrued but unpaid interest thereon, on the Termination Date.  The Borrowers may prepay Subordinated Loans at any time, subject always to the terms of the Financing Orders and the Subordination Agreement.

Notwithstanding the foregoing, the rights of the Lenders hereunder are subject to the terms and conditions of the Financing Orders and the Subordination Agreement.

SECTION 3.2. <u>Lenders' Books and Records</u>.  Each Lender shall record the principal amount of the Subordinated Loans owing to the Lender from time to time on its books.  Each Lender's books and records shall conclusively evidence the outstanding Subordinated Loans hereunder, irrespective of whether any Loan is also evidenced by a promissory note or other instrument.

# ARTICLE 4
## GENERAL WARRANTIES AND REPRESENTATIONS

Each Borrower warrants and represents to the Lenders:

SECTION 4.1. <u>Authorization, Validity, and Enforceability</u>.  Such Borrower has the power and authority to execute, deliver and perform this Agreement and to grant to the Lenders Liens upon and security interests in the Collateral.

SECTION 4.2. <u>Validity and Priority of Security Interest</u>.  The Liens granted pursuant to this Agreement constitute legal, valid and perfected Liens on the Collateral.  The Liens granted hereunder shall be automatically perfected as provided in the Financing Orders.

SECTION 4.3. <u>Organization and Qualification</u>.  Such Borrower (a) is duly organized or incorporated and validly existing in good standing (except as a result of the Involuntary Cases) under the laws of the state of its organization or incorporation, (b) is qualified to do business and is in good standing (except as a result of the Involuntary Cases) in all jurisdictions in which qualification is necessary in order for it to own or lease its property and conduct its business and (c) has all requisite power and authority to conduct its business and to own its property.

# ARTICLE 5
## DEFAULT; REMEDIES

SECTION 5.1. <u>Events of Default</u>.  It shall constitute an event of default ("**Event of Default**") if any one or more of the following shall occur for any reason:

(a) any failure by the Borrowers to pay the principal of or interest on any of the Subordinated Loans when due, whether upon demand or otherwise;

(b) an Interim Financing Order is not entered within five days of the hearing on such Interim Financing Order;

(c) a Final Financing Order is not entered is not entered within five days of the hearing on such Final Financing Order;

(d) the occurrence, after the date hereof, of any "Event of Default" under the BAC Loan Agreement.

SECTION 5.2. <u>Remedies</u>.

(a) If an Event of Default exists, the Lender Agent shall, at the direction of the Lenders but subject to the Financing Orders and the Subordination Agreement, do one or more of the following, at any time or times and in any order, without notice to or demand on any Borrower: (A) terminate this Agreement; (B) declare any or all Obligations to be immediately due and payable; and (C) pursue its other rights and remedies under this Agreement and applicable law.

(b) Subject to the Financing Orders and the Subordination Agreement, if an Event of Default has occurred and is continuing, the Lenders shall have in addition to all other rights of the Lenders, the rights and remedies of a secured party under the UCC.

## ARTICLE 6
## TERM AND TERMINATION

The term of this Agreement shall end on the Termination Date unless sooner terminated in accordance with the terms hereof. The Lenders may terminate this Agreement without notice upon the occurrence of an Event of Default. Upon the effective date of termination of this Agreement for any reason whatsoever, all Obligations (including all unpaid principal, accrued and unpaid interest) shall become immediately due and payable.

## ARTICLE 7
## SECURITY INTEREST

(a) To secure the payment, observance and performance of the Obligations, each Borrower hereby mortgages, pledges, assigns and grants to Lender Agent for the benefit of the Lenders a Lien and security interest on the Collateral and agrees that such mortgages, pledges, assignments, Liens and security interests will constitute continuing security interests in and Liens on the Collateral, in favor of the Lenders, as security for the Obligations. Pursuant to Section 364(c) of the Bankruptcy Code, such Liens and security interests will constitute valid, perfected and enforceable security interests in and Liens on the Collateral and all proceeds, products, substitutions and replacements thereof.

(b) The security interests in and Liens on the Collateral securing the Obligations will be senior in rank and priority to all other Liens on and security interests in the Collateral, subject only to (i) any other valid, perfected and enforceable security interests and Liens existing as of the Involuntary Petition Date that are nonavoidable under the Bankruptcy Code or applicable nonbankruptcy law and (ii) Liens in favor of the Senior Creditor or any Affiliate of the Senior Creditor.

## ARTICLE 8
## MISCELLANEOUS

SECTION 8.1 <u>No Waivers; Cumulative Remedies</u>. No failure by the Lenders to exercise any right, remedy, or option under this Agreement or any present or future supplement thereto, or in any other agreement between any Borrower and the Lenders, or delay by the

Lenders in exercising the same, will operate as a waiver thereof.  No waiver by the Lenders will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by the Lenders on any occasion shall affect or diminish the Lenders' rights thereafter to require strict performance by the Borrowers of any provision of this Agreement.   The Lenders may proceed directly to collect the Obligations without any prior recourse to the Collateral.  The Lenders' rights under this Agreement will be cumulative and not exclusive of any other right or remedy which the Lenders may have.

SECTION 8.2 <u>Governing Law; Choice of Forum</u>.

(a) THIS AGREEMENT SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.  TO THE EXTENT ANY PROVISIONS IN THIS AGREEMENT ARE INCONSISTENT WITH ANY OF THE PROVISIONS OF THE FINANCING ORDERS, THE PROVISIONS OF THE FINANCING ORDERS SHALL GOVERN AND CONTROL.

(b) SO LONG AS THE INVOLUNTARY CASES OR ANY OTHER INSOLVENCY PROCEEDING OF THE BORROWERS IS PENDING IN THE COURT, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY ONLY BE BROUGHT IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS; <u>PROVIDED</u> THAT IF THE INVOLUNTARY CASES OR ANY OTHER INSOLVENCY PROCEEDING OF THE BORROWERS IS NO LONGER PENDING IN THE COURT, THE PARTIES HERETO SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF BORROWERS AND THE LENDERS CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE JURISDICTION OF SUCH COURTS.  EACH OF BORROWERS AND THE LENDERS IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO.

SECTION 8.3 <u>Expenses of Lenders</u>.  The Borrowers hereby agree, on a joint and several basis, to reimburse each Lender for all reasonable legal fees, costs of investigation of whatsoever kind and nature and expenses and all costs and expenses relating to the preparation, negotiation, execution and delivery of this Agreement and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, out-of-pocket costs, expenses and disbursements imposed on, incurred by or asserted against such Lender in any way relating to or arising out of this Agreement or which would not have occurred but for this Agreement and the consummation of the transactions contemplated hereby or the enforcement of any of the terms hereof.

# ARTICLE 9
## SUBORDINATION

THE SUBORDINATED LOANS INCURRED PURSUANT TO THIS AGREEMENT OR OTHERWISE OWING HEREUNDER AND THE LIENS AND OTHER SECURITY INTERESTS GRANTED PURSUANT TO THIS AGREEMENT ARE SUBORDINATED TO THE FULL PAYMENT OF THE SENIOR CREDITOR OBLIGATIONS UNDER (AND AS DEFINED IN) THE SUBORDINATION AGREEMENT.

IN WITNESS WHEREOF, the parties have entered into this Agreement on the date first above written.

**"BORROWERS"**

**VITRO AMERICA, LLC**

By: _____
     Title: _____

Attest _____
      Title:_____

**VVP FINANCE CORPORATION**

By: _____
     Title: _____

Attest _____
      Title:_____

**VVP HOLDINGS, LLC**

By: _____
     Title: _____

Attest _____
     Title:_____


**VVP AUTO GLASS, INC.**

By: _____
     Title: _____

Attest _____
     Title:_____


**SUPER SKY INTERNATIONAL, INC.**

By: _____
     Title: _____

Attest _____
     Title:_____


**SUPER SKY PRODUCTS, INC.**

By: _____
     Title: _____

Attest _____
     Title:_____

**"LENDERS"**

**VITRO, S.A.B. DE C.V.**, a Mexican company, as a Lender

By: _____

      _____, _____

**FIC REGIOMONTANO, S.A.P.I. DE C.V.**, a Mexican company, as a Lender

By: _____

      _____, _____

# ANNEX A
# Definitions

Capitalized terms used in this Agreement shall have the following respective meanings (unless otherwise defined herein), and all section references in the following definitions shall refer to sections of the Agreement:

"Accounts" means all of a Borrower's now owned or hereafter acquired or arising accounts, as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance.

"Account Debtor" means each Person obligated in any way on or in connection with an Account, Chattel Paper or General Intangibles (including a payment intangible).

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.).

"Chattel Paper" means all of each Borrower's now owned or hereafter acquired chattel paper, as defined in the UCC, including electronic chattel paper.

"Collateral" means all assets of each Borrower (other than Products), whether now owned or existing or hereafter acquired or arising, and regardless of where located, including, without limitation, the following:

(i) all Accounts;

(ii) all Inventory;

(iii) all Chattel Paper;

(iv) all Documents;

(v) all Instruments;

(vi) all General Intangibles (including Payment Intangibles and Software);

(vii) all Equipment;

(viii) all monies and other Property of any kind, now or at any time or times hereafter in the possession or under the control Lender or a bailee or Affiliate of Lender, including any Cash Collateral in a Deposit Account subject to a Blocked Account Agreement;

(ix) all Deposit Accounts;

(x) all Commercial Tort Claims, including those shown on Schedule 8.1 to the BAC Loan Agreement;

(xi) all Investment Property;

(xii) all Letter-of-Credit Rights;

(xiii) all books, records and other property related to or referring to any of the foregoing, including account ledgers, data processing records, computer software;

(xiv) all Fixtures

(xv) all Supporting Obligations;

(xvi) all accessions to, substitutions for and replacements, products and Proceeds of any of the foregoing, including, but not limited to, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

Collateral shall also include all property in which a Lien is granted as security for payment or performance of any of any obligations owed to the Senior Creditor.

Notwithstanding anything to the contrary in any Subordinated Loan Document, the term, "Collateral" does not include any shares of capital stock or other ownership interests of the Borrowers in any of their Subsidiaries or any other property that is not "Collateral" under the BAC Loan Agreement.

"Commercial Tort Claim" means each "commercial tort claim" (as defined in the UCC) of a Borrower, whether now owned or hereafter acquired or arising.

"Deposit Accounts" means all "deposit accounts" as such term is defined in the UCC.

"Default Rate" means the Interest Rate plus 2.00%.

"Document" means each "document" (as defined in the UCC) of a Borrower, whether now owned or hereafter acquired or arising, including bills of lading, warehouse receipts or other documents of title.

"Equipment" means all of each Borrower's now owned and hereafter acquired machinery, equipment, furniture, furnishings, fixtures, and other tangible personal property (except Inventory), including embedded software, motor vehicles with respect to which a certificate of title has been issued, aircraft, dies, tools, jigs, molds and office equipment, as well as all of such types of property leased by such Borrower and all of such Borrower's rights and interests with respect thereto under such leases (including, without limitation, options to purchase); together with all present and future additions and accessions thereto, replacements therefor, component and auxiliary parts and supplies used or to be used in connection therewith, and all substitutes for any of the foregoing, and all manuals, drawings, instructions, warranties and rights with respect thereto; wherever any of the foregoing is located.

"Final Financing Order" means an order that is entered by the Court, following proper notice and a hearing thereon, which is in all respects satisfactory to Lender, and will contain terms substantially the same as those set forth in the Interim Financing Order.

"Financing Orders" means the Interim Financing Order and the Final Financing Order.

"Fixture" means each "fixture" (as defined in the UCC) of a Borrower, now owned or hereafter acquired or arising.

"General Intangibles" means all of each Borrower's now owned or hereafter acquired general intangibles, choses in action and causes of action and all other intangible personal property of each Borrower of every kind and nature (other than Accounts), including, without limitation, all contract rights, payment intangibles, proprietary rights, corporate or other business records, inventions, designs, blueprints, plans, specifications, patents, patent applications, trademarks, service marks, trade names, trade secrets, goodwill, copyrights, computer software, customer lists, registrations, licenses, franchises, tax refund claims, any funds which may become due to any Borrower in connection with the termination of any other employee benefit plan or any rights thereto and any other amounts payable to any Borrower any employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, property, casualty or any similar type of insurance and any proceeds thereof, proceeds of insurance covering the lives of key employees on which any Borrower is beneficiary, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged equity interests or Investment Property and any letter of credit, guarantee, claim, security interest or other security held by or granted to any Borrower.

"Interest Rate" has the meaning specified in Article 2.

"Interim Financing Order" means an order that is entered by the Court pursuant to 11 U.S.C. §§ 105, 303, 361, 363, 364 and 552, which among other things, (I) approves the financing under this Agreement and (II) schedules a final hearing.

"Inventory" means all of each Borrower's now owned and hereafter acquired inventory, goods and merchandise, wherever located, to be furnished under any contract of service or held for sale or lease, all returned goods, raw materials, work-in-process, finished goods (including embedded software), other materials and supplies of any kind, nature or description which are used or consumed in a Borrower's business or used in connection with the packing, shipping, advertising, selling or finishing of such goods, merchandise, and all documents of title or other documents representing them.

"Investment Property" means all "investment property" (as defined in the UCC) of a Borrower, now owned and hereafter acquired or arising.

"Involuntary Cases" has the meaning specified in the recitals of the Agreement.

"Involuntary Petition Date" means November 17, 2010.

"Letter-of-Credit Right" means each "letter-of-credit right" (as defined in the UCC) of each Borrower, whether now owned or hereafter acquired or arising.

"Lien" means: (a) any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute, or contract, and including a security interest, charge, claim, or lien arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes; and (b) to the extent not included under clause (a), any reservation, exception, encroachment, easement, right-of-way, covenant, condition, restriction, lease or other title exception or encumbrance affecting property.

"Loan Documents" means this Agreement, the Financing Orders and any other instrument or agreement evidencing the Subordinated Loans.

"Obligations" means all present and future Subordinated Loans, advances, liabilities, obligations, covenants, duties, and debts owing by any or all Borrowers to the Lender arising under or pursuant to this Agreement or any of the other Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to any or all Borrowers hereunder or under any of the other Loan Documents.

"Payment Intangibles" means each "payment intangible" (as defined in the UCC) of each Borrower, whether now owned or hereafter acquired or arising.

"Proceeds" means all "proceeds" (as defined in the UCC) of a Borrower, whether now owned or hereafter acquired or arising.

"Real Estate" means certain of each Borrower's now or hereafter owned or leased estates in real property, including, without limitation, all fees, leaseholds and future interests, together with all of such Borrower's now or hereafter owned or leased interests in the improvements thereon, the fixtures attached thereto and the easements appurtenant thereto.

"Software" means all "software" (as defined in the UCC) of a Borrower, whether now owned or hereafter acquired or arising.

"Subordination Agreement" means that certain Subordination Agreement dated as of [__], 2011 between the Borrowers, as obligors, and Senior Creditor.

"Stated Termination Date" has the meaning specified in the BAC Loan Agreement.

"Supporting Obligations" means all supporting obligations, as such term is defined in the UCC, that support the payment of Accounts, Chattel Paper, Documents, General Intangibles or Instruments.

"Termination Date" means the earliest to occur of (i) the Stated Termination Date and (ii) the date this Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of this Agreement.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.