Thomas E Lauria
State Bar No. 11998025
J. Christopher Shore (admitted pro hac vice)
John K. Cunningham (admitted pro hac vice)
Richard Kebrdle (admitted pro hac vice)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151

ATTORNEYS FOR THE PETITIONING CREDITORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases (Involuntary) |
| | ) | |
| VITRO ASSET CORP., et al., | ) | Case No. 10-47470-RFN-11 |
| | ) | |
| Debtors.[1] | ) | **Jointly Administered** |
| | ) | |

## THE PETITIONING CREDITORS' OBJECTION TO THE EMERGENCY MOTION OF CERTAIN ALLEGED DEBTORS FOR INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 303, AND 364, (I) APPROVING AMENDMENT OF THE TERMS OF THE FINAL FINANCING ORDER AND (II) SCHEDULING FINAL HEARING

TO THE HONORABLE RUSSELL F. NELMS, UNITED STATES BANKRUPTCY JUDGE:

Knighthead Master Fund, L.P., Brookville Opportunities Fund, LP (f/k/a

Brookville Horizons Fund, L.P.), Davidson Kempner Distressed Opportunities Fund L.P., and

Lord Abbett Bond-Debenture Fund, Inc. (collectively, the "Petitioning Creditors"), as creditors

and parties in interest in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Vitro

Asset Corp. and its affiliated debtors (collectively, the "Alleged Debtors") file this objection (the

---

[1]     The Alleged Debtors are Vitro Asset Corp., Vitro Chemicals, Fibers & Mining, LLC, Vitro America, LLC, Troper Services, Inc., Vitro Packaging, LLC, VVP Holdings, LLC, Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Co., Crisa Corp., VVP Finance Corp., VVP Auto Glass, Inc., V-MX Holdings, LLC, Super Sky Products, Inc., and Super Sky International, Inc.

"Objection"), to the Motion of Certain Alleged Debtors[2] for Interim and Final Orders, Pursuant

to Sections 105, 303, and 364 of title 11 of the United States Code (the "Bankruptcy Code")

(I) Approving Amendment of the Terms of the Final Financing Order and (II) Scheduling Final

Hearing [Docket No. 182] (the "Motion"). The Motion should be denied for the reasons set forth

below.

## PRELIMINARY STATEMENT

We are only a week away from trial on the involuntary petitions in these Chapter

11 Cases. Yet, the Court is now presented with another "emergency" by the Alleged Debtors.

This time it is the Alleged Debtors' Mexican parent, Vitro, S.A.B. de C.V. ("Vitro SAB"), who

is requiring immediate approval by the Court of a *secured* loan to the Alleged Debtors in the

amount of $3.5 million per month. This is not the first request for such relief. In November

2010, this Court rejected an identical request for affiliate financing by the Alleged Debtors

seeking to obtain secured intercompany financing from Vitro SAB. In denying that request, the

Court held that the evidence showed that Vitro SAB previously advanced funds to the Alleged

Debtors on an *unsecured* basis prepetition. Given that course of conduct between the parent

company (Vitro SAB) and its wholly-owned U.S. subsidiaries (the Alleged Debtors), the Court

denied the secured financing request because there was no evidence as to *why* Vitro SAB would

no longer continue to provide such financing on an unsecured basis going forward. Nothing has

changed. To date, there is still no evidence as to why Vitro SAB is requiring liens and security

interests to advance funds to the Alleged Debtors – and no witness from Vitro SAB is providing

any evidence or testimony in support of the Motion. For that reason alone, the Alleged Debtors'

request to approve secured financing from Vitro SAB should—again—be denied.

---

[2] The Alleged Debtors seeking relief through the Motion are Vitro America, LLC and VVP Finance Corp. as borrowers, and VVP Holdings, LLC, VVP Auto Glass, Inc., Super Sky International, Inc., and Super Sky Products, Inc. as guarantors.

Additionally, the filing of this Motion is not only unexpected, but the rationale for the Alleged Debtors' request is perplexing. After having fought tooth and nail to avoid entry of an order for relief in these Chapter 11 Cases, the Alleged Debtors are now requesting that this Court provide the very bankruptcy protections that are reserved for a debtor in possession operating its business in a plenary chapter 11 case. The Alleged Debtors cannot argue that they are healthy companies able to pay their debts as they come due that should remain outside of bankruptcy and, at the same time, argue that they require emergency debtor-in-possession ("DIP") financing relief to make ends meet. They cannot have it both ways. If the Alleged Debtors truly need the relief requested in the Motion—a new $3.5 million per month secured loan facility from Vitro SAB containing DIP financing protections pursuant to an order from this Court under section 364 of the Bankruptcy Code—then surely they should consent to the involuntary petitions and seek that DIP financing relief directly.[3]

Moreover, if the Court nevertheless decides to permit secured financing from Vitro SAB at this time, then such financing should *only* occur in accordance with applicable nonbankruptcy law consistent with section 303(f) of the Bankruptcy Code as if the Chapter 11 Cases had not been commenced. In other words, no special bankruptcy rights under section 364 of the Bankruptcy Code or otherwise should be granted. The Alleged Debtors are permitted to continue operating their businesses without prior court approval under section 303(f) of the Bankruptcy Code as though bankruptcy had not been commenced (i.e., the so-called "Gap Period"). Any such transaction during the Gap Period, however, necessarily must comply with

---

[3]     In reality, the Motion is nothing more than a disguised DIP financing motion. Specifically, the Motion seeks entry of an order, among other things, (i) approving the secured financing from Vitro SAB pursuant to section 364 of the Bankruptcy Code, (ii) granting "continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected" liens and security interest under section 364(c)(3) of the Bankruptcy Code, (iii) barring any subsequent challenges to the secured loans, including pursuant to sections 510, 549 or 550 of the Bankruptcy Code, and (iv) granting Vitro SAB the benefits and protections as a "good faith lender" under section 364(e) of the Bankruptcy Code.

applicable non-bankruptcy law (e.g., the Alleged Debtors must comply with all applicable recording statutes to perfect a secured loan). But that is not what the Alleged Debtors want here. They are not (as in the case of the Bank of America facility) requesting a mere "comfort" order from the Court preserving the status quo. Instead, the Alleged Debtors ask this Court to bless a DIP loan from Vitro SAB with all of the DIP loan protections under section 364 of the Bankruptcy Code—*but* without consenting to orders for relief in these Chapter 11 Cases and undertaking the duties and responsibilities of being a debtor in possession. In the absence of consenting to the involuntary petitions and converting these Chapter 11 Cases into plenary chapter 11 cases, the Alleged Debtors are not eligible for section 364 relief. Courts hold that affirmative relief under section 364 of the Bankruptcy Code (as explained further below) is only available to a trustee or debtor in possession, who is operating the business under sections 721, 1108, 1203, 1204, or 1304 of the Bankruptcy Code. Involuntary debtors (like the Alleged Debtors), who are operating their businesses under section 303(f) of the Bankruptcy Code as though no bankruptcy case had been commenced, do not qualify for section 364 relief. Accordingly, for the reasons set forth herein, the Court should deny the Motion.

## OBJECTION

I. **THE MOTION SHOULD BE DENIED BECAUSE VITRO SAB HAS NOT PROVIDED ANY EVIDENCE TO THE COURT AS TO WHY FINANCING TO THE ALLEGED DEBTORS SHOULD NOT CONTINUE TO BE PROVIDED ON AN UNSECURED BASIS CONSISTENT WITH PAST PRACTICES.**

1. This is not the first request by the Alleged Debtors for emergency *secured financing* from the Alleged Debtors' Mexican parent, Vitro SAB. On November 22, 2010, the Alleged Debtors sought authority from the Court to borrow up to $3 million (with an actual forecast of requiring $1.5 million per month) [Docket No. 22] (the "First Affiliate Financing Motion"). See First Affiliate Financing Motion ¶ 18.

2.     At the November 23, 2010 hearing on the First Affiliate Financing

Motion, the Alleged Debtors' financial advisor, John Stewart of Alvarez & Marsal, testified that

Vitro SAB routinely provided intercompany loans to the Alleged Debtors on an ***unsecured*** basis

prior to the commencement of these Chapter 11 Cases. Specifically, Mr. Stewart testified:

> [Shore]: Are you aware of whether there are any cash management agreements between the Alleged Debtors and any non-debtor affiliate?
>
> [Stewart]: I believe that there's documented intercompany loans that reflect transfers that have occurred in the past as well as the transfer of inventory for purposes of distribution. Transfer pricing and things like that.
>
> . . .
>
> [Shore]: . . . And are you aware of whether any affiliate of an [ ] Debtor has any kind of security – current security arrangements with any Alleged Debtor?
>
> [Stewart]: I'm not familiar with one.

Hr'g Tr. at 79:9-22 (Nov. 23, 2010).

3.     In denying the Alleged Debtors' secured financing request under the First

Affiliate Financing Motion, the Court ruled:

> [T]he evidence doesn't support the argument that the Alleged Debtors sought unsecured financing from the parent and couldn't get it from the parent, necessarily, and it doesn't support the notion that the parent ordinarily does lend to the Alleged Debtors on a secured basis. In fact, the contrary appears to be true. It appears that the intercompany debts typically have been unsecured up until this request.
>
> So, while the Alleged Debtors have satisfied the requirements of Rule 4001 – that is, they have established that they may suffer immediate and irreparable harm if they can't get the loan in order to comply with the BOA covenant – they don't meet the requirement of Section 364(c), which is that they demonstrate that they can't procure debt on an unsecured basis.

> So I'll grant that motion except for the provision that provides for
> lending on a secured basis.

Hr'g Tr. at 13:3-19 (Nov. 23, 2010).

4. In sum, the Court required evidence as to why Vitro SAB would not continue to provide financing to the Alleged Debtors on an unsecured basis consistent with its past practices. Both the interim and final order [Docket No. 137] (the "Final Financing Order") on the First Affiliate Financing Motion contain provisions providing for such financing on an unsecured basis. To date, no evidence by Vitro SAB has been provided to the Court as to why it now requires such intercompany loans to be secured. No witness subject to cross-examination on behalf of Vitro SAB is appearing at the hearing on the Motion. Accordingly, the evidentiary record before the Court continues to be silent as to Vitro SAB's alleged requirement of liens and security interests in connection with such intercompany financing. There is no question that the Alleged Debtors are wholly owned subsidiaries of Vitro SAB, but the record is silent as to why Vitro SAB is now requiring all new intercompany loans to be secured.

5. Given the lack of any evidence on the very issue identified by the Court, the Petitioning Creditors request that the Motion be denied.

## II. THE MOTION IMPROPERLY SEEKS DIP FINANCING RELIEF, AND SUCH RELIEF IS NOT AVAILABLE TO THE ALLEGED DEBTORS IN THESE INVOLUNTARY CASES.

6. By the Motion, the Alleged Debtors now seek to obtain financing up to $3.5 million per month on a secured basis (the "Secured Affiliate Loan") from Vitro SAB. See id. ¶¶ 7-10, 12-19. The Alleged Debtors rely on section 364(c)(3) of title 11 of the Bankruptcy Code, without any supporting case law, as the sole basis for their relief. As involuntary debtors operating under section 303(f) of the Bankruptcy Code, however, the Alleged Debtors simply are not entitled that relief.

7.     The court in <u>In re Roxy Roller Rink Joint Venture</u>, 73 B.R. 521 (Bankr. S.D.N.Y. 1987), addressed this very issue and held that "[section] 364(c) . . . is not available to a debtor during the involuntary gap period." <u>Id.</u> at 525.  The court in <u>Roxy Roller</u> articulated two grounds for its holding.  First, section 364 of the Bankruptcy Code is inapplicable to debtors who are operating their businesses during the Gap Period under section 303(f).  Section 364(a) of the Bankruptcy Code (which is the prerequisite to section 364(c)) only permits a trustee or debtor in possession to obtain unsecured credit in the ordinary course of business as administrative expenses under section 503(b)(1) of the Bankruptcy Code, if such trustee "***is authorized to operate the business for the debtor under 721, 1108 or 1304***" of the Bankruptcy Code.  <u>See</u> <u>id.</u> at 526 (emphasis added) (quoting 11 U.S.C. § 364(a)).  Section 364(a) "cannot be operative during the involuntary gap period because the debtor's authorization to operate the business comes from . . . [section] 303(f) and not from . . . [sections] 721 or 1108." <u>Id.</u> at 526.  The same analysis and conclusion hold true for the Alleged Debtors here.  They are authorized to operate their businesses only under section 303(f), <u>see</u> Motion ¶ 2, 13 ("As authorized by Section 303(f) of the Bankruptcy Code, the Alleged Debtors continue to operate their businesses and use, acquire or dispose of property as if the Involuntary Cases had not been commenced."), and therfore, are not entitled to section 364 relief.

8.     Second, the <u>Roxy Roller</u> court concluded that a debtor operating under section 303(f) is not a "trustee" eligible to obtain credit under section 364.  <u>In re Roxy Roller Rink Joint Venture</u>, 73 B.R. at 526-27 ("the term trustee does not include the involuntary gap debtor"); <u>see also</u> <u>In re E.D. Wilkins Grain Co.</u>, 235 B.R. 647, 650 (Bankr. E.D. Cal. 1999) (the grant of authority under section 303(f) does not vest the involuntary debtor with the powers of a trustee); <u>but see</u> <u>In re Shah Int'l, Inc.</u>, 94 B.R. 136, 138 (Bankr. E.D. Wis. 1988) (allowing the

debtors to give their counsel mortgages in their properties as retainers for representation because the court was concerned that the debtors would not receive competent representation without such mortgage).[4] In chapter 11 cases, section 1107(a) of the Bankruptcy Code provides that, "subject to any limitations on a trustee serving in a case under this chapter . . . a *debtor in possession* shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a *trustee* serving in a case under this chapter." 11 U.S.C. § 1107(a) (emphasis added); In re Roxy Roller Rink Joint Venture, 73 B.R. at 527. A "debtor in possession" is defined in section 1101(1) of the Bankruptcy Code as "*debtor* except when a person . . . is serving as a trustee in the case." 11 U.S.C. § 1101(1); In re Roxy Roller Rink Joint Venture, 73 B.R. at 526. And, a "debtor" is defined under section 101(12) of the Bankruptcy Code as "person or municipality concerning which a case under this title has been commenced." 11 U.S.C. § 101(12); In re Roxy Roller Rink Joint Venture, 73 B.R. at 526. Thus, "only if . . . [section] 1107(a) applies to the [D]ebtor[s] during the involuntary [G]ap [P]eriod would the [d]ebtor[s] fall within the definition of the term 'trustee' and be able to use . . . [sections] 364(b) and (c) to incur superpriority borrowings." In re Roxy Roller Rink Joint Venture, 73 B.R. at 527.

9.      "The statutory scheme makes it evident that . . . [section] 1107(a) does not apply to the debtor[s] during the . . . [G]ap [P]eriod." Id. During the Gap Period, debtors operating under section 303(f) have the freedom to continue to operate their businesses, and "to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced." 11 U.S.C. § 303(f). As the Roxy Roller court explained:

> The freedom explicitly granted by . . . [section] 303(f) to the debtor
> is plainly inconsistent with the fiduciary obligations imposed on a
> debtor by . . . [section] 1107(a). It is unreasonable to assume that

---

[4]      The facts in Shah are distinguishable as the court relied primarily on the need for the debtors to obtain counsel to continue their restructuring efforts. In fact, the court did not rely at all on section 364 in finding that secured financing was available to the debtors.

the [Bankruptcy] Code intended to impose such fiduciary obligations on the unwilling involuntary debtor before the order for relief. *As the involuntary gap Chapter 11 debtor cannot qualify as a "trustee", it cannot take advantage of . . . [section] 364(b) or (c) to obtain superpriority for the claims of a lender.*

Id. at 527 (emphasis added).

10.     Moreover, the court opined that:

It is a sensible statutory scheme to preclude the debtor from taking advantage of the powers of the Bankruptcy Code, such as the right to incur debt under . . . [section] 364 on a priming lien, superpriority basis or the right to void liens, recover fraudulent conveyances or set aside preferences under Code §§ 547 and 548, while the debtor opposes the entry for an order for relief and when no order for relief may ever be entered.

Id.

11.     Indeed, so long as the Alleged Debtors are not bound by the burdens and fiduciary responsibilities of a "trustee" or "debtor in possession" in these Chapter 11 Cases, they likewise are not entitled to receive the benefits and protections of a "trustee" or "debtor in possession" provided under the Bankruptcy Code. If the Alleged Debtors wish to avail themselves of such benefits, such as they are attempting to do in the Motion, they must consent to the involuntary petitions filed by the Petitioning Creditors. Otherwise, the Alleged Debtors are not entitled to an order under section 364 of the Bankruptcy Code, which relief is reserved for chapter 11 debtors in possession operating their businesses under section 1108 and subject to the duties of a trustee set forth in section 1107, subject to bankruptcy court supervision.

## III.     THE RELIEF REQUESTED BY THE ALLEGED DEBTORS WOULD PREJUDICE THE PETITIONING CREDITORS' RIGHTS.

12.     Further, the relief sought by the Alleged Debtors would provide an impermissible benefit to the Vitro SAB, at the expense of the Petitioning Creditors. If approved under section 364 of the Bankruptcy Code, the Secured Affiliate Loan, would have the effect of

priming the Petitioning Creditors' contractual rights under the indentures governing their notes (the "Indentures").

13.     Indeed, because the Alleged Debtors are in the Gap Period, the Petitioning Creditors would have no means under which they could enforce those rights given the imposition of the automatic stay. Currently, the Alleged Debtors are afforded the protection of the automatic stay. With the automatic stay in place, the Petitioning Creditors are stayed from enforcing their contractual rights and remedies against the Alleged Debtors outside of bankruptcy.

14.     For example, the Petitioning Creditors have covenants under certain of the Indentures executed by Vitro SAB and the Alleged Debtors, which prevent intercompany loans unless such loans are subordinated in right of payment to the notes. Specifically, sections 4.05(b) and 4.07 of the Indentures dated February 1, 2007 for the 8.625% Senior Notes due 2012 (the "2012 Indenture") and the 9.125% Senior Notes due 2017 (the "2017 Indenture") provide:

> [Vitro SAB] and, to the extent provided below, any Restricted Subsidiary [including the Alleged Debtors] may Incur the following . . .
>
> ***Debt of the Company or any Restricted Subsidiary of the Company*** so long as such Debt continues to be owed to the Company or a Restricted Subsidiary and which, if the obligor is the Company or a Guarantor, ***is subordinated in right of payment to the notes*** . . . .

Indentures § 4.05(b) (emphasis added). Attached hereto as **Exhibit "A"** are copies of Article 4 of the 2012 Indenture and the 2017 Indenture.

> ***The Company will not***, and will not permit any Restricted Subsidiary to . . . ***incur . . . any Lien of any nature*** whatsoever on any of its properties or assets, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, ***without effectively providing that the Notes are secured equally and ratably with*** (or, if the obligation to be secured by the Lien is subordinated in right

of payment to the Notes or any Note Guaranty, prior to) *the obligations so secured for so long as such obligations are so secured.*

Indentures § 4.07 (emphasis added). Thus, under the Indentures, any intercompany loan issued by Vitro SAB or the Alleged Debtors must be subordinated in rights to payment to the notes *and* lien created must provide that the notes "are secured equally and [with such lien] for so long as such obligations are so secured."

15.     The Alleged Debtors and Vitro SAB, however, seek to override this express contractual right of the Petitioning Creditors. The secured affiliate loan , if approved under section 364, would give Vitro SAB security interests and liens, junior only to the liens of the Prepetition Secured Parties (as defined in the Motion). See Motion ¶¶ 9-10, 12, 17.

16.     Similarly, the Secured Affiliate Loan, if approved, would also prime the administrative expense claims that the Petitioning Creditors have for their fees and actual expenses, including certain professional fees and expenses, should the Court approve the involuntary petitions. Section 503(b)(3) of the Bankruptcy Code allows "a creditor that files a petition under section 303 of this title" to receive administrative expense claims for "actual, necessary expenses . . . incurred." 11 U.S.C. § 503(b)(3)(A). The proposed liens under the secured affiliate loan would prime the Petitioning Creditors' section 503(b)(4) administrative expense claims, further subordinating and impairing the Petitioning Creditors' rights.

17.     Moreover, by seeking this Court's imprimatur under section 364, the Alleged Debtors are seeking to shield this otherwise impermissible grant of security interests to Vitro SAB from future attack under, among other remedies, section 549 of the Bankruptcy Code. Under section 549(a), "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . (A) that is *authorized only under section 303(f)* . . .

or (B) that is *not authorized . . . by the court.*" 11 U.S.C. § 549(a) (emphasis added). If the Court approves the Secured Affiliate Loan under section 364, however, its explicit authorization would eliminate any such section 549 avoidance rights. See Proposed Interim Order ¶ 4 ("The Affiliate Liens shall not be subject to Section 510, 549 (to the extent a successful action is brought against the [Vitro SAB]) or 550 of the Bankruptcy Code").

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: Fort Worth, Texas
March 23, 2011

Jeff P. Prostok
State Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
(817) 877-8855

By /s/ Jeff P. Prostok
Jeff P. Prostok

-and-

Thomas E Lauria
State Bar No. 11998025
J. Christopher Shore (admitted pro hac vice)
John K. Cunningham (admitted pro hac vice)
Richard Kebrdle (admitted pro hac vice)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

*Attorneys for the Petitioning Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF electronic Notice, if available, and upon the parties listed below via email, on March 23, 2011.

**Counsel for the Alleged Debtors:**
Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
Attn:   Risa Rosenberg, Esq.
        Dennis Dunne, Esq.
        Howard Kelberg, Esq.
Email: rrosenberg@milbank.com
       ddunne@milbank.com
       hkelberg@milbank.com

Liz Boydston
Fulbright & Jaworski, LLP
2200 Ross Ave., Suite 2800
Dallas, TX 75201
Email: lboydston@fulbright.com

William Richard Greendyke
Fulbright & Jaworski, LLP
1301 McKinney, Suite 5100
Houston, TX 77010
Email: wgreendyke@fulbright.com

**Counsel to Indenture Trustee (2013 Notes):**
Sullivan & Worcester LLP
Post Office Square
Boston, MA 02109
Attn:   Richard Hiersteiner
        Amy A. Zuccarello
Email: rhiersteiner@sandw.com
       azuccarello@sandw.com

**Counsel to Indenture Trustee (2012 Notes and 2017 Notes):**
Chadbourne Parke LLP
30 Rockefeller Plaza
New York, NY 10112
Attn:   Marian Baldwin Fuerst
        Adrienne Duffy
Email: mbaldwin@chadbourne.com
       aduffy@chadbourne.com

**Office of the U.S. Trustee**
1100 Commerce St., Room 976
Dallas, TX 75242-1496
Attn: Elizabeth A. Ziegler
Email: elizabeth.ziegler@usdoj.gov

/s/ Jeff P. Prostok
Jeff P. Prostok

L:\JPROSTOK\Vitro #5389\Pleadings\objection to financing motion 3.23.11.DOC

# EXHIBIT "A"

**VITRO, S.A.B. de C.V.**
as Issuer

the Guarantors party hereto

and

**THE BANK OF NEW YORK**
as Trustee, Registrar and Paying Agent

Indenture

Dated as of February 1, 2007

**8.625%**
**Senior Notes**
**Due 2012**

## CROSS-REFERENCE TABLE

| TIA Sections | | Indenture Sections |
|---|---|---|
| 310 | (a) | 7.1 |
| | (b) | 7.08 |
| 311 | | 7.03 |
| 312 | | 11.03 |
| 313 | | 7.06 |
| 314 | (a) | 4, 4.02 |
| | (c) | 11.05 |
| | (e) | 11.06 |
| 315 | (a) | 7.01, 7.02 |
| | (b) | 7.02, 7.05 |
| | (c) | 7.01 |
| | (d) | 7.02 |
| | (e) | 6.12, 7.02 |
| 316 | (a) | 2.05, 6.02, 6.04, 6.05 |
| | (b) | 6.06, 6.07 |

|       | (c)     | 11.03 |
| 317   | (a) (1) | 6.08  |
|       | (a) (2) | 6.09  |
|       | (b)     | 2.03  |
| 318   |         | 11.02 |

RECITALS

ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. Definitions

ARTICLE 2
THE NOTES

Section 2.01. Form, Dating and Denominations; Legends
Section 2.02. Execution and Authentication; Exchange Notes; Additional Notes
Section 2.03. Registrar, Paying Agent and Authenticating Agent; Paying Agent to Hold Money in Trust
Section 2.04. Replacement Notes
Section 2.05. Outstanding Notes
Section 2.06. Temporary Notes
Section 2.07. Cancellation
Section 2.08. CUSIP and CINS Numbers
Section 2.09. Registration, Transfer and Exchange
Section 2.10. Restrictions on Transfer and Exchange

ARTICLE 3
REDEMPTION; OFFER TO PURCHASE

Section 3.01. Optional Redemption
Section 3.02. Redemption with Proceeds of Public Equity Offering
Section 3.03. Method and Effect of Redemption
Section 3.04. Offer to Purchase
Section 3.05. Optional Tax Redemption

ARTICLE 4
COVENANTS

Section 4.01. Payment Of Notes
Section 4.02. Maintenance of Office or Agency.
Section 4.03. Existence
Section 4.04. Payment of Taxes and other Claims
Section 4.05. Limitation on Debt and Disqualified or Preferred Stock
Section 4.06. Limitation on Restricted Payments
Section 4.07. Limitation on Liens
Section 4.08. Limitation on Sale and Leaseback Transactions
Section 4.09. Limitation on Dividend and other Payment Restrictions Affecting Restricted Subsidiaries
Section 4.10. Limitation on Sale or Issuance of Equity Interests of Restricted Subsidiaries
Section 4.11. Guaranties by Restricted Subsidiaries
Section 4.12. Repurchase of Notes Upon a Change of Control
Section 4.13. Limitation on Asset Sales
Section 4.14. Limitation on Transactions with Shareholders and Affiliates
Section 4.15. Line of Business
Section 4.16. Limitation on Accounts Receivables Facilities
Section 4.17. Designation of Restricted and Unrestricted Subsidiaries
Section 4.18. Anti-Layering
Section 4.19. Financial Reports
Section 4.20. Reports to Trustee
Section 4.21. Listing
Section 4.22. Additional Amounts
Section 4.23. Additional Interest
Section 4.24. Interest Rate Adjustment

ARTICLE 5
CONSOLIDATION, MERGER, LEASE OR SALE OF ASSETS

Section 5.01. Consolidation, Merger, Lease or Sale of All or Substantially All Assets by the Company; No Lease of All or Substantially All Assets
Section 5.02. Consolidation, Merger, Lease or Sale of Assets by a Guarantor

ARTICLE 6
DEFAULT AND REMEDIES

Section 6.01. Events of Default
Section 6.02. Acceleration
Section 6.03. Other Remedies
Section 6.04. Waiver of Past Defaults
Section 6.05. Control by Majority
Section 6.06. Limitation on Suits
Section 6.07. Rights of Holders to Receive Payment
Section 6.08. Collection Suit by Trustee
Section 6.09. Trustee May File Proofs of Claim
Section 6.10. Priorities
Section 6.11. Restoration of Rights and Remedies
Section 6.12. Undertaking for Costs
Section 6.13. Rights and Remedies Cumulative
Section 6.14. Delay or Omission Not Waiver
Section 6.15. Waiver of Stay, Extension or Usury Laws

ARTICLE 7
THE TRUSTEE

Section 7.01. General
Section 7.02. Certain Rights of Trustee
Section 7.03. Individual Rights of Trustee
Section 7.04. Trustee's Disclaimer
Section 7.05. Notice of Default
Section 7.06. Reports by Trustee to Holders
Section 7.07. Compensation And Indemnity
Section 7.08. Replacement of Trustee
Section 7.09. Successor Trustee by Merger
Section 7.10. Eligibility
Section 7.11. Money Held in Trust

ARTICLE 8
DEFEASANCE AND DISCHARGE

Section 8.01. Discharge of Company's Obligations
Section 8.02. Legal Defeasance
Section 8.03. Covenant Defeasance
Section 8.04. Application of Trust Money
Section 8.05. Repayment to Company
Section 8.06. Reinstatement

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01. Amendments Without Consent of Holders
Section 9.02. Amendments With Consent of Holders
Section 9.03. Effect of Consent
Section 9.04. Trustee's Rights and Obligations
Section 9.05. Conformity With Trust Indenture Act
Section 9.06. Payments for Consents

## ARTICLE 10
## GUARANTIES

Section 10.01. The Guaranties
Section 10.02. Guaranty Unconditional
Section 10.03. Discharge; Reinstatement
Section 10.04. Waiver by the Guarantors
Section 10.05. Subrogation and Contribution
Section 10.06. Stay of Acceleration
Section 10.07. Limitation on Amount of Guaranty
Section 10.08. Execution and Delivery of Guaranty
Section 10.09. Release of Guaranty

## ARTICLE 11
## MISCELLANEOUS

Section 11.01. Currency Indemnity
Section 11.02. Trust Indenture Act of 1939
Section 11.03. Noteholder Communications; Noteholder Actions
Section 11.04. Notices
Section 11.05. Certificate and Opinion as to Conditions Precedent
Section 11.06. Statements Required in Certificate or Opinion
Section 11.07. Payment Date Other Than a Business Day
Section 11.08. Governing Law
Section 11.09. Consent to Jurisdiction and Service
Section 11.10. No Adverse Interpretation of Other Agreements
Section 11.11. Successors
Section 11.12. Duplicate Originals
Section 11.13. Separability
Section 11.14. Table of Contents and Headings
Section 11.15. No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders
Section 11.16. Luxembourg Law Provision
Section 11.17. Waiver of Jury Trial

## EXHIBITS

EXHIBIT A Form of Note
EXHIBIT B Form of Supplemental Indenture
EXHIBIT C Restricted Legend
EXHIBIT D DTC Legend
EXHIBIT E Regulation S Certificate
EXHIBIT F Rule 144A Certificate
EXHIBIT G Institutional Accredited Investor Certificate

---

INDENTURE, dated as of February 1, 2007, between VITRO, S.A.B. de C.V., a *sociedad anonima bursatil de capital variable* organized under the laws of Mexico, as the Company, the Guarantors party hereto and THE BANK OF NEW YORK, a corporation organized under the laws of the State of New York authorized to conduct a banking business, as Trustee, Registrar and Paying Agent.

RECITALS

The Company has duly authorized the execution and delivery of the Indenture to provide for the issuance of up to $300,000,000 aggregate principal amount of the Company's 8.625% Senior Notes Due 2012, and, if and when issued, any Additional Notes, together with any Exchange Notes issued therefor as provided herein (the "**Notes**"). All things necessary to make the Indenture a valid agreement of the Company, in accordance with its terms, have been done, and the Company has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by

the Company and authenticated and delivered by the Trustee and duly issued by the Company, the valid obligations of the Company as hereinafter provided.

In addition, the Guarantors party hereto have duly authorized the execution and delivery of the Indenture as guarantors of the Notes. All things necessary to make the Indenture a valid agreement of each Guarantor, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make the Note Guarantees, when the Notes are executed by the Company and authenticated and delivered by the Trustee and duly issued by the Company, the valid obligations of such Guarantor as hereinafter provided.

This Indenture is subject to, and will be governed by, the provisions of the Trust Indenture Act that are required to be a part of and govern indentures qualified under the Trust Indenture Act.

THIS INDENTURE WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

the Indenture), (3) such obligation would have arisen absent a further issuance of the Notes pursuant to the Indenture; and (4) and such obligation cannot be avoided by the Company or the relevant Guarantor, as applicable, taking reasonable measures available to it (including, without limitation, changing the jurisdiction from or through which payments are made); provided, however, that no such notice of redemption shall be given earlier than 60 days prior to the earliest date on which the Company or the relevant Guarantor, as applicable, would be obliged to pay such Excess Additional Amounts. Prior to the giving of any notice of redemption of the Notes pursuant to the foregoing, the Company will deliver to the Trustee (1) an Officers' Certificate stating that the conditions precedent to the right of the Company to so redeem have occurred and that the obligation to pay Excess Additional Amounts cannot be avoided by the Company by taking commercially reasonable measures available to it, and (2) a written opinion of independent legal counsel of recognized standing in the relevant Tax Jurisdiction to the effect that the Company has become obligated to pay Excess Additional Amounts as a result of a change or amendment described above.

The foregoing provisions will apply *mutatis mutandis* to any successor Person to the Company after such successor Person becomes a party to this Indenture. Notices of redemption hereunder will be given in accordance with the provisions set forth under Section 3.03 .

Article 4
Covenants

Section 4.01 . *Payment Of Notes.* (a) The Company agrees to pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and the Indenture. Not later than 9:00 A.M. (New York City time) on the due date of any principal of or interest on any Notes, or any redemption or purchase price of the Notes, the Company will deposit with the Trustee (or Paying Agent) money in immediately available funds sufficient to pay such amounts, *provided* that if the Company or any Affiliate of the Company is acting as Paying Agent, it will, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of money sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in the Indenture. In each case the Company will promptly notify the Trustee in writing of its compliance with this paragraph.

(b) An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Company or any Affiliate of the Company) holds on that date money designated for and sufficient to pay the installment. If the Company or any Affiliate of the Company acts as Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

(c) The Company agrees to pay interest on overdue principal, and overdue installments of interest at the rate per annum specified in the Notes.

(d) If a Holder of Notes and 2017 Notes in an aggregate principal amount of $10.0 million or more has given adequate wire transfer instructions to the Company and the Trustee in writing at least 10 days in advance, the Company will pay all principal, interest, Additional Amounts and premium, if any, on that Holder's Notes in accordance with those instructions. All other payments on the Notes will be made at the office or agency of the Paying Agent within the City and State of New York and of the Luxembourg Paying Agent within Luxembourg, as the case may be, unless the Company elects to make interest payments by check mailed to the Noteholders at their address set forth in the Register of Holders.

Section 4.02 . *Maintenance of Office or Agency.* The Company will maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Company in respect of the Notes and the Indenture may be served. The Company hereby initially designates the Corporate Trust Office of the Trustee as such office of the Company. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served to the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03 . *Existence.* The Company will do or cause to be done all things necessary to preserve and keep in full force and

effect its existence and the existence of each of its Restricted Subsidiaries in accordance with their respective organizational documents, and the material rights, licenses and franchises of the Company and each Restricted Subsidiary, *provided* that the Company is not required to preserve any such right, license or franchise, or the existence of any Restricted Subsidiary, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries taken as a whole; and *provided further* that this Section does not prohibit any transaction otherwise permitted by Section 4.13 or Article 5 .

Section 4.04 . *Payment of Taxes and other Claims.* The Company will pay or discharge, and cause each of its Subsidiaries to pay or discharge before the same become delinquent (i) all material taxes, assessments and governmental charges levied or imposed upon the Company or any Subsidiary or its income or profits or property, and (ii) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Company or any Subsidiary, other than any such tax, assessment, charge or claim the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves, if necessary, have been established or where the failure to effect such payment will not be disadvantageous to Holders.

Section 4.05 . *Limitation on Debt and Disqualified or Preferred Stock.* (a) The Company

(1) will not, and will not permit any of its Restricted Subsidiaries to, Incur any Debt; and

(2) will not, and will not permit any Restricted Subsidiary to, Incur any Disqualified Stock, and will not permit any of its Restricted Subsidiaries to Incur any Preferred Stock (other than Disqualified or Preferred Stock of Restricted Subsidiaries held by the Company or a Substantially Wholly-Owned Restricted Subsidiary, so long as it is so held);

*provided* that the Company or any Restricted Subsidiary may Incur Debt and the Company or any Restricted Subsidiary may Incur Disqualified Stock and the Company or any Restricted Subsidiary may Incur Preferred Stock if, on the date of the Incurrence, after giving effect to the Incurrence and the receipt and application of the proceeds therefrom, the Leverage Ratio is not greater than 3.50 or less than zero.

(b) Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur the following ("**Permitted Debt**"):

(1) Debt of the Company or any Guarantor incurred for working capital needs in the ordinary course of business, to fund capital expenditures or to make interest payments; provided that the aggregate principal amount at any time outstanding does not exceed $100.0 million, less any amount of such Debt permanently repaid as provided by Section 4.13 , and Guarantees of such Debt by any Guarantor;

(2) Debt of the Company or any Restricted Subsidiary of the Company so long as such Debt continues to be owed to the Company or a Restricted Subsidiary and which, if the obligor is the Company or a Guarantor, is subordinated in right of payment to the notes;

(3) Debt of the Company pursuant to the Notes (other than Additional Notes) and Debt of any Guarantor pursuant to a Note Guaranty of the Notes (including Additional Notes);

(4) Debt ("**Permitted Refinancing Debt**") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance, (all of the above, for purposes of this clause, "**refinance**") then outstanding Debt in an amount not to exceed the principal amount of the Debt so refinanced, plus premiums, fees and expenses; *provided* that

(A) in case the Debt to be refinanced is subordinated in right of payment to the Notes, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is outstanding, is expressly made subordinate in right of payment to the Notes at least to the extent that the Debt to be refinanced is subordinated to the Notes,

(C) the new Debt does not have a Stated Maturity prior to the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is at least equal to the remaining Average Life of the Debt to be refinanced,

(D) in no event may Debt of the Company or any Guarantor be refinanced pursuant to this clause by means of any Debt of any Restricted Subsidiary that is not a Guarantor, and

(E) Debt Incurred pursuant to clauses (1), (2), (5), (6), (11) and (12) may not be refinanced pursuant to this clause;

(5) Hedging Agreements of the Company or any Restricted Subsidiary entered into in the ordinary course of business for the purpose of limiting risks associated with the business of the Company and its Restricted Subsidiaries and not for speculation;

(6) Debt of the Company or any Restricted Subsidiary with respect to letters of credit and bankers' acceptances issued in the ordinary course of business and not supporting Debt, including letters of credit supporting performance, surety or appeal bonds or indemnification, adjustment of purchase price or similar obligations incurred in connection with the acquisition or disposition of any business or assets, including but not limited to any such amounts outstanding from time to time under the Bank of America Credit Facility;

(7) Acquired Debt, *provided* that after giving effect to the Incurrence thereof, the Company could Incur at least $1.00 of Debt under the Leverage Ratio test set forth in the first sentence of this covenant;

(8) Debt of the Company or any Restricted Subsidiary outstanding on the Issue Date, including the 2013 Notes, (and, for purposes of clause (4) (D), not otherwise constituting Permitted Debt);

(9) Debt of the Company or any Restricted Subsidiary, which may include Capital Leases, Incurred on or after the Issue Date for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property, provided that the principal amount of any Debt Incurred pursuant to this clause may not exceed (a) $25.0 million less (b) the aggregate outstanding amount of Permitted Refinancing Debt Incurred to refinance Debt Incurred pursuant to this clause;

(10) Debt of the Company pursuant to any Permitted Receivables Financing;

(11) Debt of the Company or any Guarantor consisting of Guarantees of Debt of the Company or any Restricted Subsidiary Incurred under any other clause of this covenant; and

(12) Debt of the Company or any Restricted Subsidiary Incurred on or after the Issue Date not otherwise permitted in an aggregate principal amount at any time outstanding not to exceed $25.0 million.

For purposes of determining compliance with this Section 4.05 , (A) in the event that an item of Debt meets the criteria of more than one of the types of Debt described above, the Company, in its sole discretion, shall classify such item of Debt and only be required to include the amount and type of such Debt in one of such clauses, although the Company may divide and classify an item of Debt in one or more of the types of Debt and may later re-divide or reclassify all or a portion of such item of Debt in any manner that complies with Section 4.05 and (B) the amount of Debt issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in conformity with Mexican GAAP.

Section 4.06 . *Limitation on Restricted Payments.* (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly (the payments and other actions described in the following clauses being collectively "**Restricted Payments**"):

(i) declare or pay any dividend or make any distribution on its Equity Interests held by Persons other than the Company or any of its Wholly Owned Restricted Subsidiaries (other than (x) dividends or distributions paid solely in the Company's Qualified Equity Interests or (y) dividends or distributions by a Restricted Subsidiary on shares of its Common Stock that are paid *pro rata* to all holders of such Common Stock or, if such Restricted Subsidiary has more than one class of Capital Stock, any dividend or distribution by such Restricted Subsidiary on all shares of its Capital Stock that is paid *pro rata* to all holders of such Capital Stock in proportion to such holders' equity interest in such Restricted Subsidiary);

(ii) purchase, redeem, retire or otherwise acquire for value any Equity Interests of the Company held by Persons other than the Company or any of its Wholly Owned Restricted Subsidiaries;

(iii) repay, redeem, repurchase, defease, retire or otherwise acquire for value, or make any payment on or with respect to, any Subordinated Debt (other than for value payable solely in Subordinated Debt that constitutes Permitted Refinancing Debt or in shares of Capital Stock of the Company (other than Disqualified Stock or Preferred Stock)) except a payment of interest or principal at Stated Maturity and except as contemplated by Section 4.13 ; or

(iv) make any Investment other than a Permitted Investment;

unless, at the time of, and after giving effect to, the proposed Restricted Payment:

(1) no Default has occurred and is continuing,

(2) the Company could Incur at least $1.00 of Debt under the Leverage Ratio test set forth in the first sentence of Section 4.05 , and

(3) the aggregate amount expended for all Restricted Payments made on or after the Issue Date would not, subject to paragraph (c), exceed the sum of

(A) 50% of the aggregate amount of the Consolidated Net Income (or, if the Consolidated Net Income is a loss, *minus* 100% of the amount of the loss) accrued on a cumulative basis during the period, taken as one accounting period, beginning on January 1, 2007 and ending on the last day of the Company's most recently completed fiscal quarter for which internal financial statements are available, *plus*

(B) subject to paragraph (c), the aggregate net cash proceeds received by the Company (other than from a Subsidiary) after the Issue Date from

(i) the issuance and sale of its Qualified Equity Interests, including by way of issuance of its Disqualified Equity Interests or Debt to the extent since converted into Qualified Equity Interests of the Company, or

(ii) a contribution by a Person other than a Restricted Subsidiary to the equity capital of the Company not representing an interest in Disqualified Stock, *plus*

(C) the cash return, after the Issue Date, on any other Investment made after the Issue Date pursuant to this paragraph (a), as a result of any sale for cash, repayment, redemption, liquidating distribution or other cash realization (not included in Consolidated Net Income), not to exceed the amount of such Investment so made; plus

(D) to the extent not included in clause (A) above, an amount equal to the net reduction in Investments in Unrestricted Subsidiaries resulting from payments of interest on Debt, dividends, repayments of loans or advances, or other transfers of assets, in each case to the Company or any Restricted Subsidiary from Unrestricted Subsidiaries, or from any revocation of the designation of an Unrestricted Subsidiary (valued in each case as provided in the definition of "Investments"), not to exceed, in the case of any Unrestricted Subsidiary, the amount of Investments previously made by the Company and any Restricted Subsidiary in such Unrestricted Subsidiary included as a Restricted Payment pursuant to this clause (3).

The amount expended in any Restricted Payment, if other than in cash, will be deemed to be the fair market value of the relevant non-cash assets, as determined in good faith by the Board of Directors, whose determination will be conclusive and evidenced by a Board Resolution.

(b) The foregoing will not prohibit:

(1) cash dividends on the Company's Capital Stock and repurchases of the Company's Equity Interests in an amount not to exceed (together with all other cash dividends of the Company and repurchases of the Company's Equity Interests in the same fiscal year of the Company) $15.0 million in the aggregate in any

fiscal year of the Company;

(2) the payment of any dividend within 90 days after the date of declaration thereof if, at the date of declaration, such payment would comply with paragraph (a);

(3) dividends or distributions by a Restricted Subsidiary payable, on a pro rata basis or on a basis more favorable to the Company, to all holders of any class of Capital Stock of such Restricted Subsidiary a majority of which is held, directly or indirectly through Restricted Subsidiaries, by the Company;

(4) the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt with the proceeds of, or in exchange for, Permitted Refinancing Debt;

(5) the purchase, redemption or other acquisition or retirement for value of Equity Interests of the Company or any Restricted Subsidiary in exchange for, or out of the proceeds of a substantially concurrent offering of, Qualified Equity Interests of the Company or of a cash contribution to the common equity of the Company;

(6) the repayment, redemption, repurchase, defeasance or other acquisition or retirement of Subordinated Debt of the Company in exchange for, or out of the proceeds of, a substantially concurrent offering of, Qualified Equity Interests of the Company;

(7) any Investment made in exchange for, or out of the net cash proceeds of, a substantially concurrent offering of Qualified Equity Interests of the Company;

(8) the purchase, redemption or other acquisition or retirement for value of Equity Interests of the Company held by officers, directors or employees or former officers, directors or employees (or their estates or beneficiaries under their estates), upon death, disability, retirement, severance or termination of employment or pursuant to any agreement under which the Equity Interests were issued; *provided* that the aggregate cash consideration paid therefor after the Issue Date does not exceed an aggregate amount of $5.0 million;

(9) the payment of cash dividends (without duplication) on any Disqualified Stock of the Company or a Restricted Subsidiary or Preferred Stock of a Restricted Subsidiary Incurred after the Issue Date in compliance with Section 4.05 ; and

(10) the repurchase of any Subordinated Debt at a purchase price not greater than 101% of the principal amount thereof in the event of (x) a change of control pursuant to a provision no more favorable to the holders thereof than the provisions of Section 4.12 or (y) an Asset Sale pursuant to a provision no more favorable to the holders thereof than the provisions of Section 4.13 ;

*provided* that, in the case of clauses (6), (7) and (8) no Default has occurred and is continuing or would occur as a result thereof.

(c) Proceeds of the issuance of Qualified Equity Interests will be included under clause (3) of paragraph (a) only to the extent they are not applied as described in clause (5), (6) or (7) of paragraph (b). Restricted Payments permitted pursuant to clause (3), (4), (5), (6) or (7) of paragraph (b) will not be included in making the calculations under clause (3) of paragraph (a).

(d) Not later than the date of making any Restricted Payment, the Company will deliver to the Trustee an Officers' Certificate stating that the Restricted Payment is permitted and setting forth the basis upon which the calculations required by the covenant were calculated.

Section 4.07 . *Limitation on Liens.* The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of its properties or assets, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or any Note Guaranty, prior to) the obligations so secured for so long as such obligations are so secured.

Section 4.08 . *Limitation on Sale and Leaseback Transactions.* The Company will not, and will not permit any Restricted

Subsidiary to, enter into any Sale and Leaseback Transaction with respect to any property or asset unless

    (1) the Company or the Restricted Subsidiary would be entitled to

        (A) Incur Debt in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to Section 4.05 , and

        (B) create a Lien on such property or asset securing such Attributable Debt without equally and ratably securing the Notes pursuant to Section 4.07 ,

    in which case, the corresponding Debt and Lien will be deemed incurred pursuant to those provisions, and

    (2) the Company complies with Section 4.13 .

Section 4.09 . *Limitation on Dividend and other Payment Restrictions Affecting Restricted Subsidiaries.* (a) Except as provided in paragraph (b), the Company will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary to

    (1) pay dividends or make any other distributions on any Equity Interests of the Restricted Subsidiary owned by the Company or any other Restricted Subsidiary,

    (2) pay any Debt or other obligation owed to the Company or any other Restricted Subsidiary,

    (3) make loans or advances to the Company or any other Restricted Subsidiary, or

    (4) transfer any of its property or assets to the Company or any other Restricted Subsidiary.

(b) The provisions of paragraph (a) do not apply to any encumbrances or restrictions

    (1) existing on the Issue Date in the Indentures or any other agreements in effect on the Issue Date, and any extensions, renewals, replacements or refinancings of any of the foregoing; *provided* the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the Noteholders than the encumbrances or restrictions being extended, renewed, replaced or refinanced;

    (2) existing under or by reason of applicable law;

    (3) existing

        (A) with respect to any Person, or to the property or assets of any Person, at the time the Person is acquired by the Company or any Restricted Subsidiary, or

        (B) with respect to any Unrestricted Subsidiary at the time it is designated or is deemed to become a Restricted Subsidiary,

which encumbrances or restrictions (i) are not applicable to any other Person or the property or assets of any other Person and (ii) were not put in place in anticipation of such event, and any extensions, renewals, replacements or refinancings of any of the foregoing, *provided* the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the Noteholders than the encumbrances or restrictions being extended, renewed, replaced or refinanced;

    (4) of the type described in clause (a)(4) arising or agreed to in the ordinary course of business (i) that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease or license, (ii) by virtue of any Lien on, or agreement to transfer, option or similar right with respect to any property or assets of, the Company or any Restricted Subsidiary or (iii) not relating to any Debt;

(5) with respect to a Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of, or property and assets of, the Restricted Subsidiary that is permitted by Section 4.10 and Section 4.13 ;

(6) customary restrictions with respect to a Finance Subsidiary, pursuant to the terms of the related financing by the Finance Subsidiary;

(7) contained in the terms governing any Debt if (as determined in good faith by the Board of Directors) (i) the encumbrances or restrictions are ordinary and customary for a financing of that type and (ii) the encumbrances or restrictions either (x) would not, at the time agreed to, be expected to materially adversely affect the ability of the Company to make payments on the Notes or (y) in the case of any Permitted Refinancing Debt, are, taken as a whole, no less favorable in any material respect to the Noteholders than those contained in the agreements governing the Debt being refinanced;

(8) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(9) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business; or

(10) required pursuant to the Indentures.

Section 4.10 . *Limitation on Sale or Issuance of Equity Interests of Restricted Subsidiaries.* The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, sell or issue any Equity Interests of a Restricted Subsidiary unless

(1) the sale or issuance is to the Company or a Substantially Wholly Owned Restricted Subsidiary,

(2) the sale or issuance is of Capital Stock representing directors' qualifying shares or Capital Stock required by applicable law to be held by a Person other than the Company or a Restricted Subsidiary,

(3) the sale or issuance is an Incurrence of Disqualified or Preferred Stock of a Restricted Subsidiary permitted by Section 4.05 , or

(4) (i) if, after giving effect to the sale or issuance, the Restricted Subsidiary would no longer be a Restricted Subsidiary, all remaining Investments of the Company and the Restricted Subsidiaries in such Person (valued at an amount equal to the Company's remaining proportional share of the fair market value of such Person's assets less liabilities), if deemed made at that time, would be permitted under Section 4.06 and (ii) the Company complies with Section 4.13 with respect to the sale or issuance.

Section 4.11 . *Guaranties by Restricted Subsidiaries.* If after the Issue Date the Company or any of its Wholly Owned Restricted Subsidiaries acquires or creates a Subsidiary that is a Wholly Owned Restricted Subsidiary after giving effect to such transaction (other than a Finance Subsidiary), the Company must cause the new Wholly Owned Restricted Subsidiary to provide a Note Guaranty.

A Restricted Subsidiary required to provide a Note Guaranty shall execute a supplemental indenture in the form of Exhibit B, and deliver an Opinion of Counsel to the Trustee to the effect that the supplemental indenture has been duly authorized, executed and delivered by the Restricted Subsidiary and constitutes a valid and binding obligation of the Restricted Subsidiary, enforceable against the Restricted Subsidiary in accordance with its terms (subject to customary exceptions).

Section 4.12 . *Repurchase of Notes Upon a Change of Control.* (a) Not later than 30 days following a Change of Control, the Company will make an Offer to Purchase all outstanding Notes at a purchase price equal to 101% of the principal amount plus accrued interest to the date of purchase.

Section 4.13 . *Limitation on Asset Sales.* (a)The Company will not, and will not permit any Restricted Subsidiary to, make any Asset Sale unless the following conditions are met:

(1) The Asset Sale is for fair market value, as determined in good faith by either the Board of Directors or the finance committee (or its successor committee) of the Board of Directors.

(2) At least 75% of the consideration consists of (A) cash or Cash Equivalents received at closing, (B) property or assets (other than Capital Stock) to be owned by and used in the business of the Company or any Restricted Subsidiary of a nature or type used in a business similar or related to the business of the Company and its Restricted Subsidiaries on the date of such Asset Sale or (C) Capital Stock in one or more Persons principally engaged in a Permitted Business which thereby become Restricted Subsidiaries. (For purposes of this clause (2), the assumption by the purchaser of Debt or other obligations (other than Subordinated Debt) of the Company or a Restricted Subsidiary pursuant to a customary novation agreement, and instruments or securities received from the purchaser that are promptly, but in any event within 30 days of the closing, converted by the Company to cash, to the extent of the cash actually so received, shall be considered cash received at closing.)

(3) Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds may be used

(A) to permanently repay Debt other than Subordinated Debt of the Company or a Guarantor or any Debt of a Restricted Subsidiary that is not a Guarantor (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary, or

(B) to acquire all or substantially all of the assets of a Permitted Business, to purchase equity interests in a Restricted Subsidiary from a third party, or to acquire a majority of the Voting Stock of another Person that thereupon becomes a Restricted Subsidiary engaged in a Permitted Business, or to make capital expenditures or otherwise acquire long-term assets that are to be used in a Permitted Business.

(4) The Net Cash Proceeds of an Asset Sale not applied pursuant to clause (3) within 360 days of the Asset Sale constitute **"Excess Proceeds"**. Excess Proceeds of less than $10.0 million will be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds $10.0 million, the Company must, within 30 days, make an Offer to Purchase notes having a principal amount equal to

(A) accumulated Excess Proceeds, multiplied by

(B) a fraction (x) the numerator of which is equal to the outstanding principal amount of the Notes and (y) the denominator of which is equal to the outstanding principal amount of the Notes and all *pari passu* Debt similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale,

rounded down to the nearest $1,000. The purchase price for the Notes will be 100% of the principal amount plus accrued interest to the date of purchase. Upon completion of the Offer to Purchase, Excess Proceeds will be reset at zero.

Section 4.14 . *Limitation on Transactions with Shareholders and Affiliates.* (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering of any service with (x) any holder, or any Affiliate of any holder, of 5% or more of any class of Voting Stock of the Company or (y) any Affiliate of the Company or any Restricted Subsidiary (a **"Related Party Transaction"**), except upon fair and reasonable terms that when taken as a whole are no less favorable to the Company or the Restricted Subsidiary than could be obtained at that time in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company.

(b) After the Issue Date, any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $5.0 million must first be approved by a majority of the Board of Directors who are disinterested in the subject matter of the transaction pursuant to a Board Resolution delivered to the Trustee. Prior to entering into any Related Party Transaction or series of Related Party Transactions after the Issue Date with an aggregate value in excess of $10.0 million, the Company must in addition obtain and deliver to the Trustee a favorable written opinion from an Independent Financial Advisor as to the fairness of the transaction to the Company and its Restricted Subsidiaries from a financial point of view

(c) The foregoing paragraphs do not apply to

(1) the payment of reasonable and customary regular fees to directors of the Company;

(2) any Restricted Payments not prohibited by Section 4.06 ;

(3) transactions solely among or between Guarantors or solely among or between the Company and a Guarantor;

(4) reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Board of Directors, including contributions to a pension trust for employees of the Company and its Restricted Subsidiaries and the acquisition in the open market, and contribution of, Capital Stock of the Company to a stock option trust for employees of the Company and its Restricted Subsidiaries;

(5) transactions, including Related Party Transactions, undertaken pursuant to any contractual obligations or rights in existence on the Issue Date (as in effect on the Issue Date or as amended, modified or replaced from time to time so long as the amended, modified or new obligations or rights, taken as a whole, are no less favorable to the Company or any Restricted Subsidiary and any of their Subsidiaries than those in effect on the Issue Date);

(6) transactions entered into as part of a financing effected by a Finance Subsidiary; and

(7) loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and in an aggregate principal amount at any time not exceeding $2.0 million.

Section 4.15 . *Line of Business.* The Company will not, and will not permit any of its Restricted Subsidiaries, to engage in any business other than a Permitted Business, except to an extent that so doing would not be material to the Company and its Restricted Subsidiaries, taken as a whole.

Section 4.16 . *Limitation on Accounts Receivables Facilities.* The Company and its Restricted Subsidiaries may sell, transfer or otherwise dispose of accounts receivable; provided that:

(1) the sale, transfer or other disposition is in connection with a Permitted Receivables Financing; and

(2) the aggregate consideration received in each such sale, transfer or other disposition is at least equal to the fair market value of the receivables sold less customary discounts, reserves or amounts reflecting the implicit interest rate.

Section 4.17 . *Designation of Restricted and Unrestricted Subsidiaries.* (a) The Board of Directors may designate any Subsidiary, including a newly acquired or created Subsidiary, to be an Unrestricted Subsidiary if it meets the following qualifications and the designation would not cause a Default.

(1) (A) The Subsidiary does not own any Disqualified Stock of the Company or Disqualified or Preferred Stock of a Restricted Subsidiary or hold any Debt of, or any Lien on any property of, the Company or any Restricted Subsidiary, if such Disqualified or Preferred Stock or Debt could not be Incurred under Section 4.05 or such Lien would violate Section 4.07 ; and

(B) the Subsidiary does not own any Voting Stock of a Restricted Subsidiary, and all of its Subsidiaries are Unrestricted Subsidiaries.

(2) At the time of designation, the designation would be permitted under Section 4.06 .

(3) To the extent the Debt of the Subsidiary is not Non-Recourse Debt, any Guarantee or other credit support thereof by the Company or any Restricted Subsidiary is permitted under Section 4.05 and Section 4.06 .

(4) The Subsidiary is not party to any transaction or arrangement with the Company or any Restricted Subsidiary that would not be permitted under Section 4.14 .

(5) Neither the Company nor any Restricted Subsidiary has any obligation to subscribe for additional Equity Interests of the Subsidiary or to maintain or preserve its financial condition or cause it to achieve specified levels of operating results except to the extent permitted by Section 4.05 and Section 4.06.

Once so designated the Subsidiary will remain an Unrestricted Subsidiary, subject to paragraph (b).

(b) (1) A Subsidiary previously designated an Unrestricted Subsidiary which at any time fails to meet the qualifications set forth in paragraph (a) will be deemed to become at that time a Restricted Subsidiary, subject to the consequences set forth in paragraph (d).

(2) The Board of Directors may designate an Unrestricted Subsidiary to be a Restricted Subsidiary if the designation would not cause a Default.

(c) Upon a Restricted Subsidiary becoming an Unrestricted Subsidiary,

(1) all existing Investments of the Company and the Restricted Subsidiaries therein (valued at the Company's proportional share of the fair market value of its assets less liabilities) will be deemed made at that time;

(2) all existing Capital Stock or Debt of the Company or a Restricted Subsidiary held by it will be deemed Incurred at that time, and all Liens on property of the Company or a Restricted Subsidiary held by it will be deemed incurred at that time;

(3) all existing transactions between it and the Company or any Restricted Subsidiary will be deemed entered into at that time;

(4) it is released at that time from its Note Guaranty, if any; and

(5) it will cease to be subject to the provisions of the Indenture as a Restricted Subsidiary.

(d) Upon an Unrestricted Subsidiary becoming, or being deemed to become, a Restricted Subsidiary,

(1) all of its Debt and Disqualified or Preferred Stock will be deemed Incurred at that time for purposes of Section 4.05 , but will not be considered the sale or issuance of Equity Interests for purposes of Section 4.10 or Section 4.13 ;

(2) Investments therein previously charged under Section 4.06 will be credited thereunder;

(3) it may be required to issue a Note Guaranty of the Notes pursuant to Section 4.11 ; and

(4) it will thenceforward be subject to the provisions of the Indenture as a Restricted Subsidiary.

(e) Any designation by the Board of Directors of a Subsidiary as a Restricted Subsidiary or Unrestricted Subsidiary will be evidenced to the Trustee by promptly filing with the Trustee a copy of the Board Resolution giving effect to the designation and an Officers' Certificate certifying that the designation complied with the foregoing provisions.

Section 4.18 . *Anti-Layering.* Neither the Company nor any Guarantor may Incur any Debt that is subordinate in right of payment to other Debt of the Company or the Guarantor unless such Debt is also subordinate in right of payment to the Notes or the relevant Note Guaranty on substantially identical terms. This does not apply to distinctions between categories of Debt that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Debt.

Section 4.19 . *Financial Reports.* (a) Whether or not the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Company must provide the Trustee and Noteholders within the time periods specified in those sections with

(1) all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Form 20-F (or any successor form) if the Company were required to file such forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and an audit report thereon by the Company's certified independent accountants, and

(2) unaudited quarterly financial information (which shall include at least a balance sheet, income statement and cash flow statement in each case prepared in accordance with Mexican GAAP) along with other financial information and a discussion of results in each case with at least the level of information provided by the Company in its Form 6-K for the third quarter of 2006, within 45 days after the end of each of the first three fiscal quarters of each fiscal year

In addition, whether or not required by the Commission, the Company will, after the effectiveness of an exchange offer registration statement or shelf registration statement if the Commission will accept the filing, file a copy of all of the information and reports referred to in clauses (1) and (2) with the Commission for public availability within the time periods specified in the Commission's rules and regulations.

(b) For so long as any of the notes remain outstanding and constitute "restricted securities" under Rule 144, the Company will furnish to the Holders of the Notes and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(c) All obligors on the Notes will comply with Section 314(a) of the Trust Indenture Act.

(d) Delivery of these reports and information to the Trustee is for informational purposes only and the Trustee's receipt of them will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

Section 4.20 . *Reports to Trustee.* (a) The Company will deliver to the Trustee within 120 days after the end of each fiscal year an Officer's Certificate stating that the Company has fulfilled its obligations hereunder or, if there has been a Default, specifying the Default and its nature and status.

(b) The Company will deliver to the Trustee, as soon as possible and in any event within 30 days after the Company becomes aware or should reasonably become aware of the occurrence of a Default, an Officers' Certificate setting forth the details of the Default, and the action which the Company proposes to take with respect thereto.

(c) The Company will notify the Trustee in writing when any Notes are listed on any national securities exchange and of any delisting.

Section 4.21 . *Listing.* The Company will use its best efforts to obtain and maintain listing of the Notes on the Official List of the Luxembourg Stock Exchange and to trade the Notes on the Euro MTF, the alternative market of the Luxembourg Stock Exchange; *provided, however*, that if the Company is unable to list the Notes on the Official List of the Luxembourg Stock Exchange and/or the Notes do not trade on the Euro MTF, or if the Company is unable to maintain such listing and trading, it will, prior to the delisting of the Notes, use its commercially reasonable efforts to obtain and maintain a listing of the Notes on another internationally recognized stock exchange. In the event that a Restricted Subsidiary provides a Guarantee or is released from its obligations under a Guarantee at a time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and trading on the Euro MTF, the Company will, to the extent required by the rules of the Luxembourg Stock Exchange, publish notice of the granting or release of such Guarantee in a daily newspaper with general circulation in Luxembourg (which newspaper is expected to be *d'Wort*), send a copy of such notice to the Luxembourg Stock Exchange and, in the case of the grant of a Guarantee by a new Restricted Subsidiary, deposit a copy of such Guarantee with the Luxembourg Stock Exchange and the Luxembourg Paying Agent.

Section 4.22 . *Additional Amounts.* All payments under or in respect of the Notes or any Note Guaranty shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "Taxes") of

whatever nature imposed, levied, collected, withheld or assessed of any Tax Jurisdiction unless such withholding or deduction is required by law. In the event of any such withholding or deduction imposed or levied by a Tax Jurisdiction is required to be made from any payments under or with respect to the Notes or any Note Guaranty, the Company or the relevant Guarantor, as applicable, shall pay to Holders of the Notes such additional amounts ("**Additional Amounts**") as will result in the net payment to such Holder (including Additional Amounts) of the amount that would otherwise have been receivable by such Holder in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable with respect to:

(a) any Taxes that would not have been so withheld or deducted but for the Holder or beneficial owner of the Notes having a present or former connection to the relevant Tax Jurisdiction (including having a permanent establishment in such Tax Jurisdiction, being a citizen or resident or national of, incorporated in or carrying on a business, in the relevant Tax Jurisdiction in which such Taxes are imposed) other than the mere receipt of payments in respect of the Notes or any Note Guaranty, the mere holding or ownership of such Note or beneficial interest in the Note or the exercise of any rights under the Notes, any Note Guaranty, this Indenture or the Registration Rights Agreement;

(b) where presentation is required for payment on a Note, any Taxes that would not have been so withheld or deducted if the Note had been presented for payment within 30 days after the Relevant Date, except to the extent that the Holder would have been entitled to Additional Amounts had the Note been presented on any day during such 30 day period and there were no additional withholdings or deductions as a result of such late presentment;

(c) any Taxes that would not have been so withheld or deducted but for the failure by the Holder or the beneficial owner of the Note or any payment in respect of such Note, after written request made to that Holder or beneficial owner at least 30 days before any such withholding or deduction would be payable, by the Company or the relevant Guarantor, as applicable, to comply with any certification, identification, information, documentation or other similar reporting requirement concerning its nationality, residence, identity or connection with the relevant Tax Jurisdiction, which is required or imposed by a statute, regulation or administrative practice of the relevant Taxing Jurisdiction as a precondition to exemption from all or part of such Taxes;

(d) any estate, inheritance, gift, sales, transfer, personal property or similar Taxes imposed with respect to any Note;

(e) any Taxes payable other than by withholding or deduction;

(f) any withholding or deduction imposed on a payment to an individual that is required to be made pursuant to the European Union Directive on the taxation of savings income (the "**Directive**") implementing the conclusions of the European Counsel of Economic and Finance Ministers (ECOFIN) meeting on June 3, 2003, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(g) any Taxes imposed in connection with a Note presented for payment by or on behalf of a Holder or beneficial owner thereof who would have been able to avoid such tax by presenting the relevant Note to another paying agent;

(h) any payment on a Note or a Note Guaranty to a Holder that is a fiduciary or partnership or a person other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or the beneficial owner of the payment would not have been entitled to the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the Holder of the Note or Note Guaranty; or

(i) any combination of (a) through (h) above.

Notwithstanding the foregoing, the limitations on the Company's or relevant Guarantor's obligation to pay Additional Amounts set forth in clauses (c) and (h) above shall not apply if (i) the provision of information, documentation or other evidence described in such clauses (c) and (h) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a Holder or beneficial owner of a Note (taking into account any relevant differences between U.S. and Mexican law rules, regulations or administrative practice) than comparable information or other reporting requirements imposed under U.S. tax law, regulation and administrative practice (such as IRS Forms W-8BEN and W-9) or (ii) Rule 3.23.8 issued by the Ministry of Finance and Public Credit on April 28, 2006 or a substantially similar successor of such rule is in effect, unless the provision of the information, documentation or other evidence described in clauses (c) and (h) is expressly required by statute, regulation, rule, ruling or administrative practice in order to apply Rule 3.23.8 (or a substantially similar successor of such rule), the Company cannot obtain such information, documentation or other evidence on its own through reasonable diligence and the Company otherwise would meet the requirements for application of Rule 3.23.8 (or such

successor of such rule). In addition, such clauses (c) and (d) shall not be construed to require that a non-Mexican pension or retirement fund or a non-Mexican financial institution or another Holder register with the Ministry of Finance and Public Credit for the purpose of establishing eligibility for an exemption from or reduction of Mexican withholding tax or to require that a Holder or beneficial owner certify or provide information concerning whether it is or is not a tax-exempt pension or retirement fund.

If the Directive imposes taxes upon Notes presented for payment, the Company or relevant Guarantor will use commercially reasonable efforts to maintain a Paying Agent with a specified office in a Member State of the European Union that will not be obligated to withhold or deduct tax pursuant to the Directive or any law implementing or complying with, or introduced in order to conform to, the Directive.

References to principal, interest or any other amount payable on or in respect of any Note shall be deemed also to refer to any Additional Amounts which may be payable as set forth in this Indenture or in the Notes to the extent that Additional Amounts are, were or would be payable in respect thereof.

At least 10 Business Days prior to the first Interest Payment Date (and at least 10 Business Days prior to each succeeding Interest Payment Date if there has been any change with respect to the matters set forth in the below mentioned Officers' Certificate), the Company or the relevant Guarantor, as applicable, will furnish to the Trustee and the Paying Agent an Officers' Certificate instructing the Trustee and the Paying Agent whether payments of principal of or interest on the Notes due on such Interest Payment Date shall be without deduction or withholding for or on account of any Taxes by the Tax Jurisdictions. If any such deduction or withholding shall be required, at least 20 days prior to such Interest Payment Date (unless the obligation to pay Additional Amounts arises after the 20th day prior to the payment date, in which case the Company or the relevant Guarantor shall notify the Trustee and the Paying Agent in writing promptly thereafter), the Company, or the relevant Guarantor, as applicable, will furnish the Trustee and the Paying Agent with an Officers' Certificate that specifies the amount, if any, required to be withheld on such payment to Holders of the Notes. If the Company or any Guarantor is obligated to pay Additional Amounts with respect to such payment, the Officers' Certificate must also set forth any other information reasonably necessary to enable the Paying Agent to pay Additional Amounts to the Holders on the relevant payment date. For these purposes, any Officers' Certificate required by this Indenture to be provided to the Trustee and the Paying Agent shall be deemed to be duly provided if telecopied to the Trustee and such Paying Agent.

Each of the Company and the Guarantors, jointly and severally, agree to indemnify the Trustee and the Paying Agent for, and to hold each harmless against, any loss, liability or expense reasonably incurred without bad faith on its part arising out of or in connection with actions taken or omitted by it in reliance on any Officer's Certificate furnished pursuant to this Section 4.22 or any failure to furnish such a certificate.

The Company or the relevant Guarantor, as applicable, will make all withholdings and deductions required by law and will remit the full amount deducted or withheld to the relevant tax authority in accordance with applicable law. The Company or the relevant Guarantor, as applicable, will obtain official receipts from each tax authority evidencing the payment of any Taxes so deducted or withheld, or, if such receipts are not obtainable, such other documentation reasonably acceptable to the Trustee. The Company, or the relevant Guarantor, as applicable, shall furnish to the Trustee the official receipts (or a certified copy of the official receipts or other such documentation, as applicable) evidencing payment of Taxes. The Company or the relevant Guarantor, as applicable, will attach to each certified copy or other such documentation, as applicable, a certificate stating (x) that the amount of such Tax evidenced by the certified copy was paid in connection with payments under or with respect to the Notes then outstanding upon which such Taxes were due and (y) the amount of such withholding tax paid per $1,000 of principal amount of the Notes. Copies of such receipts or other such documentation, as applicable, shall be made available to Holders of the Notes upon request.

The Company and the relevant Guarantor, as applicable, shall promptly pay when due, and indemnify the Holder for, any present or future stamp, issue, registration, court and/or documentary taxes, and/or any other excise taxes, similar charges or similar levies imposed by the Tax Jurisdictions on the execution, delivery, registration or enforcement of any of the Notes, this Indenture, any Note Guaranty or any other document or instrument referred to herein or therein.

The Company and the relevant Guarantor, as applicable, will indemnify and hold harmless each Holder of Notes and, upon written request of any Holder of Notes, reimburse each such Holder, for the amount of:

(1) any Taxes (other than Taxes excluded under clauses (a) through (h)) levied or imposed and paid by such Holder as a result of payments made on or with respect to the Notes; provided that reasonable supporting documentation is provided; and

(2) any Taxes (other than Taxes excluded under clauses (a) through (h)) levied or imposed with respect to any reimbursement under the foregoing clause (1), so that the net amount received by such Holder after such reimbursement will not be less than the net amount the Holder would have received if Taxes (other than Taxes excluded under clauses (a) through (h)) on such reimbursement had not been imposed.

Any payments made pursuant to the preceding sentence will be treated as Additional Amounts for all relevant purposes.

The obligations of the Company and the Guarantor pursuant to this Section 4.22 shall survive termination or discharge of this Indenture, payment of the Notes and/or resignation or removal of the Trustee or the Paying Agent.

Section 4.23 . *Additional Interest.* If Additional Interest is payable by the Company pursuant to the Registration Rights Agreement, the Company shall deliver to the Trustee an Officers' Certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such Additional Interest is payable. Unless and until a Responsible Officer of the Trustee receives such a certificate, the Trustee may assume without inquiry that no Additional Interest is payable. If the Company has paid Additional Interest directly to the persons entitled to it, the Company shall deliver to the Trustee an Officers' Certificate setting forth the particulars of such payment.

Section 4.24 . *Interest Rate Adjustment.* (a) The interest rate on the Notes specified in the Notes (increased as the case may be with Additional Interest) will increase by 1.00% per annum commencing on the date that is 90 days after the Issue Date if, as of such date, each of the Specified Guarantors has not unconditionally guaranteed, jointly and severally, on an unsecured basis, the obligations of the Company pursuant to the Notes and this Indenture by executing a supplemental indenture in the form of Exhibit B.

(b) To avoid any such interest rate adjustment, the Company shall deliver to the Trustee (x) an Officers' Certificate to the effect that none of the conditions requiring an interest rate adjustment are continuing and that represents that the supplemental indenture has been duly authorized, executed and delivered by the Specified Guarantors and constitutes a valid and binding obligation of the Specified Guarantors, enforceable against each of the Specified Guarantors in accordance with its terms (subject to customary exceptions), and (y) copies of each of the relevant supplemental indentures and any other related documentation.

Upon delivery of the above, the interest rate adjustment will no longer remain in effect.

## Article 5
## Consolidation, Merger, Lease or Sale of Assets

Section 5.01 . *Consolidation, Merger, Lease or Sale of All or Substantially All Assets by the Company; No Lease of All or Substantially All Assets.* (a) The Company will not

    (i) consolidate with or merge with or into any Person, or

    (ii) sell, convey, transfer, or otherwise dispose of all or substantially all of its assets as an entirety or substantially an entirety, in one transaction or a series of related transactions, to any Person or

    (iii) permit any Person to merge with or into the Company

unless

    (1) either: (a) the Company is the surviving corporation; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a corporation organized or existing under the laws of Mexico, a member of the European Union or the United States of America, any state of the United States of America or the District of Columbia and expressly assumes by supplemental indenture all of the obligations of the Company under the Indenture, the Notes and the Registration Rights Agreement;

    (2) immediately after giving effect to the transaction, no Default has occurred and is continuing;

    (3) immediately after giving effect to the transaction on a pro forma basis, the Company or the resulting,

**VITRO, S.A.B. de C.V.**
as Issuer

the Guarantors party hereto

and

**THE BANK OF NEW YORK**
as Trustee, Registrar and Paying Agent

Indenture

Dated as of February 1, 2007

9.125%
Senior Notes
Due 2017

## CROSS-REFERENCE TABLE

| TIA Sections | | Indenture Sections |
|---|---|---|
| 310 | (a) | 7.1 |
| | (b) | 7.08 |
| 311 | | 7.03 |
| 312 | | 11.03 |
| 313 | | 7.06 |
| 314 | (a) | 4, 4.02 |
| | (c) | 11.05 |
| | (e) | 11.06 |
| 315 | (a) | 7.01, 7.02 |
| | (b) | 7.02, 7.05 |
| | (c) | 7.01 |
| | (d) | 7.02 |
| | (e) | 6.12, 7.02 |
| 316 | (a) | 2.05, 6.02, 6.04, 6.05 |
| | (b) | 6.06, 6.07 |
| | (c) | 11.03 |
| 317 | (a) (1) | 6.08 |
| | (a) (2) | 6.09 |
| | (b) | 2.03 |
| 318 | | 11.02 |

RECITALS

ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. Definitions

ARTICLE 2
THE NOTES

Section 2.01. Form, Dating and Denominations; Legends
Section 2.02. Execution and Authentication; Exchange Notes; Additional Notes
Section 2.03. Registrar, Paying Agent and Authenticating Agent; Paying Agent to Hold Money in Trust
Section 2.04. Replacement Notes
Section 2.05. Outstanding Notes
Section 2.06. Temporary Notes
Section 2.07. Cancellation
Section 2.08. CUSIP and CINS Numbers
Section 2.09. Registration, Transfer and Exchange
Section 2.10. Restrictions on Transfer and Exchange

ARTICLE 3
REDEMPTION; OFFER TO PURCHASE

Section 3.01. Optional Redemption
Section 3.02. Redemption with Proceeds of Public Equity Offering
Section 3.03. Method and Effect of Redemption
Section 3.04. Offer to Purchase
Section 3.05. Optional Tax Redemption

## ARTICLE 4
## COVENANTS

Section 4.01. Payment Of Notes
Section 4.02. Maintenance of Office or Agency.
Section 4.03. Existence
Section 4.04. Payment of Taxes and other Claims
Section 4.05. Limitation on Debt and Disqualified or Preferred Stock
Section 4.06. Limitation on Restricted Payments
Section 4.07. Limitation on Liens
Section 4.08. Limitation on Sale and Leaseback Transactions
Section 4.09. Limitation on Dividend and other Payment Restrictions Affecting Restricted Subsidiaries
Section 4.10. Limitation on Sale or Issuance of Equity Interests of Restricted Subsidiaries
Section 4.11. Guaranties by Restricted Subsidiaries
Section 4.12. Repurchase of Notes Upon a Change of Control
Section 4.13. Limitation on Asset Sales
Section 4.14. Limitation on Transactions with Shareholders and Affiliates
Section 4.15. Line of Business
Section 4.16. Limitation on Accounts Receivables Facilities
Section 4.17. Designation of Restricted and Unrestricted Subsidiaries
Section 4.18. Anti-Layering
Section 4.19. Financial Reports
Section 4.20. Reports to Trustee
Section 4.21. Listing
Section 4.22. Additional Amounts
Section 4.23. Additional Interest
Section 4.24. Interest Rate Adjustment

## ARTICLE 5
## CONSOLIDATION, MERGER, LEASE OR SALE OF ASSETS

Section 5.01. Consolidation, Merger, Lease or Sale of All or Substantially All Assets by the Company; No Lease of All or Substantially All Assets
Section 5.02. Consolidation, Merger, Lease or Sale of Assets by a Guarantor

## ARTICLE 6
## DEFAULT AND REMEDIES

Section 6.01. Events of Default
Section 6.02. Acceleration
Section 6.03. Other Remedies
Section 6.04. Waiver of Past Defaults
Section 6.05. Control by Majority
Section 6.06. Limitation on Suits
Section 6.07. Rights of Holders to Receive Payment
Section 6.08. Collection Suit by Trustee
Section 6.09. Trustee May File Proofs of Claim
Section 6.10. Priorities
Section 6.11. Restoration of Rights and Remedies
Section 6.12. Undertaking for Costs
Section 6.13. Rights and Remedies Cumulative
Section 6.14. Delay or Omission Not Waiver
Section 6.15. Waiver of Stay, Extension or Usury Laws

## ARTICLE 7
## THE TRUSTEE

Section 7.01. General
Section 7.02. Certain Rights of Trustee
Section 7.03. Individual Rights of Trustee

Section 7.04. Trustee's Disclaimer
Section 7.05. Notice of Default
Section 7.06. Reports by Trustee to Holders
Section 7.07. Compensation And Indemnity
Section 7.08. Replacement of Trustee
Section 7.09. Successor Trustee by Merger
Section 7.10. Eligibility
Section 7.11. Money Held in Trust

ARTICLE 8
DEFEASANCE AND DISCHARGE

Section 8.01. Discharge of Company's Obligations
Section 8.02. Legal Defeasance
Section 8.03. Covenant Defeasance
Section 8.04. Application of Trust Money
Section 8.05. Repayment to Company
Section 8.06. Reinstatement

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01. Amendments Without Consent of Holders
Section 9.02. Amendments With Consent of Holders
Section 9.03. Effect of Consent
Section 9.04. Trustee's Rights and Obligations
Section 9.05. Conformity With Trust Indenture Act
Section 9.06. Payments for Consents

ARTICLE 10
GUARANTIES

Section 10.01. The Guaranties
Section 10.02. Guaranty Unconditional
Section 10.03. Discharge; Reinstatement
Section 10.04. Waiver by the Guarantors
Section 10.05. Subrogation and Contribution
Section 10.06. Stay of Acceleration
Section 10.07. Limitation on Amount of Guaranty
Section 10.08. Execution and Delivery of Guaranty
Section 10.09. Release of Guaranty

ARTICLE 11
MISCELLANEOUS

Section 11.01. Currency Indemnity
Section 11.02. Trust Indenture Act of 1939
Section 11.03. Noteholder Communications; Noteholder Actions
Section 11.04. Notices
Section 11.05. Certificate and Opinion as to Conditions Precedent
Section 11.06. Statements Required in Certificate or Opinion
Section 11.07. Payment Date Other Than a Business Day
Section 11.08. Governing Law
Section 11.09. Consent to Jurisdiction and Service
Section 11.10. No Adverse Interpretation of Other Agreements
Section 11.11. Successors
Section 11.12. Duplicate Originals
Section 11.13. Separability
Section 11.14. Table of Contents and Headings
Section 11.15. No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders

Section 11.16. Luxembourg Law Provision
Section 11.17. Waiver of Jury Trial

EXHIBITS

EXHIBIT A Form of Note
EXHIBIT B Form of Supplemental Indenture
EXHIBIT C Restricted Legend
EXHIBIT D DTC Legend
EXHIBIT E Regulation S Certificate
EXHIBIT F Rule 144A Certificate
EXHIBIT G Institutional Accredited Investor Certificate

---

INDENTURE, dated as of February 1, 2007, between VITRO, S.A.B. de C.V., a *sociedad anonima bursatil de capital variable* organized under the laws of Mexico, as the Company, the Guarantors party hereto and THE BANK OF NEW YORK, a corporation organized under the laws of the State of New York authorized to conduct a banking business, as Trustee, Registrar and Paying Agent.

## RECITALS

The Company has duly authorized the execution and delivery of the Indenture to provide for the issuance of up to $700,000,000 aggregate principal amount of the Company's 9.125% Senior Notes Due 2017, and, if and when issued, any Additional Notes, together with any Exchange Notes issued therefor as provided herein (the **"Notes"**). All things necessary to make the Indenture a valid agreement of the Company, in accordance with its terms, have been done, and the Company has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Company and authenticated and delivered by the Trustee and duly issued by the Company, the valid obligations of the Company as hereinafter provided.

In addition, the Guarantors party hereto have duly authorized the execution and delivery of the Indenture as guarantors of the Notes. All things necessary to make the Indenture a valid agreement of each Guarantor, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make the Note Guarantees, when the Notes are executed by the Company and authenticated and delivered by the Trustee and duly issued by the Company, the valid obligations of such Guarantor as hereinafter provided.

This Indenture is subject to, and will be governed by, the provisions of the Trust Indenture Act that are required to be a part of and govern indentures qualified under the Trust Indenture Act.

## THIS INDENTURE WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

outstanding principal amount thereof, together with any Additional Amounts then due and that will become due on the redemption date as a result of the redemption and accrued and unpaid interest to the redemption date, if (1) as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of the relevant Tax Jurisdiction, or any change in the official application, administration or interpretation of such laws, regulations or rulings in the relevant Tax Jurisdiction, the Company or the relevant Guarantor, as applicable, has or will become obligated to pay any Additional Amounts on the Notes in excess of the Additional Amounts the Company would be obligated to pay if payments made on the Notes were subject to withholding or deduction of Mexican taxes at a rate of 4.9 percent ("**Excess Additional Amounts**"), (2) such change or amendment is announced on or after the Issue Date (or, if the relevant Tax Jurisdiction has changed since the date of the Indenture, the date on which the then current Tax Jurisdiction became the applicable Tax Jurisdiction under the Indenture), (3) such obligation would have arisen absent a further issuance of the Notes pursuant to the Indenture; and (4) and such obligation cannot be avoided by the Company or the relevant Guarantor, as applicable, taking reasonable measures available to it (including, without limitation, changing the jurisdiction from or through which payments are made); provided, however, that no such notice of redemption shall be given earlier than 60 days prior to the earliest date on which the Company or the relevant Guarantor, as applicable, would be obliged to pay such Excess Additional Amounts. Prior to the giving of any notice of redemption of the Notes pursuant to the foregoing, the Company will deliver to the Trustee (1) an Officers' Certificate stating that the conditions precedent to the right of the Company to so redeem have occurred and that the obligation to pay Excess Additional Amounts cannot be avoided by the Company by taking commercially reasonable measures available to it, and (2) a written opinion of independent legal counsel of recognized standing in the relevant Tax Jurisdiction to the effect that the Company has become obligated to pay Excess Additional Amounts as a result of a change or amendment described above.

The foregoing provisions will apply *mutatis mutandis* to any successor Person to the Company after such successor Person becomes a party to this Indenture. Notices of redemption hereunder will be given in accordance with the provisions set forth under Section 3.03 .

## Article 4
## Covenants

Section 4.01 . *Payment Of Notes.* (a)  The Company agrees to pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and the Indenture. Not later than 9:00 A.M. (New York City time) on the due date of any principal of or interest on any Notes, or any redemption or purchase price of the Notes, the Company will deposit with the Trustee (or Paying Agent) money in immediately available funds sufficient to pay such amounts, *provided* that if the Company or any Affiliate of the Company is acting as Paying Agent, it will, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of money sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in the Indenture. In each case the Company will promptly notify the Trustee in writing of its compliance with this paragraph.

(b) An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Company or any Affiliate of the Company) holds on that date money designated for and sufficient to pay the installment. If the Company or any Affiliate of the Company acts as Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

(c) The Company agrees to pay interest on overdue principal, and overdue installments of interest at the rate per annum specified in the Notes.

(d) If a Holder of Notes and 2012 Notes in an aggregate principal amount of $10.0 million or more has given adequate wire transfer instructions to the Company and the Trustee in writing at least 10 days in advance, the Company will pay all principal, interest, Additional Amounts and premium, if any, on that Holder's Notes in accordance with those instructions. All other payments on the Notes will be made at the office or agency of the Paying Agent within the City and State of New York and of the Luxembourg Paying Agent within Luxembourg, as the case may be, unless the Company elects to make interest payments by check mailed to the Noteholders at their address set forth in the Register of Holders.

Section 4.02 . *Maintenance of Office or Agency.* The Company will maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Company in respect of the Notes and the Indenture may be served. The Company hereby initially designates the Corporate Trust Office of the Trustee as such office of the Company. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served to the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03 . *Existence.* The Company will do or cause to be done all things necessary to preserve and keep in full force and effect its existence and the existence of each of its Restricted Subsidiaries in accordance with their respective organizational documents, and the material rights, licenses and franchises of the Company and each Restricted Subsidiary, *provided* that the Company is not required to preserve any such right, license or franchise, or the existence of any Restricted Subsidiary, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries taken as a whole; and *provided further* that this Section does not prohibit any transaction otherwise permitted by Section 4.13 or Article 5 .

Section 4.04 . *Payment of Taxes and other Claims.* The Company will pay or discharge, and cause each of its Subsidiaries to pay or discharge before the same become delinquent (i) all material taxes, assessments and governmental charges levied or imposed upon the Company or any Subsidiary or its income or profits or property, and (ii) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Company or any Subsidiary, other than any such tax, assessment, charge or claim the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves, if necessary, have been established or where the failure to effect such payment will not be disadvantageous to Holders.

Section 4.05 . *Limitation on Debt and Disqualified or Preferred Stock.* (a) The Company

> (1) will not, and will not permit any of its Restricted Subsidiaries to, Incur any Debt; and

> (2) will not, and will not permit any Restricted Subsidiary to, Incur any Disqualified Stock, and will not permit any of its Restricted Subsidiaries to Incur any Preferred Stock (other than Disqualified or Preferred Stock of Restricted Subsidiaries held by the Company or a Substantially Wholly-Owned Restricted Subsidiary, so long as it is so held);

*provided* that the Company or any Restricted Subsidiary may Incur Debt and the Company or any Restricted Subsidiary may Incur Disqualified Stock and the Company or any Restricted Subsidiary may Incur Preferred Stock if, on the date of the Incurrence, after giving effect to the Incurrence and the receipt and application of the proceeds therefrom, the Leverage Ratio is not greater than 3.50 or less than zero.

(b) Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur the following ("**Permitted Debt**"):

> (1) Debt of the Company or any Guarantor incurred for working capital needs in the ordinary course of business, to fund capital expenditures or to make interest payments; provided that the aggregate principal amount at any time outstanding does not exceed $100.0 million, less any amount of such Debt permanently repaid as provided by Section 4.13 , and Guarantees of such Debt by any Guarantor;

> (2) Debt of the Company or any Restricted Subsidiary of the Company so long as such Debt continues to be owed to the Company or a Restricted Subsidiary and which, if the obligor is the Company or a Guarantor, is subordinated in right of payment to the notes;

> (3) Debt of the Company pursuant to the Notes (other than Additional Notes) and Debt of any Guarantor pursuant to a Note Guaranty of the Notes (including Additional Notes);

> (4) Debt ("**Permitted Refinancing Debt**") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance, (all of the above, for purposes of this clause, "**refinance**") then outstanding Debt in an amount not to exceed the principal amount of the Debt so refinanced, plus premiums, fees and expenses; *provided* that

>> (A) in case the Debt to be refinanced is subordinated in right of payment to the Notes, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is

outstanding, is expressly made subordinate in right of payment to the Notes at least to the extent that the Debt to be refinanced is subordinated to the Notes,

(C) the new Debt does not have a Stated Maturity prior to the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is at least equal to the remaining Average Life of the Debt to be refinanced,

(D) in no event may Debt of the Company or any Guarantor be refinanced pursuant to this clause by means of any Debt of any Restricted Subsidiary that is not a Guarantor, and

(E) Debt Incurred pursuant to clauses (1), (2), (5), (6), (11) and (12) may not be refinanced pursuant to this clause;

(5) Hedging Agreements of the Company or any Restricted Subsidiary entered into in the ordinary course of business for the purpose of limiting risks associated with the business of the Company and its Restricted Subsidiaries and not for speculation;

(6) Debt of the Company or any Restricted Subsidiary with respect to letters of credit and bankers' acceptances issued in the ordinary course of business and not supporting Debt, including letters of credit supporting performance, surety or appeal bonds or indemnification, adjustment of purchase price or similar obligations incurred in connection with the acquisition or disposition of any business or assets, including but not limited to any such amounts outstanding from time to time under the Bank of America Credit Facility;

(7) Acquired Debt, *provided* that after giving effect to the Incurrence thereof, the Company could Incur at least $1.00 of Debt under the Leverage Ratio test set forth in the first sentence of this covenant;

(8) Debt of the Company or any Restricted Subsidiary outstanding on the Issue Date, including the 2013 Notes, (and, for purposes of clause (4) (D), not otherwise constituting Permitted Debt);

(9) Debt of the Company or any Restricted Subsidiary, which may include Capital Leases, Incurred on or after the Issue Date for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property, provided that the principal amount of any Debt Incurred pursuant to this clause may not exceed (a) $25.0 million less (b) the aggregate outstanding amount of Permitted Refinancing Debt Incurred to refinance Debt Incurred pursuant to this clause;

(10) Debt of the Company pursuant to any Permitted Receivables Financing;

(11) Debt of the Company or any Guarantor consisting of Guarantees of Debt of the Company or any Restricted Subsidiary Incurred under any other clause of this covenant; and

(12) Debt of the Company or any Restricted Subsidiary Incurred on or after the Issue Date not otherwise permitted in an aggregate principal amount at any time outstanding not to exceed $25.0 million.

For purposes of determining compliance with this Section 4.05 , (A) in the event that an item of Debt meets the criteria of more than one of the types of Debt described above, the Company, in its sole discretion, shall classify such item of Debt and only be required to include the amount and type of such Debt in one of such clauses, although the Company may divide and classify an item of Debt in one or more of the types of Debt and may later re-divide or reclassify all or a portion of such item of Debt in any manner that complies with Section 4.05 and (B) the amount of Debt issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in conformity with Mexican GAAP.

Section 4.06 . *Limitation on Restricted Payments.* (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly (the payments and other actions described in the following clauses being collectively **"Restricted Payments"**):

(i) declare or pay any dividend or make any distribution on its Equity Interests held by Persons other than the Company or any of its Wholly Owned Restricted Subsidiaries (other than (x) dividends or distributions paid

solely in the Company's Qualified Equity Interests or (y) dividends or distributions by a Restricted Subsidiary on shares of its Common Stock that are paid *pro rata* to all holders of such Common Stock or, if such Restricted Subsidiary has more than one class of Capital Stock, any dividend or distribution by such Restricted Subsidiary on all shares of its Capital Stock that is paid *pro rata* to all holders of such Capital Stock in proportion to such holders' equity interest in such Restricted Subsidiary);

(ii) purchase, redeem, retire or otherwise acquire for value any Equity Interests of the Company held by Persons other than the Company or any of its Wholly Owned Restricted Subsidiaries;

(iii) repay, redeem, repurchase, defease, retire or otherwise acquire for value, or make any payment on or with respect to, any Subordinated Debt (other than for value payable solely in Subordinated Debt that constitutes Permitted Refinancing Debt or in shares of Capital Stock of the Company (other than Disqualified Stock or Preferred Stock)) except a payment of interest or principal at Stated Maturity and except as contemplated by Section 4.13 ; or

(iv) make any Investment other than a Permitted Investment;

unless, at the time of, and after giving effect to, the proposed Restricted Payment:

(1) no Default has occurred and is continuing,

(2) the Company could Incur at least $1.00 of Debt under the Leverage Ratio test set forth in the first sentence of Section 4.05 , and

(3) the aggregate amount expended for all Restricted Payments made on or after the Issue Date would not, subject to paragraph (c), exceed the sum of

(A) 50% of the aggregate amount of the Consolidated Net Income (or, if the Consolidated Net Income is a loss, *minus* 100% of the amount of the loss) accrued on a cumulative basis during the period, taken as one accounting period, beginning on January 1, 2007 and ending on the last day of the Company's most recently completed fiscal quarter for which internal financial statements are available, *plus*

(B) subject to paragraph (c), the aggregate net cash proceeds received by the Company (other than from a Subsidiary) after the Issue Date from

(i) the issuance and sale of its Qualified Equity Interests, including by way of issuance of its Disqualified Equity Interests or Debt to the extent since converted into Qualified Equity Interests of the Company, or

(ii) a contribution by a Person other than a Restricted Subsidiary to the equity capital of the Company not representing an interest in Disqualified Stock, *plus*

(C) the cash return, after the Issue Date, on any other Investment made after the Issue Date pursuant to this paragraph (a), as a result of any sale for cash, repayment, redemption, liquidating distribution or other cash realization (not included in Consolidated Net Income), not to exceed the amount of such Investment so made; plus

(D) to the extent not included in clause (A) above, an amount equal to the net reduction in Investments in Unrestricted Subsidiaries resulting from payments of interest on Debt, dividends, repayments of loans or advances, or other transfers of assets, in each case to the Company or any Restricted Subsidiary from Unrestricted Subsidiaries, or from any revocation of the designation of an Unrestricted Subsidiary (valued in each case as provided in the definition of "Investments"), not to exceed, in the case of any Unrestricted Subsidiary, the amount of Investments previously made by the Company and any Restricted Subsidiary in such Unrestricted Subsidiary included as a Restricted Payment pursuant to this clause (3).

The amount expended in any Restricted Payment, if other than in cash, will be deemed to be the fair market value of the relevant non-cash assets, as determined in good faith by the Board of Directors, whose determination will be conclusive and evidenced by a Board Resolution.

(b) The foregoing will not prohibit:

(1) cash dividends on the Company's Capital Stock and repurchases of the Company's Equity Interests in an amount not to exceed (together with all other cash dividends of the Company and repurchases of the Company's Equity Interests in the same fiscal year of the Company) $15.0 million in the aggregate in any fiscal year of the Company;

(2) the payment of any dividend within 90 days after the date of declaration thereof if, at the date of declaration, such payment would comply with paragraph (a);

(3) dividends or distributions by a Restricted Subsidiary payable, on a pro rata basis or on a basis more favorable to the Company, to all holders of any class of Capital Stock of such Restricted Subsidiary a majority of which is held, directly or indirectly through Restricted Subsidiaries, by the Company;

(4) the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt with the proceeds of, or in exchange for, Permitted Refinancing Debt;

(5) the purchase, redemption or other acquisition or retirement for value of Equity Interests of the Company or any Restricted Subsidiary in exchange for, or out of the proceeds of a substantially concurrent offering of, Qualified Equity Interests of the Company or of a cash contribution to the common equity of the Company;

(6) the repayment, redemption, repurchase, defeasance or other acquisition or retirement of Subordinated Debt of the Company in exchange for, or out of the proceeds of, a substantially concurrent offering of, Qualified Equity Interests of the Company;

(7) any Investment made in exchange for, or out of the net cash proceeds of, a substantially concurrent offering of Qualified Equity Interests of the Company;

(8) the purchase, redemption or other acquisition or retirement for value of Equity Interests of the Company held by officers, directors or employees or former officers, directors or employees (or their estates or beneficiaries under their estates), upon death, disability, retirement, severance or termination of employment or pursuant to any agreement under which the Equity Interests were issued; *provided* that the aggregate cash consideration paid therefor after the Issue Date does not exceed an aggregate amount of $5.0 million;

(9) the payment of cash dividends (without duplication) on any Disqualified Stock of the Company or a Restricted Subsidiary or Preferred Stock of a Restricted Subsidiary Incurred after the Issue Date in compliance with Section 4.05 ; and

(10) the repurchase of any Subordinated Debt at a purchase price not greater than 101% of the principal amount thereof in the event of (x) a change of control pursuant to a provision no more favorable to the holders thereof than the provisions of Section 4.12 or (y) an Asset Sale pursuant to a provision no more favorable to the holders thereof than the provisions of Section 4.13 ;

*provided* that, in the case of clauses (6), (7) and (8) no Default has occurred and is continuing or would occur as a result thereof.

(c) Proceeds of the issuance of Qualified Equity Interests will be included under clause (3) of paragraph (a) only to the extent they are not applied as described in clause (5), (6) or (7) of paragraph (b). Restricted Payments permitted pursuant to clause (3), (4), (5), (6) or (7) of paragraph (b) will not be included in making

the calculations under clause (3) of paragraph (a).

(d) Not later than the date of making any Restricted Payment, the Company will deliver to the Trustee an Officers' Certificate stating that the Restricted Payment is permitted and setting forth the basis upon which the calculations required by the covenant were calculated.

Section 4.07 . *Limitation on Liens.* The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of its properties or assets, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or any Note Guaranty, prior to) the obligations so secured for so long as such obligations are so secured.

Section 4.08 . *Limitation on Sale and Leaseback Transactions.* The Company will not, and will not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction with respect to any property or asset unless

    (1) the Company or the Restricted Subsidiary would be entitled to

        (A) Incur Debt in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to Section 4.05 , and

        (B) create a Lien on such property or asset securing such Attributable Debt without equally and ratably securing the Notes pursuant to Section 4.07 ,

in which case, the corresponding Debt and Lien will be deemed incurred pursuant to those provisions, and

    (2) the Company complies with Section 4.13 .

Section 4.09 . *Limitation on Dividend and other Payment Restrictions Affecting Restricted Subsidiaries.* (a) Except as provided in paragraph (b), the Company will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary to

    (1) pay dividends or make any other distributions on any Equity Interests of the Restricted Subsidiary owned by the Company or any other Restricted Subsidiary,

    (2) pay any Debt or other obligation owed to the Company or any other Restricted Subsidiary,

    (3) make loans or advances to the Company or any other Restricted Subsidiary, or

    (4) transfer any of its property or assets to the Company or any other Restricted Subsidiary.

(b) The provisions of paragraph (a) do not apply to any encumbrances or restrictions

    (1) existing on the Issue Date in the Indentures or any other agreements in effect on the Issue Date, and any extensions, renewals, replacements or refinancings of any of the foregoing; *provided* the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the Noteholders than the encumbrances or restrictions being extended, renewed, replaced or refinanced;

    (2) existing under or by reason of applicable law;

    (3) existing

        (A) with respect to any Person, or to the property or assets of any Person, at the time the Person is acquired by the Company or any Restricted Subsidiary, or

(B) with respect to any Unrestricted Subsidiary at the time it is designated or is deemed to become a Restricted Subsidiary,

which encumbrances or restrictions (i) are not applicable to any other Person or the property or assets of any other Person and (ii) were not put in place in anticipation of such event, and any extensions, renewals, replacements or refinancings of any of the foregoing, *provided* the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the Noteholders than the encumbrances or restrictions being extended, renewed, replaced or refinanced;

(4) of the type described in clause (a)(4) arising or agreed to in the ordinary course of business (i) that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease or license, (ii) by virtue of any Lien on, or agreement to transfer, option or similar right with respect to any property or assets of, the Company or any Restricted Subsidiary or (iii) not relating to any Debt;

(5) with respect to a Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of, or property and assets of, the Restricted Subsidiary that is permitted by Section 4.10 and Section 4.13 ;

(6) customary restrictions with respect to a Finance Subsidiary, pursuant to the terms of the related financing by the Finance Subsidiary;

(7) contained in the terms governing any Debt if (as determined in good faith by the Board of Directors) (i) the encumbrances or restrictions are ordinary and customary for a financing of that type and (ii) the encumbrances or restrictions either (x) would not, at the time agreed to, be expected to materially adversely affect the ability of the Company to make payments on the Notes or (y) in the case of any Permitted Refinancing Debt, are, taken as a whole, no less favorable in any material respect to the Noteholders than those contained in the agreements governing the Debt being refinanced;

(8) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(9) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business; or

(10) required pursuant to the Indentures.

Section 4.10 . *Limitation on Sale or Issuance of Equity Interests of Restricted Subsidiaries.* The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, sell or issue any Equity Interests of a Restricted Subsidiary unless

(1) the sale or issuance is to the Company or a Substantially Wholly Owned Restricted Subsidiary,

(2) the sale or issuance is of Capital Stock representing directors' qualifying shares or Capital Stock required by applicable law to be held by a Person other than the Company or a Restricted Subsidiary,

(3) the sale or issuance is an Incurrence of Disqualified or Preferred Stock of a Restricted Subsidiary permitted by Section 4.05 , or

(4) (i) if, after giving effect to the sale or issuance, the Restricted Subsidiary would no longer be a Restricted Subsidiary, all remaining Investments of the Company and the Restricted Subsidiaries in such Person (valued at an amount equal to the Company's remaining proportional share of the fair market value of such Person's assets less liabilities), if deemed made at that time, would be permitted under Section 4.06 and (ii) the Company complies with Section 4.13 with respect to the sale or issuance.

Section 4.11 . *Guaranties by Restricted Subsidiaries.* If after the Issue Date the Company or any of its Wholly Owned Restricted Subsidiaries acquires or creates a Subsidiary that is a Wholly Owned Restricted Subsidiary after giving effect to such transaction (other than a Finance Subsidiary), the Company must cause the new Wholly Owned Restricted Subsidiary to

provide a Note Guaranty.

A Restricted Subsidiary required to provide a Note Guaranty shall execute a supplemental indenture in the form of Exhibit B, and deliver an Opinion of Counsel to the Trustee to the effect that the supplemental indenture has been duly authorized, executed and delivered by the Restricted Subsidiary and constitutes a valid and binding obligation of the Restricted Subsidiary, enforceable against the Restricted Subsidiary in accordance with its terms (subject to customary exceptions).

Section 4.12 . *Repurchase of Notes Upon a Change of Control.* (a) Not later than 30 days following a Change of Control, the Company will make an Offer to Purchase all outstanding Notes at a purchase price equal to 101% of the principal amount plus accrued interest to the date of purchase.

Section 4.13 . *Limitation on Asset Sales.* (a)The Company will not, and will not permit any Restricted Subsidiary to, make any Asset Sale unless the following conditions are met:

(1) The Asset Sale is for fair market value, as determined in good faith by either the Board of Directors or the finance committee (or its successor committee) of the Board of Directors.

(2) At least 75% of the consideration consists of (A) cash or Cash Equivalents received at closing, (B) property or assets (other than Capital Stock) to be owned by and used in the business of the Company or any Restricted Subsidiary of a nature or type used in a business similar or related to the business of the Company and its Restricted Subsidiaries on the date of such Asset Sale or (C) Capital Stock in one or more Persons principally engaged in a Permitted Business which thereby become Restricted Subsidiaries. (For purposes of this clause (2), the assumption by the purchaser of Debt or other obligations (other than Subordinated Debt) of the Company or a Restricted Subsidiary pursuant to a customary novation agreement, and instruments or securities received from the purchaser that are promptly, but in any event within 30 days of the closing, converted by the Company to cash, to the extent of the cash actually so received, shall be considered cash received at closing.)

(3) Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds may be used

(A) to permanently repay Debt other than Subordinated Debt of the Company or a Guarantor or any Debt of a Restricted Subsidiary that is not a Guarantor (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary, or

(B) to acquire all or substantially all of the assets of a Permitted Business, to purchase equity interests in a Restricted Subsidiary from a third party, or to acquire a majority of the Voting Stock of another Person that thereupon becomes a Restricted Subsidiary engaged in a Permitted Business, or to make capital expenditures or otherwise acquire long-term assets that are to be used in a Permitted Business.

(4) The Net Cash Proceeds of an Asset Sale not applied pursuant to clause (3) within 360 days of the Asset Sale constitute **"Excess Proceeds"**. Excess Proceeds of less than $10.0 million will be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds $10.0 million, the Company must, within 30 days, make an Offer to Purchase notes having a principal amount equal to

(A) accumulated Excess Proceeds, multiplied by

(B) a fraction (x) the numerator of which is equal to the outstanding principal amount of the Notes and (y) the denominator of which is equal to the outstanding principal amount of the Notes and all *pari passu* Debt similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale,

rounded down to the nearest $1,000. The purchase price for the Notes will be 100% of the principal amount plus accrued interest to the date of purchase. Upon completion of the Offer to Purchase, Excess Proceeds will be reset at zero.

Section 4.14 . *Limitation on Transactions with Shareholders and Affiliates.* (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering of any service with (x) any holder, or any Affiliate of any holder, of 5% or more of any class of Voting Stock of the Company or (y) any Affiliate of the Company or any Restricted Subsidiary (a **"Related Party Transaction"**), except upon fair and reasonable terms that when taken as a whole are no less favorable to the Company or the Restricted Subsidiary than could be obtained at that time in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company.

(b) After the Issue Date, any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $5.0 million must first be approved by a majority of the Board of Directors who are disinterested in the subject matter of the transaction pursuant to a Board Resolution delivered to the Trustee. Prior to entering into any Related Party Transaction or series of Related Party Transactions after the Issue Date with an aggregate value in excess of $10.0 million, the Company must in addition obtain and deliver to the Trustee a favorable written opinion from an Independent Financial Advisor as to the fairness of the transaction to the Company and its Restricted Subsidiaries from a financial point of view

(c) The foregoing paragraphs do not apply to

   (1) the payment of reasonable and customary regular fees to directors of the Company;

   (2) any Restricted Payments not prohibited by Section 4.06 ;

   (3) transactions solely among or between Guarantors or solely among or between the Company and a Guarantor;

   (4) reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Board of Directors, including contributions to a pension trust for employees of the Company and its Restricted Subsidiaries and the acquisition in the open market, and contribution of, Capital Stock of the Company to a stock option trust for employees of the Company and its Restricted Subsidiaries;

   (5) transactions, including Related Party Transactions, undertaken pursuant to any contractual obligations or rights in existence on the Issue Date (as in effect on the Issue Date or as amended, modified or replaced from time to time so long as the amended, modified or new obligations or rights, taken as a whole, are no less favorable to the Company or any Restricted Subsidiary and any of their Subsidiaries than those in effect on the Issue Date);

   (6) transactions entered into as part of a financing effected by a Finance Subsidiary; and

   (7) loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and in an aggregate principal amount at any time not exceeding $2.0 million.

Section 4.15 . *Line of Business.* The Company will not, and will not permit any of its Restricted Subsidiaries, to engage in any business other than a Permitted Business, except to an extent that so doing would not be material to the Company and its Restricted Subsidiaries, taken as a whole.

Section 4.16 . *Limitation on Accounts Receivables Facilities.* The Company and its Restricted Subsidiaries may sell, transfer or otherwise dispose of accounts receivable; provided that:

   (1) the sale, transfer or other disposition is in connection with a Permitted Receivables Financing; and

   (2) the aggregate consideration received in each such sale, transfer or other disposition is at least equal to the fair market value of the receivables sold less customary discounts, reserves or amounts reflecting the implicit interest rate.

Section 4.17 . *Designation of Restricted and Unrestricted Subsidiaries.* (a) The Board of Directors may designate any Subsidiary, including a newly acquired or created Subsidiary, to be an Unrestricted Subsidiary if it meets the following

qualifications and the designation would not cause a Default.

   (1) (A) The Subsidiary does not own any Disqualified Stock of the Company or Disqualified or Preferred Stock of a Restricted Subsidiary or hold any Debt of, or any Lien on any property of, the Company or any Restricted Subsidiary, if such Disqualified or Preferred Stock or Debt could not be Incurred under Section 4.05 or such Lien would violate Section 4.07 ; and

   (B) the Subsidiary does not own any Voting Stock of a Restricted Subsidiary, and all of its Subsidiaries are Unrestricted Subsidiaries.

   (2) At the time of designation, the designation would be permitted under Section 4.06 .

   (3) To the extent the Debt of the Subsidiary is not Non-Recourse Debt, any Guarantee or other credit support thereof by the Company or any Restricted Subsidiary is permitted under Section 4.05 and Section 4.06 .

   (4) The Subsidiary is not party to any transaction or arrangement with the Company or any Restricted Subsidiary that would not be permitted under Section 4.14 .

   (5) Neither the Company nor any Restricted Subsidiary has any obligation to subscribe for additional Equity Interests of the Subsidiary or to maintain or preserve its financial condition or cause it to achieve specified levels of operating results except to the extent permitted by Section 4.05 and Section 4.06.

Once so designated the Subsidiary will remain an Unrestricted Subsidiary, subject to paragraph (b).

(b) (1) A Subsidiary previously designated an Unrestricted Subsidiary which at any time fails to meet the qualifications set forth in paragraph (a) will be deemed to become at that time a Restricted Subsidiary, subject to the consequences set forth in paragraph (d).

   (2) The Board of Directors may designate an Unrestricted Subsidiary to be a Restricted Subsidiary if the designation would not cause a Default.

(c) Upon a Restricted Subsidiary becoming an Unrestricted Subsidiary,

   (1) all existing Investments of the Company and the Restricted Subsidiaries therein (valued at the Company's proportional share of the fair market value of its assets less liabilities) will be deemed made at that time;

   (2) all existing Capital Stock or Debt of the Company or a Restricted Subsidiary held by it will be deemed Incurred at that time, and all Liens on property of the Company or a Restricted Subsidiary held by it will be deemed incurred at that time;

   (3) all existing transactions between it and the Company or any Restricted Subsidiary will be deemed entered into at that time;

   (4) it is released at that time from its Note Guaranty, if any; and

   (5) it will cease to be subject to the provisions of the Indenture as a Restricted Subsidiary.

(d) Upon an Unrestricted Subsidiary becoming, or being deemed to become, a Restricted Subsidiary,

   (1) all of its Debt and Disqualified or Preferred Stock will be deemed Incurred at that time for purposes of Section 4.05 , but will not be considered the sale or issuance of Equity Interests for purposes of Section 4.10 or Section 4.13 ;

   (2) Investments therein previously charged under Section 4.06 will be credited thereunder;

   (3) it may be required to issue a Note Guaranty of the Notes pursuant to Section 4.11 ; and

(4) it will thenceforward be subject to the provisions of the Indenture as a Restricted Subsidiary.

(e) Any designation by the Board of Directors of a Subsidiary as a Restricted Subsidiary or Unrestricted Subsidiary will be evidenced to the Trustee by promptly filing with the Trustee a copy of the Board Resolution giving effect to the designation and an Officers' Certificate certifying that the designation complied with the foregoing provisions.

Section 4.18 . *Anti-Layering.* Neither the Company nor any Guarantor may Incur any Debt that is subordinate in right of payment to other Debt of the Company or the Guarantor unless such Debt is also subordinate in right of payment to the Notes or the relevant Note Guaranty on substantially identical terms. This does not apply to distinctions between categories of Debt that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Debt.

Section 4.19 . *Financial Reports.* (a) Whether or not the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Company must provide the Trustee and Noteholders within the time periods specified in those sections with

(1) all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Form 20-F (or any successor form) if the Company were required to file such forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and an audit report thereon by the Company's certified independent accountants, and

(2) unaudited quarterly financial information (which shall include at least a balance sheet, income statement and cash flow statement in each case prepared in accordance with Mexican GAAP) along with other financial information and a discussion of results in each case with at least the level of information provided by the Company in its Form 6-K for the third quarter of 2006, within 45 days after the end of each of the first three fiscal quarters of each fiscal year

In addition, whether or not required by the Commission, the Company will, after the effectiveness of an exchange offer registration statement or shelf registration statement if the Commission will accept the filing, file a copy of all of the information and reports referred to in clauses (1) and (2) with the Commission for public availability within the time periods specified in the Commission's rules and regulations.

(b) For so long as any of the notes remain outstanding and constitute "restricted securities" under Rule 144, the Company will furnish to the Holders of the Notes and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(c) All obligors on the Notes will comply with Section 314(a) of the Trust Indenture Act.

(d) Delivery of these reports and information to the Trustee is for informational purposes only and the Trustee's receipt of them will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

Section 4.20 . *Reports to Trustee.* (a) The Company will deliver to the Trustee within 120 days after the end of each fiscal year an Officer's Certificate stating that the Company has fulfilled its obligations hereunder or, if there has been a Default, specifying the Default and its nature and status.

(b) The Company will deliver to the Trustee, as soon as possible and in any event within 30 days after the Company becomes aware or should reasonably become aware of the occurrence of a Default, an Officers' Certificate setting forth the details of the Default, and the action which the Company proposes to take with respect thereto.

(c) The Company will notify the Trustee in writing when any Notes are listed on any national securities exchange and of any delisting.

Section 4.21 . *Listing.* The Company will use its best efforts to obtain and maintain listing of the Notes on the Official List of the Luxembourg Stock Exchange and to trade the Notes on the Euro MTF, the alternative market of the Luxembourg Stock Exchange; *provided, however,* that if the Company is unable to list the Notes on the Official List of the Luxembourg Stock Exchange and/or the Notes do not trade on the Euro MTF, or if the Company is unable to maintain such listing and trading, it will, prior to the delisting of the Notes, use its commercially reasonable efforts to obtain and maintain a listing of the Notes

on another internationally recognized stock exchange. In the event that a Restricted Subsidiary provides a Guarantee or is released from its obligations under a Guarantee at a time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and trading on the Euro MTF, the Company will, to the extent required by the rules of the Luxembourg Stock Exchange, publish notice of the granting or release of such Guarantee in a daily newspaper with general circulation in Luxembourg (which newspaper is expected to be *d'Wort*), send a copy of such notice to the Luxembourg Stock Exchange and, in the case of the grant of a Guarantee by a new Restricted Subsidiary, deposit a copy of such Guarantee with the Luxembourg Stock Exchange and the Luxembourg Paying Agent.

Section 4.22 . *Additional Amounts.* All payments under or in respect of the Notes or any Note Guaranty shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "**Taxes**") of whatever nature imposed, levied, collected, withheld or assessed of any Tax Jurisdiction unless such withholding or deduction is required by law. In the event of any such withholding or deduction imposed or levied by a Tax Jurisdiction is required to be made from any payments under or with respect to the Notes or any Note Guaranty, the Company or the relevant Guarantor, as applicable, shall pay to Holders of the Notes such additional amounts ("**Additional Amounts**") as will result in the net payment to such Holder (including Additional Amounts) of the amount that would otherwise have been receivable by such Holder in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable with respect to:

(a) any Taxes that would not have been so withheld or deducted but for the Holder or beneficial owner of the Notes having a present or former connection to the relevant Tax Jurisdiction (including having a permanent establishment in such Tax Jurisdiction, being a citizen or resident or national of, incorporated in or carrying on a business, in the relevant Tax Jurisdiction in which such Taxes are imposed) other than the mere receipt of payments in respect of the Notes or any Note Guaranty, the mere holding or ownership of such Note or beneficial interest in the Note or the exercise of any rights under the Notes, any Note Guaranty, this Indenture or the Registration Rights Agreement;

(b) where presentation is required for payment on a Note, any Taxes that would not have been so withheld or deducted if the Note had been presented for payment within 30 days after the Relevant Date, except to the extent that the Holder would have been entitled to Additional Amounts had the Note been presented on any day during such 30 day period and there were no additional withholdings or deductions as a result of such late presentment;

(c) any Taxes that would not have been so withheld or deducted but for the failure by the Holder or the beneficial owner of the Note or any payment in respect of such Note, after written request made to that Holder or beneficial owner at least 30 days before any such withholding or deduction would be payable, by the Company or the relevant Guarantor, as applicable, to comply with any certification, identification, information, documentation or other similar reporting requirement concerning its nationality, residence, identity or connection with the relevant Tax Jurisdiction, which is required or imposed by a statute, regulation or administrative practice of the relevant Taxing Jurisdiction as a precondition to exemption from all or part of such Taxes;

(d) any estate, inheritance, gift, sales, transfer, personal property or similar Taxes imposed with respect to any Note;

(e) any Taxes payable other than by withholding or deduction;

(f) any withholding or deduction imposed on a payment to an individual that is required to be made pursuant to the European Union Directive on the taxation of savings income (the "**Directive**") implementing the conclusions of the European Counsel of Economic and Finance Ministers (ECOFIN) meeting on June 3, 2003, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(g) any Taxes imposed in connection with a Note presented for payment by or on behalf of a Holder or beneficial owner thereof who would have been able to avoid such tax by presenting the relevant Note to another paying agent;

(h) any payment on a Note or a Note Guaranty to a Holder that is a fiduciary or partnership or a person other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such partnership or the beneficial owner of the payment would not have been entitled to the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the Holder of the Note or Note Guaranty; or

(i) any combination of (a) through (h) above.

Notwithstanding the foregoing, the limitations on the Company's or relevant Guarantor's obligation to pay Additional Amounts set forth in clauses (c) and (h) above shall not apply if (i) the provision of information, documentation or other evidence described in such clauses (c) and (h) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a Holder or beneficial owner of a Note (taking into account any relevant differences between U.S. and Mexican law rules, regulations or administrative practice) than comparable information or other reporting requirements imposed under U.S. tax law, regulation and administrative practice (such as IRS Forms W-8BEN and W-9) or (ii) Rule 3.23.8 issued by the Ministry of Finance and Public Credit on April 28, 2006 or a substantially similar successor of such rule is in effect, unless the provision of the information, documentation or other evidence described in clauses (c) and (h) is expressly required by statute, regulation, rule, ruling or administrative practice in order to apply Rule 3.23.8 (or a substantially similar successor of such rule), the Company cannot obtain such information, documentation or other evidence on its own through reasonable diligence and the Company otherwise would meet the requirements for application of Rule 3.23.8 (or such successor of such rule). In addition, such clauses (c) and (d) shall not be construed to require that a non-Mexican pension or retirement fund or a non-Mexican financial institution or another Holder register with the Ministry of Finance and Public Credit for the purpose of establishing eligibility for an exemption from or reduction of Mexican withholding tax or to require that a Holder or beneficial owner certify or provide information concerning whether it is or is not a tax-exempt pension or retirement fund.

If the Directive imposes taxes upon Notes presented for payment, the Company or relevant Guarantor will use commercially reasonable efforts to maintain a Paying Agent with a specified office in a Member State of the European Union that will not be obligated to withhold or deduct tax pursuant to the Directive or any law implementing or complying with, or introduced in order to conform to, the Directive.

References to principal, interest or any other amount payable on or in respect of any Note shall be deemed also to refer to any Additional Amounts which may be payable as set forth in this Indenture or in the Notes to the extent that Additional Amounts are, were or would be payable in respect thereof.

At least 10 Business Days prior to the first Interest Payment Date (and at least 10 Business Days prior to each succeeding Interest Payment Date if there has been any change with respect to the matters set forth in the below mentioned Officers' Certificate), the Company or the relevant Guarantor, as applicable, will furnish to the Trustee and the Paying Agent an Officers' Certificate instructing the Trustee and the Paying Agent whether payments of principal of or interest on the Notes due on such Interest Payment Date shall be without deduction or withholding for or on account of any Taxes by the Tax Jurisdictions. If any such deduction or withholding shall be required, at least 20 days prior to such Interest Payment Date (unless the obligation to pay Additional Amounts arises after the 20th day prior to the payment date, in which case the Company or the relevant Guarantor shall notify the Trustee and the Paying Agent in writing promptly thereafter), the Company, or the relevant Guarantor, as applicable, will furnish the Trustee and the Paying Agent with an Officers' Certificate that specifies the amount, if any, required to be withheld on such payment to Holders of the Notes. If the Company or any Guarantor is obligated to pay Additional Amounts with respect to such payment, the Officers' Certificate must also set forth any other information reasonably necessary to enable the Paying Agent to pay Additional Amounts to the Holders on the relevant payment date. For these purposes, any Officers' Certificate required by this Indenture to be provided to the Trustee and the Paying Agent shall be deemed to be duly provided if telecopied to the Trustee and such Paying Agent.

Each of the Company and the Guarantors, jointly and severally, agree to indemnify the Trustee and the Paying Agent for, and to hold each harmless against, any loss, liability or expense reasonably incurred without bad faith on its part arising out of or in connection with actions taken or omitted by it in reliance on any Officer's Certificate furnished pursuant to this Section 4.22 or any failure to furnish such a certificate.

The Company or the relevant Guarantor, as applicable, will make all withholdings and deductions required by law and will remit the full amount deducted or withheld to the relevant tax authority in accordance with applicable law. The Company or the relevant Guarantor, as applicable, will obtain official receipts from each tax authority evidencing the payment of any Taxes so deducted or withheld, or, if such receipts are not obtainable, such other documentation reasonably acceptable to the Trustee. The Company, or the relevant Guarantor, as applicable, shall furnish to the Trustee the official receipts (or a certified copy of the official receipts or other such documentation, as applicable) evidencing payment of Taxes. The Company or the relevant Guarantor, as applicable, will attach to each certified copy or other such documentation, as applicable, a certificate stating (x) that the amount of such Tax evidenced by the certified copy was paid in connection with payments under or with respect to the Notes then outstanding upon which such Taxes were due and (y) the amount of such withholding tax paid per $1,000 of principal amount of the Notes. Copies of such receipts or other such documentation, as applicable, shall be made available to Holders of the Notes upon request.

The Company and the relevant Guarantor, as applicable, shall promptly pay when due, and indemnify the Holder for, any present or future stamp, issue, registration, court and/or documentary taxes, and/or any other excise taxes, similar charges or

similar levies imposed by the Tax Jurisdictions on the execution, delivery, registration or enforcement of any of the Notes, this Indenture, any Note Guaranty or any other document or instrument referred to herein or therein.

The Company and the relevant Guarantor, as applicable, will indemnify and hold harmless each Holder of Notes and, upon written request of any Holder of Notes, reimburse each such Holder, for the amount of:

(1) any Taxes (other than Taxes excluded under clauses (a) through (h)) levied or imposed and paid by such Holder as a result of payments made on or with respect to the Notes; provided that reasonable supporting documentation is provided; and

(2) any Taxes (other than Taxes excluded under clauses (a) through (h)) levied or imposed with respect to any reimbursement under the foregoing clause (1), so that the net amount received by such Holder after such reimbursement will not be less than the net amount the Holder would have received if Taxes (other than Taxes excluded under clauses (a) through (h)) on such reimbursement had not been imposed.

Any payments made pursuant to the preceding sentence will be treated as Additional Amounts for all relevant purposes.

The obligations of the Company and the Guarantor pursuant to this Section 4.22 shall survive termination or discharge of this Indenture, payment of the Notes and/or resignation or removal of the Trustee or the Paying Agent.

Section 4.23 . *Additional Interest.* If Additional Interest is payable by the Company pursuant to the Registration Rights Agreement, the Company shall deliver to the Trustee an Officers' Certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such Additional Interest is payable. Unless and until a Responsible Officer of the Trustee receives such a certificate, the Trustee may assume without inquiry that no Additional Interest is payable. If the Company has paid Additional Interest directly to the persons entitled to it, the Company shall deliver to the Trustee an Officers' Certificate setting forth the particulars of such payment.

Section 4.24 . *Interest Rate Adjustment.* (a) The interest rate on the Notes specified in the Notes (increased as the case may be with Additional Interest) will increase by 1.00% per annum commencing on the date that is 90 days after the Issue Date if, as of such date, each of the Specified Guarantors has not unconditionally guaranteed, jointly and severally, on an unsecured basis, the obligations of the Company pursuant to the Notes and this Indenture by executing a supplemental indenture in the form of Exhibit B.

(b) To avoid any such interest rate adjustment, the Company shall deliver to the Trustee (x) an Officers' Certificate to the effect that none of the conditions requiring an interest rate adjustment are continuing and that represents that the supplemental indenture has been duly authorized, executed and delivered by the Specified Guarantors and constitutes a valid and binding obligation of the Specified Guarantors, enforceable against each of the Specified Guarantors in accordance with its terms (subject to customary exceptions), and (y) copies of each of the relevant supplemental indentures and any other related documentation.

Upon delivery of the above, the interest rate adjustment will no longer remain in effect.

## Article 5
## Consolidation, Merger, Lease or Sale of Assets

Section 5.01 . *Consolidation, Merger, Lease or Sale of All or Substantially All Assets by the Company; No Lease of All or Substantially All Assets.* (a) The Company will not

    (i) consolidate with or merge with or into any Person, or

    (ii) sell, convey, transfer, or otherwise dispose of all or substantially all of its assets as an entirety or substantially an entirety, in one transaction or a series of related transactions, to any Person or

    (iii) permit any Person to merge with or into the Company

unless